**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RALPH WHITLEY, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BP P.L.C., ANTHONY HAYWARD, IAIN C. CONN, ROBERT W. DUDLEY, BYRON E. GROTE, ANDY G. INGLIS, CARL-HENRIC SVANBERG, PAUL M. ANDERSON, ANTONY BURGMANS, CYNTHIA B. CARROLL, SIR WILLIAM M. CASTELL, GEORGE DAVID, IAN DAVIS, DOUGLAS J. FLINT, DEANNE S. JULIUS, THE SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, RICHARD J. DORAZIL, and JOHN DOES 1-20,<br><br>Defendants. | Civil Action:<br><br>10 CIV 4935<br><br> |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, on behalf of the BP Employee Savings Plan, BP Capital Accumulation Plan, BP Partnership Savings Plan, and BP Direct SavePlan (collectively, the "Plan"), covering substantially all employees of BP P.L.C. and its subsidiaries (collectively "BP" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this action on behalf of the Plan and all Participants and beneficiaries in the Plan to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including injunctive relief

and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.      From January 1, 2010 through the present (the "Class Period"), the Plan acquired and held BP American Depository Shares ("BP ADSs"), which were offered as one of the retirement saving options in the participant contribution component of the Plan.

3.      Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in BP ADSs by, among other things: (i) continuing to offer BP ADSs as a retirement saving option; (ii) continuing to acquire and hold BP ADSs in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the prudence of investing in BP ADSs; and (iv) maintaining the Plan's pre-existing investment in BP ADSs when it was no longer a prudent investment for the Plan.

4.      As a result of Defendants' fiduciary breaches, as alleged herein, the Plan suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5.      Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

6. In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

### JURISDICTION AND VENUE

7. ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

8. ***Personal Jurisdiction.*** ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9. ***Venue.*** Venue is proper in this District. BP's ADSs trade on the New York Stock Exchange ("NYSE").

- 3 -

## PARTIES

### Plaintiff

10.     *Plaintiff Ralph Whitley* ("Whitley") is a former BP employee and is a participant in the BP Employee Savings Plan.

### Defendants

**A.     The Company**

11.     *Defendant BP* is one of the world's leading international oil and gas companies. BP operates in more than 80 countries, providing customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products for everyday items.  BP does business within this District.

**A.     Board of Directors**

12.     *Defendant Anthony Hayward* ("Hayward") is BP's Chief Executive Officer ("CEO") and a member of its Board of Directors (the "Board").  Defendant Hayward has been BP's CEO since May 2007 and has worked for BP or its subsidiaries since 1982.  Defendant Hayward held a series of roles in exploration and production, becoming a director of exploration and production in 1997.  In 2000, Defendant Hayward was made group treasurer and an executive vice president in 2002.  He was chief executive officer of exploration and production between 2002 and 2007.  He became an executive director of BP in 2003.  During the Class Period, Defendant Hayward was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

13.   ***Defendant Iain C. Conn*** ("Conn") has served as BP's head of refining and marketing since 2007 and as an Executive Director of the Board since 2004. Defendant Conn joined BP in 1986 and served in a variety of roles, including group vice president of BP's refining and marketing business from 2000 to 2002, chief executive of petrochemicals from 2002 to 2004, and group executive officer from 2004 to 2007, before being appointed head of refining and marketing. During the Class Period, Defendant Conn was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

14.   ***Defendant Robert W. Dudley*** ("Dudley") has served as BP's Managing Director and Executive Director on the Board since April 2009. Defendant Dudley joined the Amoco Corporation, which merged with BP in 1998, in 1979. Before he was appointed Director, following a variety of posts, Defendant Dudley served as president and chief executive officer of a BP subsidiary from 2003 until 2008. During the Class Period, Defendant Dudley was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

15.   ***Defendant Byron E. Grote*** ("Grote") is Chief Financial Officer ("CFO") and a member of the Board. Defendant Grote joined BP in 1987 following the acquisition of The Standard Oil Company of Ohio, where he had worked since 1979. Defendant Grote was

appointed an Executive Director of BP in 2000 and Chief Financial Officer in 2002. During the Class Period, Defendant Grote was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

16.     **Defendant Andy G. Inglis** ("Inglis") is an Executive Director and Chief Executive of Exploration and Production. Defendant Inglis has worked for BP in various capacities since 1980 and has held his current positions since 2007. During the Class Period, Defendant Inglis was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

17.     **Defendant Carl-Henric Svanberg** ("Svanberg") is the Chairman of the Board of BP. Defendant Svanberg was appointed a Non-Executive Director of BP in September 2009 and became Chairman in January 2010. Defendant Svanberg also heads the Chairman's Committee and is a member of BP's Nomination Committee. During the Class Period, Defendant Svanberg was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

18.    *Defendant Paul M. Anderson* ("Anderson") is a Non-Executive member of the Board.   Defendant Anderson joined the Board in February 2010 and is a member of the Chairman's Committee and the Safety, Ethics and Environment Assurance Committee.  During the Class Period, Defendant Anderson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

19.    *Defendant Antony Burgmans* ("Burgmans") joined BP's Board in 2004. Defendant Burgmans is a member of the Chairman's, Remuneration, and Safety, Ethics and Environment Assurance Committees.  During the Class Period, Defendant Burgmans was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

20.    *Defendant Cynthia B. Carroll* ("Carroll") is a member of BP's Board.  Defendant Carroll has served on the Board since 2007 and is a member of the Chairman's and Safety, Ethics and Environment Assurance Committees.  During the Class Period, Defendant Carroll was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the

management of the Plan's assets.

21.     *Defendant Sir William M. Castell* ("Castell") has been a member of BP's Board since 2006. Defendant Castell is a member of the Chairman's and the Nomination Committees and is Chairman of the Safety, Ethics and Environment Assurance Committee. During the Class Period, Defendant Castell was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

22.     *Defendant George David* ("David") is member of BP's Board. Defendant David joined the Board in 2008 and is a member of the Chairman's, Audit and Remuneration Committees. During the Class Period, Defendant David was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

23.     *Defendant Ian Davis* ("Davis") is a member of BP's Board. Defendant Davis joined in the Board in April 2010 and is a member of the Chairman's Remuneration, and Audit Committees. During the Class Period, Defendant Davis was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

- 8 -

24.    *Defendant Douglas J. Flint* ("Flint") has served as a Non-Executive Director on BP's Board since 2005. Defendant Flint is a member of the Chairman's and Audit Committees. During the Class Period, Defendant Flint was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

25.    *Defendant DeAnne S. Julius* ("Julius") has served as a Non-Executive Director of BP since 2001. Defendant Julius is a member of the Chairman's and Nomination Committees and is Chairman of the Remuneration Committee. During the Class Period, Defendant Julius was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

26.    Defendants Hayward, Conn, Dudley, Grote, Inglis, Svanberg, Anderson, Burgmans, Carroll, Castell, David, Davis, Flint, and Julius are herein referred to as the "Director Defendants."

**C.    The Savings Plan Investment Oversight
Committee of BP Corporation North America Inc.**

27.    *Defendant The Savings Plan Investment Oversight Committee of BP Corporation North America Inc.* (the "Committee"). Upon information and belief, the Committee is comprised of certain Company employees and officers. The Committee is charged with the day-to-day management and administration of the Plan or management and disposition

of the Plan's assets.

28.     **Defendant Richard J. Dorazil** ("Dorazil") was, during part of the Class Period, the Plan Administrator. Defendant Dorazil was at all relevant times the Vice President-HR Total Reward Western Hemisphere for BP. Defendant Dorazil signed SEC filings for the Plan during the Class Period.   During the Class Period, Defendant Dorazil was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

29.     **Defendants John Does 1-20** were persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets. John Does 1-20 failed to properly appoint, monitor and inform such persons in that these Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, these Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by BP during the Class Period identified herein) but nonetheless continued to allow such persons to offer BP ADSs as investment options under the Plan when the market prices of BP ADSs were artificially inflated and when BP ADSs were not prudent investments for Participants' retirement accounts under the Plan.   Liability is only asserted against each of these Defendants for such periods of time as these Defendants acted as a fiduciary with respect to the Plan.

## CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between January 1, 2010 and the present, inclusive (the "Class Period) and whose accounts held BP ADSs or units in the BP Fund, but excluding all named defendants and their heirs or successors in interest.

31.    While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, the members of the Class are so numerous that joinder of all members is impracticable.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(i)    whether Defendants violated ERISA.

33.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct as complained of herein.

34. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35. Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

36. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

37. In the alternative, Plaintiff requests that the Court allow him to proceed under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2). Section 502(a)(2), 29 U.S.C. § 1132(a)(2) states that "[a] civil action may be brought -- by the Secretary [of Labor], or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]" ERISA Section 409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make*

> *good to such plan any losses to the plan resulting from each such*
> *breach, and to restore to such plan any profits of such fiduciary*
> *which have been made through use of assets of the plan by the*
> *fiduciary,* and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

(Emphasis added).

## THE PLAN

38.     The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and

(3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

39.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. §

1132(d)(1).

40.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a

defendant.  Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its

Participants.

41.     The Plan is "defined contribution plan" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual

accounts for each participant and for benefits based solely upon the amount contributed to the

Participants' account, and any income, expenses, gains and losses, and any forfeitures of

accounts of other Participants which may be allocated to such Participants' accounts.

Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated

to each individual's account.

42.     The Plan is a voluntary contribution plan whereby Participants make contributions

to the Plan and direct the Plan to purchase investments with those contributions from options

pre-selected by Defendants which are then allocated to Participants' individual accounts.

43.     The Plan Participants may invest their contributions and employer contributions

in one or more of the investment options offered by the Plan.  Investment income, representing

interest and dividends, and changes in the fair value of investments, are credited to each

participant on a daily basis based upon individual investment options selected.

44.    The Plan's June 16, 2010 Form 11-K ("2010 Form 11-K") states in relevant part:

### BP Employee Savings Plan

The BP Employee Savings Plan ("ESP") was established on July 1, 1955. Generally, an employee of the Company or a participating affiliate is eligible to participate in ESP immediately after date of hire, as long as that employee is not eligible to participate in a separate Company-sponsored defined contribution plan, or the employee is represented by a labor organization that has bargained for and agreed to the provisions of ESP.

Under ESP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to Internal Revenue Service ("IRS") limits. Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. A specified portion of the employee contribution, up to a maximum of 7% of compensation, as defined, is matched by the Company. Participants are permitted to rollover amounts into ESP representing distributions from other qualified plans.

The benefit to which a participant is entitled is the benefit which can be provided by the participant's vested account balance. Participants are immediately and fully vested in their participant contribution accounts. Vesting in Company matching contribution accounts is dependent upon specific criteria as described in the plan document. At December 31, 2009 and 2008, forfeited nonvested accounts totaled $475,032 and $292,188, respectively. ESP may use forfeitures to reduce future Company matching contributions or to pay plan expenses. [...].

### BP Capital Accumulation Plan

The BP Capital Accumulation Plan ("CAP") was established on July 1, 1988. Employees of the Company and its subsidiaries who are represented employees at the Carson, California refinery are eligible to participate in CAP. The plan was frozen to new participants effective January 1, 2002.

Under CAP, participants may contribute up to 27% of their base pay, subject to IRS limits. Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. The Company makes matching contributions to the participant's account at 160% of the participant's pre-tax contribution, up to a maximum Company contribution of 8% of the participant's base salary. Participants are permitted to rollover amounts into CAP representing distributions from other qualified plans.

- 14 -

All contributions and earnings are immediately vested and nonforfeitable. The benefit to which a participant is entitled is the benefit which can be provided by the participant's account balance.

### BP Partnership Savings Plan

The BP Partnership Savings Plan ("PSP") was established on April 1, 1988. Certain salaried employees of the Company who are associated with the Company's retail operations are eligible to participate in PSP after date of hire. Prior to October 1, 2009, eligibility required the completion of six months of service and the attainment of age 21.

Under PSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits. Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. A specified portion of the employee contribution, up to a maximum of 3% of compensation, as defined, is matched by the Company. Participants are permitted to rollover amounts into PSP representing distributions from other qualified plans.

The benefit to which a participant is entitled is the benefit which can be provided by the participant's vested account balance. Participants are immediately and fully vested in their participant contribution accounts. Vesting in Company matching contribution accounts is dependent upon specific criteria as described in the plan document. At December 31, 2009 and 2008, forfeited nonvested accounts totaled $65,450 and $96,368, respectively. The plan may use forfeitures to reduce future Company matching contributions or to pay plan expenses. Employees who terminated employment in conjunction with the divestment of the Company-operated retail locations were fully vested.

### BP DirectSave Plan

The BP DirectSave Plan ("DSP") was established on April 1, 1988. Employees of the Company and its subsidiaries who are hourly employees at Company-operated retail locations, plane fueling or fuel system operations are eligible to participate in the Plan after the completion of six months of service and the attainment of age 21. All Company-operated retail locations were divested during 2009. Currently there are no active employees participating in the Plan.

Under DSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits. Participants who attain age 50 before the end of the applicable year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. Except for eligible employees of Air BP, the Company makes matching contributions to the participant's account equal to $0.50 for each $1.00 of employee contributions up to 4% of compensation. Participants are permitted

to rollover amounts into DSP representing distributions from other qualified plans.

The benefit to which a participant is entitled is the benefit which can be provided by the participant's vested account balance. Participants are immediately and fully vested in their participant contribution accounts. Vesting in Company matching contribution accounts is dependent upon specific criteria as described in the plan document. At December 31, 2009 and 2008, forfeited nonvested accounts totaled $202,976 and $191,413, respectively. DSP may use forfeitures to reduce future Company matching contributions or to pay plan expenses. Employees who terminated employment in conjunction with the divestment of the Company-operated retail locations were fully vested.

*Id.* at 5-7.

45.     The purpose of the Plan is to encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement. *See* 2010 Form 11-K, at 5.

46.     The trustee of the Master Trust is State Street Bank and Trust Company. *See id.*

47.     The Company is the Plan sponsor and the Company's Vice President - HR Total Reward, Western Hemisphere is the Plan Administrator for the Plan. *See id.*

48.     Further, pursuant to the 2010 Form 11-K:

*Investment Options*

Participants may elect to invest in numerous investment options offered under their respective plan. Participants may change the percentage they contribute and the investment direction of their contributions at any time. Company contributions are made in the form of cash contributions and are invested in funds selected by participants. Participants may elect to sell any portion of their investment fund(s) and reinvest the proceeds in one or more of the other available investment alternatives. Except where the fund provider, the recordkeeper, or the plan has restrictions or takes discretionary action responsive to frequent trading or market timing concerns, there are no restrictions on the number of transactions a participant may authorize during the year.

Effective September 1, 2009, the investment options offered under the Plans were revised. The revised investment options comprise target date funds, index funds, a short-term investment fund, a stable value fund and the BP stock fund. Several investment options offered will be eliminated. Unless directed otherwise, new participant contributions invested in a discontinued investment option after December 31, 2009 were redirected into an age

appropriate target date fund. Participants will have until close of business on August 31, 2010 to transfer balances out of discontinued funds. Balances remaining in a discontinued fund at close of business on August 31, 2010 will be transferred into an age appropriate target date fund.

## A.   The Plan Fiduciaries

49.   *Named Fiduciaries*.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

50.   *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

51.   Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

52.   As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

53.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

54.     In the past several years, BP has sought to change its image from just another oil company into one of "Beyond Petroleum"— *i.e.*, a company that was environmentally conscious and wanted to develop alternative energy sources like solar and wind power.

55.     However, in devising new ways to brand the Company, BP recklessly let the crucial values of maintenance and safety fall into a custom more honored in the breach than the observance. Safety and maintenance problems were endemic throughout the Company, including at the Deepwater Horizon rig. Moreover, additional safety mechanisms, technologies, and precautions were known and available to all Defendants, but Defendants chose not to employ them on the rig.

56.     In 2005, an explosion and fire ripped through a tower at a BP refinery in Texas City, Texas, killing 15 people, injuring 170 others, and costing BP more than $1 billion to remediate. Investigators determined that BP had ignored its own protocols on operating the tower, which was filled with gasoline, and that a warning system had been disabled. The Company pleaded guilty to federal felony charges and was fined more than $50 million by the U.S. Environmental Protection Agency. In addition, BP officers signed a settlement with federal

safety inspectors vowing to institute improvements, but in 2009 the federal Occupational Safety and Health Administration ("OSHA") imposed an $87 million fine — the largest in its history — on the Company for failing to correct the safety violations at the Texas City plant. OSHA declared that there was a "serious systematic safety problem" throughout the Company.

57. In 2006, the Company shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. BP had been warned to check the pipeline in 2002, but did not do so. The Company was fined $20 million in criminal penalties after prosecutors charged it with neglecting corroded pipelines. Moreover, a Congressional committee later determined that BP had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations. The incident led to the resignation under fire of The Lord John Browne of Madingley, BP's former CEO.

58. The risks of offshore drilling were well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are far more precarious and subject to serious accidents. The Deepwater Horizon rig itself was badly burned by an accidental fire in 2005, and the accidental opening of a valve in May 2008 flooded the rig with seawater, causing very substantial damage.

**Defendants' Continued Disregard of Risks**

59. When Defendant Hayward took office in 2007, he promised to change the Company's culture, with a renewed commitment to safety. However, the record shows this promise to have been an empty one, as Defendant Hayward and the other Defendants have led the Company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures heedless of safety and environmental concerns.

- 19 -

60.     In 2009, when the federal Minerals Management Service ("MMS") proposed a rule that would have required companies to have their safety and environmental management programs audited once every three years, Defendants lodged a formal objection on behalf of BP. That same agency is also investigating charges by a whistle-blower that the Company discarded important records from its Atlantis Gulf platform.

61.     Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting, against all evidence, that voluntary compliance would suffice. In 2009, Defendants caused the Company to spend $16 million lobbying the federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and Defendants' knowledge of the high risks involved in such drilling.

62.     Further, in the months before the Deepwater Horizon rig sank in a ball of fire, the Company had four close calls on pipelines and facilities it operates in Alaska, as detailed in a January 14, 2010, letter written by two U.S. Congressmen, Rep. Bart Stupak and Rep. Henry Waxman, to the president of BP's Alaskan operations. These congressmen's letter specifically noted that the Company's efforts to cut costs could imperil safety at BP facilities. The letter, which was accompanied by a congressional document request and was referred to BP's legal department and the Safety, Ethics and Environment Assurance Committee of its Board of Directors, raised an unmistakable "red flag" that went ignored by Defendants.

63.     In the year before the accident, BP had repeatedly and aggressively cut costs. A re-organization stripped 5,000 jobs from its payroll, saving BP more than $4 billion in operating costs.

64.     The congressmen had been investigating BP since the Prudhoe Bay incident in

2006.  In their letter, the congressmen noted "several significant events" in BP's Alaskan

operations in the previous 15 months:

- **September 29, 2008**: An 8-inch high pressure gas line at the Y-Pad location "separated," sending 3 pieces of pipe to the tundra.  Two segments of the pipe measuring 14 feet and 28 feet in length landed 900 feet from the pipeline.  Roughly 30 minutes later, a second and unrelated incident occurred on the SPad, causing a gas release.

- **January 15, 2009**: A disc cleaning "pig" became lodged and lost in a 34-inch Oil Transit Line during de-oiling, allowing gas to pass around the pig and travel through Skid 50 to Pump Station 1, causing significant venting of gas to the atmosphere and the complete, temporary shutdown of the TAPS.

- **October 10, 2009**: At the Central Compressor Plant, low pressure flare staging valves stuck closed, causing gas to travel to the backup low pressure flare valves, which activated and caused gas to vent improperly into the atmosphere.  This incident could have caused an explosion.  In a briefing, you reported to Committee staff that the pilot on the backup flare was not lit and that cameras, while on, were not pointed at the flare location, which prevented BP staff from knowing the pilot was out.

- **November 29, 2009**: An 18-inch pipe near the Lisburne Production Center that was carrying a mixture of crude oil, produced water, and natural gas ruptured, spraying its contents over an estimated 8,400 square feet area.

In addition to these four events, BPXA has experienced a number of personnel incidents involving serious injury or death, including two within three weeks of each other in which individuals were crushed by their own vehicles.  A vehicle incident at Prudhoe Bay's North Gas Injection Pad on November 18, 2009 resulted in the death of a BP contract employee.

65.     The letter continued:  *"At the same time these events are occurring, Committee*

*staff have received reports that proposed budget cuts by BP may threaten the company's ability*

*to maintain safe operations."*  (Emphasis added).

**Deepwater Horizon:  Safety and Maintenance Concerns at their Lowest**

66.     On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil or natural gas

erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico off the shores of

Louisiana, engulfing the Deepwater Horizon oil rig managed by BP in fire and sinking the rig 36

hours later. The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil leak in the Gulf, covering at least 3,850 square miles of fragile ocean and wetlands marine life. The disaster threatens to become the worst oil spill in history — far worse than the famous 1989 Exxon Valdez disaster — endangering the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come and wiping out the habitat of hundreds of species of marine and oceanic life. More than 400 species, including whales and dolphins, face a dire threat from the spill, along with Louisiana's barrier islands and marshlands.

67.     Prior to its destruction, the rig was an ultra-deepwater dynamic-positioned, semi-submersible oil rig. It was owned and operated by Transocean and leased to BP through September 2013. BP leased the rig to drill an exploratory well at the Macondo prospect site in Mississippi Canyon Block 252, located on the outer continental shelf off the coast of Louisiana. The rig was positioned about 50 miles southeast of Venice, Louisiana, in water nearly 5,000 feet deep. At the time of the explosion, drilling was being conducted at over 22,000 feet — 2,000 feet deeper than allowed by federal permitting.

68.     The leak is spilling, by conservative estimates, over 5,000 barrels of petroleum — equivalent to over 200,000 gallons — into the Gulf of Mexico each day. At the time of the commencement of this action, some estimates place the discharge at 25,000 barrels (or 1,100,000 gallons) per day. According to BP's own prospectus filed with the MMS, if the pipe system at the rig eroded completely, the leakage could escalate to 163,000 barrels per day (6,800,000 gallons), a truly cataclysmic figure.

69.     At the time of the explosion, the rig was not producing any oil. The rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well. In this final phase, Halliburton workers on the rig,

under the supervision and control of BP employees, were attempting to create a cement seal to plug off the wellhead. BP employees under the supervision and control of one or more of the Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

70.    Cementing a wellhead, particularly in deep water, is delicate work that carries the risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well. Indeed, Defendants knew that the work being performed at the Deepwater Horizon rig was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the rig was doing when it exploded. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

71.    Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with alarming regularity, and most frequently of all in the Gulf of Mexico. Cementing was a factor in 18 of 39 well blowouts between 1992 and 2006. Nearly all of the blowouts examined occurred in the Gulf.

72.    Halliburton was responsible for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged. The MMS is investigating that incident, and an MMS official has testified that a poor cement job likely caused the blowout. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

73.    Moreover, a blowout preventer manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000. In that incident, BP issued a notice of default to Transocean concerning the functioning of one of Transocean's oil

rigs, in which the blowout preventer was the subject of concern.   Defendant Hayward acknowledged the existence of this dispute in public comments on May 4, 2010. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

74.    In addition, Defendants were aware of an August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work.  During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.  This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

75.    The threat of blowouts increases as drilling depth increases.  Deepwater Horizon was drilling in 5,000 feet of water, to a total depth in excess of 20,000 feet.  Defendants were well aware of the high risk of blowouts from such deep drilling.

76.    Not only did the blowout preventer on the Deepwater Horizon rig fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.  Worse, Defendants failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

77.    First, Defendants consciously elected not to install an acoustically activated remote-control shut-off valve, costing only $500,000, to the well.  Such acoustic switches are mandated in countries like Brazil and Norway, and are routinely employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of the Defendants themselves as well as their counterparts at other companies.

78.    Second, Defendants chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. Much like blowout preventers, devices that are meant to seal leaks, this valve could have served as a cutoff of last resort in explosions.

79.    Defendants ignored these precautions despite being well aware of the increased risk, from deep-sea drilling, of a failure of the primary blowout safety mechanism, the blowout preventer. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

80.    A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such great depths. Only three of 14 rigs studied had blowout preventers able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

**Further Evidence Emerges of Defendants' Misconduct as to Safety Issues**

81.    In the aftermath of the explosion and spill, Congress, as well as the federal MMS, has commenced separate investigations of allegations that BP failed to keep proper documentation about how to perform an emergency shutdown of the Atlantis, another Gulf oil platform similar to Deepwater Horizon.

82.    As reported in the *Guardian* ("Whistleblower accuse BP over rig documents: A contract worker at BP raised safety concerns after accusing it of failing to keep key documents for its Atlantis rig," Apr. 27, 2010):

- 25 -

The Guardian has learned a separate MMS investigation into the Atlantis rig allegations is being launched. MMS said it would complete its report by the end of next month. Atlantis, 190 miles south of New Orleans, is the world's largest platform of its kind and began operating in 2007 in the Gulf of Mexico at one of the deepest depths in the world.

A whistleblower employed by a contractor working for BP leaked internal emails from staffers dated August 2008 which appear to reveal concerns that BP may not have been keeping a complete accurate record of drawings of the components used to build the Atlantis platform.

Final "as-built" drawings show how generic parts are modified when they are assembled. They can be crucial to assess how such a complex structure operates in practice. It is federal law for rig operators to keep complete, up-to-date "as-built" drawings. If BP assumed the drawings were accurate and up-to-date, "this could lead to catastrophic operator errors", a BP executive involved in the project warned colleagues, according to one email.

At the end of February, the powerful House committee on natural resources wrote to MMS demanding it investigate the claims. The agency, which declined to provide further details to the Guardian , promised to launch the inquiry soon afterwards.

The Deepwater Horizon accident has reinforced environmental concerns in the US about offshore oil drilling and will put pressure on the MMS to ensure standards are fully met by all operators, particularly in the deep waters of the Gulf of Mexico.

US environmental consumer campaign group Food and Water Watch also passed to the Guardian what appears to be an official reply to the whistleblower from BP's office of the ombudsman, which was set up to investigate internal safety concerns following the Texas refinery explosion of 2005. Dated 13 April 2010, deputy ombudsman Billie Pirner Garde is quoted responding to the whistleblower's concerns over BP's 'Project Execution Plan' over Atlantis, centring on the alleged lack of documentation. "Your concerns about the project not following the terms of its own Project Execution Plan were substantiated, and addressed by a BP Management of Change document," he is quoted as writing.

## THE LAW UNDER ERISA

83.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

84.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

85.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

86.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in BP ADSs, to ensure that each investment is a suitable option for the Plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)     a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that

silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

87.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly fails to disclose, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

88.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

89.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

90.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the

management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

91.     During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in BP ADSs.  Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

92.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSATION

93.     Upon information and belief, the Plan suffered millions of dollars in losses in Plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in BP ADSs during the Class Period, in breach of Defendants' fiduciary duties. These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

94.     Defendants are responsible for losses in the Plan benefits caused by the Participants' direction of investment in BP ADSs, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants provided inaccurate and

incomplete information to the Plan Participants regarding the true health and ongoing profitability of the Company, thereby misrepresenting the Company's soundness as an investment vehicle. As a consequence, Participants could not exercise independent control over their investments in BP ADSs, and Defendants remain liable under ERISA for losses caused by such investment.

95. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in BP ADSs, eliminating such BP ADSs as an investment alternative when it became imprudent, and divesting the Plan from its holdings of BP ADSs when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

96. Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to his detriment on the misstatements and omissions that Defendants made to the Plan Participants and upon Defendants' conduct.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

97. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in BP ADSs during the Class Period. As a consequence of Defendants' breaches, the Plan suffered significant losses.

98. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . .

- 30 -

. to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

99.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

100.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

101.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## CAUSES OF ACTION

### FIRST CLAIM:  INVESTMENT IN BP ADSs
### (AGAINST ALL DEFENDANTS)

102.    Plaintiff realleges and incorporate herein by reference the allegations set forth above.

103.    Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

104.    Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.  Defendants' selection, monitoring, and continuation of the investment alternatives under the Plan were subject to the above-described fiduciary duties.  By their continuing to offer BP ADSs as an investment under the Plan, when BP's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

105.    As a consequence of Defendants' breaches, the Plan suffered losses.

106.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

107.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### SECOND CLAIM:  DIVIDED LOYALTY
### (AGAINST ALL DEFENDANTS)

108.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

109. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

110. Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plan solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

111. Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

112. As a consequence of these breaches, the Plan suffered losses.

113. Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

114. Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### THIRD CLAIM: MISMANAGEMENT OF PLAN ASSETS
### (AGAINST ALL DEFENDANTS)

115. Plaintiff realleges and incorporates herein by reference the allegations set forth above.

116. Pursuant to ERISA § 409(a), 29 U.S.C. § 110(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to a plan any losses to that plan resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

117. Pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), Defendants were required to discharge their duties with respect to the Plan solely in the interests of the Participants with the

care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

118.    Defendants breached these duties in that the Plan invested in BP ADSs when the price of BP ADSs was artificially inflated and when BP ADSs were not a prudent retirement investment, thereby failing to diversify assets so as to minimize the risk of large losses.

119.    As a consequence of these breaches, the Plan suffered losses.

120.    Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

121.    Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## FOURTH CLAIM: BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR AND INFORM THE PLAN ADMINISTRATOR(S) (AGAINST THE MONITORING DEFENDANTS ONLY)

122.    Plaintiff realleges and incorporates herein by reference the allegations set forth above.

123.    Defendants Hayward, Conn, Dudley, Grote, Inglis, Svanberg, Anderson, Burgmans, Carroll, Castell, David, Davis, Flint, and Julius (the "Monitoring Defendants") had the duty and responsibility to properly appoint, monitor and inform the Plan Administrator(s) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.

124.    The Monitoring Defendants failed to properly appoint, monitor and inform such persons in that the Monitoring Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Monitoring

Defendants did adequately inform such persons of the true operating condition of the Company (including the operating problems being experienced by BP during the Class Period identified herein) but nonetheless continued to allow such persons to offer BP ADSs as an investment option under the Plan even though the market price of BP ADSs were artificially inflated and even though BP ADSs were not a prudent investment for Participants' retirement accounts under the Plan.

125.   As a consequence of these breaches, the Plan suffered losses.

126.   The Monitoring Defendants are individually liable to make good to the Plan any losses to the Plan resulting from each breach.

127.   Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for:

A   Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

C.   Imposition of a Constructive Trust on any amounts by which any Defendants was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D. An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in BP ADSs;

E. Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses

F. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G. An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated: June 24, 2010

**SQUITIERI & FEARON, LLP**

By: _____
    Stephen J. Fearon, Jr.
    32 East 57th Street, 12th Floor
    New York, New York 10022
    Tel: (212) 421-6492
    Fax: (212) 421-6553
    Email: stephen@sfclasslaw.com

**EGLESTON LAW FIRM**
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: egleston@gme-law.com
Email: greg.egleston@gmail.com

*Attorneys for Plaintiff*