EXHIBIT J

## INVESTMENT MANAGER AGREEMENT

This Investment Manager Agreement dated as of the 5'th day of April, 2000 (this "Agreement") by and between BP Amoco Corporation, an Indiana corporation (hereinafter "Company"), and State Street Bank and Trust Company (hereinafter the "Investment Manager").

## RECITALS

1. Pursuant to resolutions, the Board of Directors of the Company and BP America, Inc. ("BP America") designated the Company's Investment Committee as the "named fiduciary" under the Employee Retirement Income Security Act of 1974 ("ERISA") for purposes of selecting investment managers under the Company's and BP America's employee benefit plans. Pursuant to this delegation of authority, the Investment Committee has selected the Investment Manager and, subject to the terms and conditions of this Agreement, hereby delegates fiduciary authority to the Investment Manager.

2. The Company and the Investment Manager have heretofore entered into an Amended and Restated Investment Manager Agreement dated as of June 25, 1998 (the "Prior Agreement") with respect to the Amoco Employee Savings Plan (the "Prior Plan").

3. The Prior Plan is being amended and restated as the BP Amoco Employee Savings Plan.

4. The Company and the Investment Manager desire to enter into a new agreement with respect to the BP Amoco Employee Savings Plan, the BP Amoco Partnership Savings Plan and the BP Amoco Direct Save Plan (such plans collectively referred to as the "Plan").

In consideration of the mutual covenants contained herein, the parties hereto agree as follows:

1.     <u>Trust and Appointment of the Investment Manager</u>

    (a)    The Prior Agreement is terminated the effective date of this Agreement.  The management fee payable to the Investment Manager under the Prior Agreement shall be prorated to the effective date of termination of the Prior Agreement.  On the effective date of the Agreement, all the assets in the Investment Accounts in the Prior Agreement shall be transferred by the Investment Manager into corresponding Investment Accounts established under the Agreement.  In some circumstances, a transfer of assets may not need to take place as there may only be a change of name to occur with respect to the Investment Account to reflect the new name of the Plan.

    (b)    Under the BP Amoco Master Trust for Employee Savings Plans dated as of April 1, 2000 (hereinafter "Trust"), State Street Bank and Trust Company, a trust company organized under the laws of the Commonwealth of Massachusetts (hereinafter "Trustee") is the Trustee of the Trust Fund ("Trust Fund") established therein.  A copy of the Trust, together with amendments thereto to date if any, is

attached hereto as <u>Exhibit "A"</u> and hereby made a part hereof.  A copy of any further amendments of the Trust from time to time shall be furnished to the Investment Manager and thereafter also shall be a part hereof.

(c)  In Sections 4.1 and 4.5 of the Trust, the Company reserves the right to direct the segregation from time to time of portions of the Trust Fund into separate investment accounts (hereinafter "Investment Accounts") and to appoint the Investment Managers for such Investment Accounts.  The Investment Manager in this Agreement hereby is appointed, effective this date, to be the Investment Manager as provided for in the Trust, and shall have the rights, duties and obligations of the Investment Manager as provided in the Trust and in this Agreement, all with respect to the assets in the Investment Accounts as described in the schedules attached hereto as <u>Exhibit "B"</u> and hereby made a part hereof. The Investment Manager hereby accepts such appointment.

2.  <u>Investment of Funds</u>

(a)  The Investment Manager represents that it is: (i) registered as an investment adviser under the Investment Advisers Act of 1940, or (ii) a bank as defined in that Act, or (iii) an insurance company qualified to perform the investment manager services under the laws of more than one state.

(b)  The Investment Manager acknowledges that the Trust and the Investment Accounts all referred to above are subject to the provisions of ERISA, that the Investment Manager is a fiduciary, as defined in ERISA, with respect to the Trust and Investment Accounts.  The Investment Manager is, and will continue during the term of this Agreement to be an "investment manager" as defined in Section 3(38) of ERISA. The Investment Manager shall discharge its duties with respect to the Investment Accounts in accordance with ERISA and shall be liable for its own willful and intentional misconduct, negligence, failure to act in good faith or in accordance with the fiduciary provisions of ERISA, reckless breach of its representations, warranties or covenants under this Agreement; <u>provided</u>, <u>however</u>, that the Company shall be responsible for the overall diversification of the Trust Fund and the Investment Manager's obligation to specifically diversify the Investment Accounts shall be subject to the Investment Strategy Guidelines attached hereto as <u>Exhibit "C"</u> and hereby made a part hereof.

(c)  The Investment Manager shall use its best efforts to select investments for the Investment Accounts which will achieve the overall objectives stated in the Investment Strategy Guidelines attached hereto as <u>Exhibit "C"</u>.

3.  <u>Authority of the Investment Manager</u>

(a)  Unless otherwise directed in writing by the Company, the Investment Manager shall have full discretionary authority to manage the investment of the assets in each Investment Account, including the authority to purchase, sell, cover open positions, and generally to deal in securities, financial and commodity futures

contracts, options and other property comprising or relating to each Investment Account (all hereinafter called "Securities and other Property"); provided, however, that for each Investment Account (i) any and all transactions that the Investment Manager enters into shall be undertaken by the Investment Manager in accordance with the Investment Strategy Guidelines applicable to such Investment Account and (ii) the Investment Manager shall not enter into any transaction applicable to such Investment Account other than those specifically authorized by the Investment Strategy Guidelines.  Also, unless otherwise directed in writing by the Company, the Investment Manager shall have absolute authority and discretion to choose which brokers and futures commission merchants ("brokers") are to be used for transactions for each Investment Account.  If the Company requests the Investment Manager to execute transactions through a specific broker, the Investment Manager shall not be liable for any loss by reason thereof.

(b)     The Investment Manager further shall have authority to deal directly with brokers and to cause, in the name of the Trustee, the purchase, sale and exchange of any or all of the Securities and other Property in each Investment Account and the investment and reinvestment of the principal and income of each Investment Account.  Except as provided in Section 3(a) hereof, the Company authorizes and empowers the Investment Manager to direct the Trustee to open and maintain brokerage accounts for Securities and other Property, including financial and commodity futures and commodities and options thereon (all such accounts hereinafter called "Brokerage Accounts") for and in the name of the Trust and to execute for the Trust as its agent and attorney-in-fact standard customer agreements with such broker/dealer or brokers/dealers as the Investment Manager shall select as provided above.  The Investment Manager may, using such of the Securities and other Property in each Investment Account as the Investment Manager deems necessary or desirable, direct the Trustee to deposit for the Trust original and maintenance brokerage and margin deposits and otherwise direct payments of cash, cash equivalents and Securities and other Property into such Brokerage Accounts and to such brokers as the Investment Manager deems desirable or appropriate.

(c)     The Investment Manager shall cause all Securities and other Property purchased or sold for each Investment Account to be settled at the place of business of the Trustee or as the Trustee shall direct.  All Securities and other Property of each Investment Account shall remain in the direct or indirect custody of the Trustee. The Investment Manager shall notify the Trustee as soon as practicable of the necessary information to enable the Trustee to effect such purchases and sales.

(d)     The Investment Manager further shall have the authority to instruct the Trustee to (i) pay cash for Securities and other Property delivered to the Trustee for each Investment Account, (ii) deliver Securities and other Property against payment for each Investment Account, and (iii) transfer assets and funds to such Brokerage Accounts as the Investment Manager may designate, all consistent with the

powers, authorities and limitations set forth in prior provisions of this Section 3. The Investment Manager shall not have authority to cause the Trustee to deliver Securities and other Property, or pay cash to the Investment Manager.

(e)     Notwithstanding anything contained in this Agreement to the contrary, each Investment Account shall be managed separately by the Investment Manager and shall be subject only to the individual Investment Guidelines applicable to such Investment Account. Each term and condition of the Agreement shall be complied with separately by the Investment Manager for each Investment Account.

4.     Aggregation of Orders

Unless otherwise directed in writing by the Company, the Investment Manager may aggregate sales and purchase orders of securities for each Investment Account with similar orders being made simultaneously for the other accounts managed by the Investment Manager or with accounts of the affiliates of the Investment Manager, if in the Investment Manager's reasonable judgment such aggregation shall result in an overall economic benefit to such Investment Account considering the advantageous selling or purchase price, brokerage commission and other expenses.   In accounting for such aggregated order price, commission and other expenses shall be averaged on a per bond or share basis daily.   The Company acknowledges that the determination of such economic benefit to the Investment Accounts by the Investment Manager is subjective and represents the Investment Manager's evaluation that each Investment Account is benefited by relatively better purchase or sales prices, lower commission expenses, internal efficiencies and beneficial timing of transactions or a combination of these and other factors.

5.     Documentation to be Furnished by the Company

The Company hereby agrees to furnish the Investment Manager with such further authorizations and documentation as the Investment Manager may from time to time reasonably require to enable it to carry out its obligations under this Agreement and documents.   However, to the extent that such authorizations may be provided by the Trustee, the Investment Manager agrees to seek such authorizations and documents first from the Trustee.

6.     Unit Pricing/Appraisals and Determinations of Value

(a)     Unit Pricing

The Investment Manager shall provide, in a form satisfactory to the Trustee, and Fidelity Institutional Retirement Services Company, the Plan record keeper ("Plan Record Keeper"), on a daily basis, the value of a unit each Investment Account by 6:30 p.m. Eastern time.   "Daily basis" shall be deemed to mean each business day of the Plan Record Keeper.   The Investment Manager shall provide such additional information to the Trustee and the Plan Record Keeper regarding each Investment Account as the Trustee, the Plan Record Keeper or the Company may

reasonably request.  The Investment Manager agrees to the procedures and its obligations with respect to pricing of "units" in the Investment Accounts and other matters set forth in Exhibit "D" hereto, and hereby made a part hereof. From time to time, Exhibit "D" may require amendment, in which case a writing signed by the Plan Record Keeper, the Trustee, the Company and the Investment Manager agreeing to changes in the pricing procedures for units in the Investment Account shall be adequate to amend Exhibit "D".

Notwithstanding the foregoing, the Investment Manager shall not be responsible for providing the value of a unit of the BP Amoco Stock Fund. All pricing and valuation with regard to the BP Amoco Stock Fund shall be performed by the Trustee

(i)    BP Amoco Stock Fund Investment Account.  The daily charges incurred by the BP Amoco Stock Fund Investment Account shall be charged against the net asset value of the BP Amoco Stock Fund Investment Account prior to the calculation of the unit value of this Investment Account.  Despite anything to the contrary in this Agreement, no such charges shall result in a reduction of the number of units of the BP Amoco Stock Fund Investment Account held by the Plan.

(ii)   Other Investment Accounts.  In accordance with the Declaration of Trust for the State Street Bank & Trust Company Investment Fund for Tax Exempt Retirement Plans set forth as Exhibit E hereto and hereby made a part hereof (the "Declaration of Trust"), the daily charges incurred by each Investment Account, other than the BP Amoco Stock Fund Investment Account (the "Other Investment Accounts") shall be charged against the net asset value of each Other Investment Account prior to the calculation of the unit value of each Other Investment Account.  Notwithstanding Section 5.6 of the Declaration of Trust, no such charges shall result in a reduction of the number of units of any Other Investment Account held by the Plan.

(iii)   The Investment Manager shall provide the Trustee with an appraisal of each Investment Account as of the end of each business day of which the New York Stock Exchange is open.  The Investment Manager will provide the Company with an appraisal of each Investment Account as of the end of the last business day of each month on which the New York Stock Exchange is open (the "Appraisal Date").  The appraisal to the Company shall consist of (i) a written summary of assets held in each Investment Account on the Appraisal Date and (ii) a listing of the monthly acquisitions and redemptions of units of participation in each Investment Account. The Investment Manager agrees to deliver each appraisal within three (3) business days following the Appraisal Date.  Securities traded on a national securities exchange shall be valued at the last sale price on the exchange, or if the Investment Manager deems it appropriate, at the last known bid price.  Other securities for which market quotations are readily available shall be valued at the known current bid price,

or at the mean of the bid and asked prices as the Investment Manager may elect.  All open futures positions held shall be marked to market as of the close of business on the Appraisal Date, on the same basis as set forth in the preceding sentence.  Other securities and all other assets shall be valued at fair value as determined in good faith by the Investment Manager.

Notwithstanding the foregoing, the Investment Manager shall not be responsible for providing appraisals for the BP Amoco Stock Fund. All appraisals for the BP Amoco Stock Fund shall be provided by the Trustee.

(c)     The Investment Manager agrees to provide such financial and other information regarding the funds and the securities in which each Investment Account is invested and each Investment Account itself as reasonably requested by the Company, the Trustee or the Plan Record Keeper.

7.     <u>Investment Account Additions and Withdrawals</u>

The Company may cause cash or any Securities and other Property to be added to or withdrawn from any Investment Account in its discretion, and shall give or cause written notice of such additions or withdrawals to be given to the Investment Manager.

(i)     <u>BP Amoco Stock Fund Investment Account</u>.  All requests to acquire or redeem units of the BP Amoco Stock Fund Investment Account shall be effected as provided by this Agreement except that, notwithstanding anything in this Agreement to the contrary, requests to acquire or redeem units of participation in the BP Amoco Stock Fund Investment Account shall be effected on a daily basis.

(ii)     <u>Other Investment Accounts</u>.  All requests to acquire or redeem units of any Other Investment Account shall be effected as provided by the terms of the Declaration of Trust, except that, notwithstanding the Declaration of Trust, requests to acquire or redeem units of participation in the Other Investment Accounts shall be effected on a daily basis.  The Company may elect to transfer the assets of any Other Investment Account to another Investment Manager if the Declaration of Trust shall be amended so that the acquisition or redemption of units of participation in any Other Investment Account is not permitted on a daily basis.

8.     <u>Management Fee</u>

The Investment Manager shall be paid a "Management Fee" for its services for each Investment Account in the manner and in such amounts as provided in the exhibit attached hereto as <u>Exhibit "F"</u> and hereby made a part hereof.  Except as provided otherwise in <u>Exhibit "F"</u>, if the Investment Manager shall have served for any Investment Account less than the whole of any payment period, its fee shall be payable on a pro rata basis for the partial period.

9.      Assignment

No assignment (as that term in defined in the Investment Advisers Act of 1940) of this Agreement or any Investment Account shall be made by the Investment Manager without the consent of the Company.  If the Investment Manager is a partnership or limited liability company, any change in the membership of the partnership or the limited liability company, or in the relative interests of the members in the partnership or in the limited liability company, shall be reported in writing to the Company within a reasonable time, but in no event later than thirty days after the effective date of such change.

10.     Amendment

No amendment of this Agreement shall be effective unless in writing and signed by authorized representatives of the parties.  Upon mutual agreement of the parties, a new Investment Account shall be added to this Agreement by both parties executing additional applicable Exhibits to this Agreement.  Upon the effective date of such Exhibits, the new Investment Account shall become subject to all the terms and conditions of this Agreement and such new Exhibits shall be deemed amendments to this Agreement.

11.     Termination

This Agreement (and all Investment Accounts) or any Investment Account may be terminated by the Company at any time on written notice to the Investment Manager, effective on delivery of the notice or at such later time as the notice may specify.  The Investment Manager may terminate this Agreement or any Investment Account at any time on written notice to the Company to become effective thirty (30) days after delivery of the notice or at such later time as the notice may specify.  Such notice shall contain written directions as to the management of any Investment Account so terminated subsequent to the receipt of such notice.  In the event that the Investment Manager notifies the Company or the Company becomes aware of a material change in the Investment Manager's personnel such that the Investment Manager, in the Company's reasonable opinion, is no longer able to adequately perform its duties hereunder, the Company shall have thirty (30) days to decide whether or not it wishes to terminate this Agreement.  In the event that the Company elects to terminate this Agreement as a result of the Investment Manager's personnel changes, and provides the Investment Manager with notice of such election within the prescribed thirty (30) day period, the Investment Manager shall reimburse the Company for any reasonable costs or expenses incurred by the Company or the terminated Investment Account as a result of the expedited transfer of assets from such Investment Account.  Subject to the preceding sentence, any termination of this Agreement shall be without liability of either party to the other except that the Investment Manager shall be entitled to any accrued but unpaid Management Fee with respect to any Investment Account so terminated.  Termination of any Investment Account or the entire Agreement by either party shall not have the effect of canceling orders to deposit or invest cash or to purchase or sell securities or other property, placed before the receipt of the notice of termination.

12.     <u>Receipt of Disclosure Materials and Bonding</u>

The Investment Manager represents that it meets all applicable bonding requirements under ERISA or the regulations promulgated thereunder in order for the Investment Manager to carry out its duties under this Agreement. The Investment Manager's fees shall not include any charge for such bonding.  In addition, the Investment Manager and the Company acknowledge that each has received and read the risk disclosure materials attached hereto as <u>Exhibit "G"</u> and made a part hereof.

13.     <u>Investment Account Statements</u>

The Investment Manager shall be furnished copies of the Trustee's monthly statements of each Investment Account Trust Fund receipts and disbursements and monthly listing of each Investment Account Trust Fund assets, and such other information regarding each Investment Account Trust Fund as it shall from time to time reasonably request.

14.     <u>Other Agreements and Obligations</u>

It is understood that the Investment Manager may have advisory or other contracts with other individuals and organizations, and may have other interests and businesses. It is also understood that personnel of the Investment Manager may be involved in the supervision and management of investment companies and pooled funds for which the Investment Manager or an affiliate thereof serves as an investment advisor or manager. Nothing in this Agreement shall be construed to prevent the Investment Manager from giving advice about or trading on its own behalf in the securities of the Company. Each party will maintain the strictest confidence with respect to any financial or other information received from the other party which it obtains in its capacity hereunder and which is not otherwise publicly disclosed or required by law to be disclosed.

15.     <u>Proxies</u>

The Investment Manager has discretionary authority with respect to any right, including the right to vote, appurtenant to any securities held in each Investment Account that are referred to the Trustee as shareholder of such securities, except that for those American Depositary Shares of BP Amoco p.l.c. ("BP ADSs") held by the Trustee in the BP Amoco Stock Fund Investment Account voting, tender and other rights shall be exercised by the Trustee pursuant to the Trust.  The Investment Manager shall exercise its discretionary authority described in the immediately preceding sentence by directing the Trustee as to the action to take with respect to such rights.  Not less frequently than annually or at such times as the Company and the Investment Manager may agree, the Investment Manager shall provide to the Company (i) a summary of its proxy voting activity in respect of securities in each Investment Account and (ii) a statement that the Investment Manager's proxy voting procedure meets the requirements of ERISA and that the Investment Manager continues to comply with such procedures.  With regard to item (i) above, the Investment Manager shall ensure that the summary sets forth those instances where the Investment Manager (a) voted in favor of the recommendations of a

company's management (b) voted against the recommendations of a company's management and (c) abstained from voting.

16.     Unrelated Business Taxable Income

In the event that any unrelated business taxable income (as defined in Section 512 of the Internal Revenue Code of 1986, as amended) is incurred by reasons of any investment of the Investment Account assets, the Investment Manager shall furnish, or cause to be furnished, information to the Trustee, with copies to the Company, which is sufficient for the Trustee to file all applicable tax returns with respect to such income on a timely basis.

17.     Reliance on Communications

The Investment Manager shall be fully protected in relying on any (a) written notice, instruction, direction or approval of the Company to the Investment Manager, signed by officers or authorized representatives of the Company, or by a majority of the members of the Investment Committee or by the secretary thereof, and (b) certification by the Secretary or any Assistant Secretary of the Company (i) as to officers and other representatives of the Company authorized to act for the Company under this Agreement, (ii) as to the membership of the Investment Committee and its Secretary as it then exists, and (iii) until a later certification is filed with the Investment Manager.

18.     The Investment Manager's Indemnity

The Investment Manager shall be liable for, and agrees to promptly indemnify and hold harmless the Trust and the Company and any of its employees or agents, for any losses or damages suffered by the Trust or the Company and of its employees or agents, including reasonable attorneys' fees and reasonable costs or taxes imposed on the Trust pursuant to Section 511 of the Code by reason of the Investment Manager's breach of any of its representations or warranties, covenants or agreements under this Agreement and any attachments or exhibits thereto.

19.     Notices

Any notice required or contemplated by this Agreement shall be in writing.  All such notices to the Company shall be addressed as follows:

> BP Amoco Corporation
> Attention: Manager, Trust Investments
> 200 E. Randolph Drive, Mail Code 3103
> Chicago, Illinois 60601

All such notices to the Investment Manager shall be addressed as follows:

> State Street Bank and Trust Company
> Attention:  Compliance Officer
> One International Place
> Boston, Massachusetts 02110

Either party hereto may, by written notice, designate a different address.

20.   Representations and Warranties

(i)   Each of the parties hereto hereby represents that it is duly authorized and empowered to execute, deliver and perform this Agreement; that any such action does not conflict with or violate any provision of law, rule or regulation, contract, deed of trust, or other instrument to which it is a party or to which any of its property is subject; and that this Agreement is a valid and binding obligation enforceable in accordance with its terms.

(ii)   The Company represents and warrants that the assets transferred to the Investment Accounts consist solely of assets of a trust which qualifies under Sections 401(a) and 501(a) of the Internal Revenue Code of 1986 (the "Code"). In the event that any assets held in the Investment Accounts lose their tax exempt status, or the Plan loses its exempt status, the Company warrants that it shall immediately cause such assets to be withdrawn from the Investment Accounts.

(iii)   The Company represents and warrants that it is the "Plan Sponsor", as defined in ERISA, and that in its capacity as the Plan Sponsor it is authorized to appoint State Street Bank and Trust Company as Investment Manager.  The Company further warrants that under the Plan and Trust documents establishing the Plan, it has authority to enter into this Agreement and that the Plan is authorized to invest in units of commingled funds maintained by a bank.

(iv)   The terms and conditions of the Declaration of Trust, including the Fund Declaration creating any commingled fund thereunder in which the Plan invests are hereby adopted and incorporated by reference into the Plan.

21.   Covenants of the Investment Manager

During the term of this Agreement, the Investment Manager agrees that:

(i)   it will not take or direct any action with respect to assets of an employee benefit plan of the Company, BP America or any of the subsidiaries or affiliates which constitutes a non-exempt prohibited transaction under ERISA.

(ii)   the personnel it uses in fulfilling its obligations under this Agreement are, and will continue to be, experienced and qualified to provide investment management services.

(iii)   it will immediately notify the Company in writing of any material change in its business, personnel, or operations, bearing on its ability to perform its duties under this Agreement in accordance with the standards enumerated herein.

(iv)   it is, and will continue to be, in compliance with all applicable registration, filing, licensing, exam and similar requirements.

(v)      it will maintain liability insurance as described in the Memorandum of Insurance attached hereto as <u>Exhibit H</u> and agrees to notify the Company within thirty (30) days if there is any material reduction in the amount of coverage.

22.     <u>Governing Law</u>

This Agreement is governed by and subject to ERISA and the Investment Advisers Act of 1940, as amended from time to time (hereinafter the "Acts") to the extent they apply to the Investment Manager.  Except as governed by the Acts, this Agreement shall be construed and the rights and obligations of the parties hereunder enforced under the laws of the State of Illinois.  No language contained herein shall be construed in any manner inconsistent with or in violation of the Acts (if applicable) or of other applicable federal and state laws and regulations, or as a waiver by the Company of any of its rights under such laws or regulations.

23.     <u>Prior Agreements</u>

This Agreement cancels and supersedes the Prior Agreement or other agreements, if any, between the parties with respect to funds under the Trust described in Section 1(a) hereof (other than the Trust itself), or under any other trust established to fund qualified or welfare plan benefits for employees of the Company, BP America or of subsidiaries or affiliates thereof.

24.     <u>Special Termination Rights</u>

Notwithstanding anything contained herein to the contrary, the Company may terminate this Agreement without payment of any pro rata fee as described in Section 8 hereof within five (5) days of its execution of this Agreement by giving written notice to such effect to the Investment Manager within such five (5) day period.

IN WITNESS WHEREOF, each of the parties hereby executes this Agreement on the date indicated to be effective as of the day and year first above written.

**BP AMOCO CORPORATION**

By: _____

Name:  Marvin L. Damsma

Title:  Director-Trust Investments

**STATE STREET BANK AND
TRUST COMPANY**

By: _____

Name:  TIMOTHY B. HARBERT

Title:  Executive Vice President

**EXHIBIT A**

**BP AMOCO MASTER TRUST FOR EMPLOYEE SAVINGS PLANS**

**EXHIBIT B-1**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(BP Amoco Stock Fund)


The assets contained in Investment Account AE01 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-2**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(Balanced Index Fund - Conservative)


The assets contained in Investment Account AE26 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-3**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(Balanced Index Fund - Moderate)

The assets contained in Investment Account AE12 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-4**

<u>**INVENTORY OF ACCOUNT ASSETS**</u>

(Balanced Index Fund - Aggressive)

The assets contained in Investment Account AE27 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-5**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(Mid-Cap Equity Index Fund)

The assets contained in Investment Account AE13 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-6**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(International Equity Index Fund)


      The assets contained in Investment Account AE14 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-7**

**<u>INVENTORY OF ACCOUNT ASSETS</u>**

(International Equity Index Fund - Europe)

The assets contained in Investment Account AE22 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-8**

<u>**INVENTORY OF ACCOUNT ASSETS**</u>

(International Equity Index Fund - Far East)

The assets contained in Investment Account AE23 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT B-9**

**INVENTORY OF ACCOUNT ASSETS**

(Bond Index Fund - Long Duration)

The assets contained in Investment Account AE25 at the State Street Bank and Trust Company represent the funds for this Investment Account to be managed by the Investment Manager.

**EXHIBIT C-1**

**INVESTMENT STRATEGY GUIDELINES**

(BP Amoco Stock Fund)

A.      Investment Objective.

The investment objective of the BP Amoco Stock Fund Investment Account (the "Investment Account") is to provide daily responsiveness to Plan participants pursuant to the Plan while attempting to match the investment return on BP Amoco p.l.c. American Depositary Shares ("BP Amoco ADSs"). The investment return on BP Amoco ADSs shall be deemed to include the net dividends on BP Amoco ADSs after the inclusion of all fees and expenses.

B.      Investment Strategy.

The Investment Account seeks to provide returns which closely track those of BP Amoco ADSs. The strategy is to invest predominantly in BP Amoco ADSs and a small amount of cash equivalents. The fund shall use lines of credit to provide liquidity where appropriate.

The fund may also hold other public and private debt and equity securities, as well as debt and equity derivatives, such as options and futures contracts, subject to the provisions of section E of this exhibit C - 1.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.      Return Objective.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses. The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period. The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 5 basis points to 15 basis points.

The Investment Account Benchmark shall be as follows:

> A return of (i) 99 percent of the compound rate of return on BP Amoco ADSs and (ii) one percent of the compound rate of return of the Investment Manager's short-term investment fund.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns. The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.    <u>Liquidity</u>.

- The Investment Manager shall use its best efforts to complete all internal and open market trades at a reasonable cost.

- The Investment Manager shall attempt to process all trades without affecting the price of BP Amoco ADSs in so far as is practical given the return objective of the Investment Account.

- The Investment Manager shall monitor all daily trading activity to measure the impact of its trading on the price of BP Amoco ADSs.

- The Investment Manager shall use independent approved brokers or other approved third parties who will be selected based on their ability to trade a high volume of BP Amoco ADSs at reasonable cost.

- During days that the Investment Manager expects to trade a volume of BP Amoco ADSs that may affect the price, the Investment Manager in its sole discretion, as it determines to be in the best interests of the Plan, may suspend trading, attempt to arrange block trades, space orders throughout the day or take other actions it deems to be in the best interests of the Plan.

- Sales and buys of BP Amoco ADSs are guaranteed for settlement by the third day following trade date.

- The Investment Manager shall arrange and maintain $200 million in cost-effective lines of credit available for drawdown on a daily basis to meet unusually high participant transaction activity.

- If the Investment Manager is unable to meet Plan liquidity needs on any day, it will promptly advise the Company that day.

E.   <u>Restrictions and Standards</u>. The Investment Account shall be comprised of (i) BP Amoco ADSs, and (ii) shall also be comprised of cash equivalents, and (iii) shall also utilize short term lines of credit where appropriate.

In addition, upon prior written approval of the Company, the fund may invest in other public and private debt and equity securities, as well as debt and equity derivatives, such as options and futures contracts.

Unless otherwise directed in writing by the Company, securities lending shall not be permitted.

F.   <u>Amendments</u>.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk. It is acknowledged by Amoco and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes. Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account. It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.   <u>Reports</u>.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company. All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.   <u>Annual Compliance Statement</u>.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

"State Street Bank and Trust Company certifies that it has managed the BP Amoco Stock Fund Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of _____, 2000, and the

Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-2**

**INVESTMENT STRATEGY GUIDELINES**

(Balanced Index Fund - Conservative)

A.    Investment Objectives.

The investment objective of the Balanced Index Fund - Conservative Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return of a fixed index asset mix of stock, bond and cash funds after the inclusion of all fees and expenses.

B.    Investment Strategy.

The Investment Account aims to be a well-diversified fund offering investors a mixture of stocks and bonds.  This combination takes advantage of the growth potential inherent in equities along with the benefits of higher income and more stability in the bond market.  An international equity component allows investors an opportunity to participate in the rapid growth of other major economies around the globe.  The portfolio weights are determined from a calculation which takes into consideration diversification, return and risk.  The Investment Account will invest in other commingled funds maintained by the Investment Manager (collectively the "Investment Manager Funds") as well as in other financial assets, all in accordance with the Fund Declarations for the Investment Manager's S&P 500 Index Fund with Futures, Daily EAFE with Securities Lending Fund, Bond Market Index Fund, and Short Term Investment Fund.

The Investment Account is balanced with approximately 40% exposure to common stocks, and 60% exposure to fixed income instruments.  The stock component will be invested in the Investment Manager's S&P 500 Index Fund with Futures, and international equities using the Investment Manager's Daily EAFE with Securities Lending Fund which provides both international equity exposure and daily liquidity.

The fixed income portion of the Investment Account will be invested in a broad base of securities including treasury and corporate bonds, mortgages, and government agencies by investing in the Bond Market Index Fund.  It will also include short-term investments to reduce volatility and to provide liquidity for daily transfer of funds through investing in the Short Term Investment Fund.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.     Return Objective.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 10 basis points to 50 basis points.

The Investment Account Benchmark shall be constructed from specific indices with the following targeted weights:

| Benchmark Indices | Target Weight |
|---|---|
| S&P 500 Index | 30% |
| MSCI EAFE Index (unhedged) | 10% |
| Lehman Brothers Aggregate Bond Index | 40% |
| 30 Day U.S. Treasury Bills | 20% |

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns.  The Company will, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager.  The Investment Manager will provide the Company with a monthly performance appraisal of the actual Investment Account performance, including a mutually agreed upon attribution analysis versus the target.  Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager.  The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.     Liquidity.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be in the Investment Account.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

For transaction requests of up to net $50 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee.

During days that the Investment Manager receives requests for transactions in excess of $50 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager shall use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day. The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, this Exhibit C-2 may not be amended without the written consent of the Investment Manager and the Company; provided however that the Declaration of Trust and the Fund Declaration may be amended in accordance with their terms.

E.     Restrictions and Standards.

For liquidity purposes or otherwise, the stock and fixed income components from time to time may also be invested in public and private equity and fixed income securities and equity and fixed income derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that BP Amoco ADSs shall not be included in the stock component unless it is part of a broad-based fund.

The use of options and futures contracts shall be limited to bona fide hedging transactions, as defined by the Commodity Futures Trading Commission, and the amount of premiums and initial margin for options and futures contracts shall not exceed 5% of the total assets of the Fund.

The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by the Company prior to the transaction.

The asset policy ranges shown below identify the bounds which the Investment Manager shall use in determining the actual portfolio proportions:

| Asset Category | Asset Policy Ranges |
|---|---|
| S&P 500 Index | 29-31% |
| EAFE Index (unhedged) | 9-11% |
| Lehman Brothers Aggregate Index | 39-41% |
| 30 Day U.S. Treasury Bills | 18-22% |

Securities Lending:  The Investment Manager's Daily EAFE with Securities Lending Fund and Passive Bond Market Index Securities Lending Fund permits securities lending. As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Daily EAFE Fund.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.  Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.  If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, the Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

The Investment Manager's S&P 500 Index Fund with Futures, Bond Market Index Fund, and Short Term Investment Fund do not permit securities lending.

F.    Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company  prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may

unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.   <u>Reports</u>.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.   <u>Annual Compliance Statement</u>.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

"State Street Bank and Trust Company certifies that it has managed the Balanced Index Fund - Conservative Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of ____, 2000 and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-3**

**INVESTMENT STRATEGY GUIDELINES**

(Balanced Index Fund) - Moderate

A.    Investment Objectives.

The investment objective of the Balanced Index Fund - Moderate Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return of a fixed index asset mix of stock, bond and cash funds after the inclusion of all fees and expenses.

B.    Investment Strategy.

The Investment Account aims to be a well-diversified fund offering investors a mixture of stocks and bonds.  This combination takes advantage of the growth potential inherent in equities along with the benefits of higher income and more stability in the bond market.  An international equity component allows investors an opportunity to participate in the rapid growth of other major economies around the globe.  The portfolio weights are determined from a calculation which takes into consideration diversification, return and risk.  The Investment Account will invest in other commingled funds maintained by the Investment Manager (collectively the "Investment Manager Funds") as well as in other financial assets, all in accordance with the Fund Declarations for the Investment Manager's S&P 500 Index Fund with Futures, S&P Midcap 400 Index Fund, Daily EAFE with Securities Lending Fund, Bond Market Index Fund, and Short Term Investment Fund.

The Investment Account is balanced with approximately 60% exposure to common stocks, and 40% exposure to fixed income instruments.  The stock component will be invested in the Investment Manager's S&P 500 Index Fund with Futures, smaller capitalization stocks using the Investment Manager's S&P Midcap 400 Index Fund, and international equities using the Investment Manager's Daily EAFE with Securities Lending Fund which provides both international equity exposure and daily liquidity.

The fixed income portion of the Investment Account will be invested in a broad base of securities including treasury and corporate bonds, mortgages, and government agencies by investing in the Bond Market Index Fund.  It will also include short-term investments to reduce volatility and to provide liquidity for daily transfer of funds through investing in the Short Term Investment Fund.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.    <u>Return Objective</u>.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses. The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period. The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 10 basis points to 50 basis points.

The Investment Account Benchmark shall be constructed from specific indices with the following targeted weights:

| Benchmark Indices | Target Weight |
|---|---|
| S&P 500 Index | 40% |
| S&P MidCap 400 Index | 5% |
| MSCI EAFE Index (unhedged) | 15% |
| Lehman Brothers Aggregate Bond Index | 30% |
| 30 Day U.S. Treasury Bills | 10% |

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns. The Company will, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager will provide the Company with a monthly performance appraisal of the actual Investment Account performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.    <u>Liquidity</u>.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be in the Investment Account. The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

For transaction requests of up to net $50 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee

During days that the Investment Manager receives requests for transactions in excess of $50 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager shall use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee  if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, this Exhibit C-3 may not be amended without the written consent of the Investment Manager and the Company; provided however that the Declaration of Trust and the Fund Declaration may be amended in accordance with their terms.

E.      Restrictions and Standards.

For liquidity purposes or otherwise, the stock and fixed income components from time to time may also be invested in public and private equity and fixed income securities and equity and fixed income derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that Amoco common stock shall not be included in the stock component unless it is part of a broad-based fund.

The use of options and futures contracts shall be limited to bona fide hedging transactions, as defined by the Commodity Futures Trading Commission, and the amount of premiums and initial margin for options and futures contracts shall not exceed 5% of the total assets of the Fund.

The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by the Company prior to the transaction.

The asset policy ranges shown below identify the bounds which the Investment Manager shall use in determining the actual portfolio proportions:

| Asset Category | Asset Policy Ranges |
|---|---|
| S&P 500 Index | 39-41% |
| S&P MidCap 400 Index | 4-6% |
| EAFE Index (unhedged) | 14-16% |
| Lehman Brothers Aggregate Index | 29-31% |
| 30 Day U.S. Treasury Bills | 9-11% |

Securities Lending:   The Investment Manager's Daily EAFE with Securities Lending Fund and Passive Bond Market Index Securities Lending Fund permits securities lending. As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.   The remaining securities lending revenues will accrue to the benefit of the Daily EAFE Fund.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.   Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.   The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.   If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, the Investment Manager is responsible for funding the shortfall.   This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

The Investment Manager's S&P 500 Index Fund with Futures, S&P Midcap 400 Index Fund, Bond Market Index Fund, and Short Term Investment Fund do not permit securities lending.

F.   <u>Amendments</u>.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.   It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.   Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to

the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.      <u>Reports</u>.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.      <u>Annual Compliance Statement</u>.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

> "State Street Bank and Trust Company certifies that it has managed the Balanced Index Fund - Moderate Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of ___, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-4**

**INVESTMENT STRATEGY GUIDELINES**

(Balanced Index Fund - Aggressive)

A.    Investment Objectives.

The investment objective of the Balanced Index Fund - Aggressive Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return of a fixed index asset mix of stock, bond and cash funds after the inclusion of all fees and expenses.

B.    Investment Strategy.

The Investment Account aims to be a well-diversified fund offering investors a mixture of stocks and bonds.  This combination takes advantage of the growth potential inherent in equities along with the benefits of higher income and more stability in the bond market.  An international equity component allows investors an opportunity to participate in the rapid growth of other major economies around the globe.  The portfolio weights are determined from a calculation which takes into consideration diversification, return and risk.  The Investment Account will invest in other commingled funds maintained by the Investment Manager (collectively the "Investment Manager Funds") as well as in other financial assets, all in accordance with the Fund Declarations for the Investment Manager's S&P 500 Index Fund with Futures, S&P Midcap Index Fund, Daily EAFE with Securities Lending Fund, Bond Market Index Fund and Short Term Investment Fund.

The Investment Account is balanced with approximately 80% exposure to common stocks, and 20% exposure to fixed income instruments.  The stock component will be invested in the Investment Manager's S&P 500 Index Fund with Futures, smaller capitalization stocks using the Investment Manager's S&P Midcap Index Fund, and international equities using the Investment Manager's Daily EAFE with Securities Lending Fund which provides both international equity exposure and daily liquidity.

The fixed income portion of the Investment Account will be invested in a broad base of securities including treasury and corporate bonds, mortgages, and government agencies by investing in the Bond Market Index Fund.  It will also include short-term investments to reduce volatility and to provide liquidity for daily transfer of funds through investing in the Short Term Investment Fund.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.   <u>Return Objective</u>.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 10 basis points to 50 basis points.

The Investment Account Benchmark shall be constructed from specific indices with the following targeted weights:

| Benchmark Indices | Target Weight |
| --- | --- |
| S&P 500 Index | 50% |
| S&P MidCap 400 Index | 10% |
| MSCI EAFE Index (unhedged) | 20% |
| Lehman Brothers Aggregate Bond Index | 20% |

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns.  The Company will, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager.  The Investment Manager will provide the Company with a monthly performance appraisal of the actual Investment Account performance, including a mutually agreed upon attribution analysis versus the target.  Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager.  The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.   <u>Liquidity</u>.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be in the Investment Account.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

For transaction requests of up to net $50 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee.

During days that the Investment Manager receives requests for transactions in excess of $50 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager shall use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day. The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, this Exhibit C-4 may not be amended without the written consent of the Investment Manager and the Company; provided however that the Declaration of Trust and the Fund Declaration may be amended in accordance with their terms.

E.     Restrictions and Standards.

For liquidity purposes or otherwise, the stock and fixed income components from time to time may also be invested in public and private equity and fixed income securities and equity and fixed income derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that Amoco common stock shall not be included in the stock component unless it is part of a broad-based fund.

The use of options and futures contracts shall be limited to bona fide hedging transactions, as defined by the Commodity Futures Trading Commission, and the amount of premiums and initial margin for options and futures contracts shall not exceed 5% of the total assets of the Fund.

The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by the Company prior to the transaction.

The asset policy ranges shown below identify the bounds which the Investment Manager shall use in determining the actual portfolio proportions:

| Asset Category | Asset Policy Ranges |
|---|---|
| S&P 500 Index | 49-51% |
| S&P MidCap 400 Index | 9-11% |
| EAFE Index (unhedged) | 19-21% |
| Lehman Brothers Aggregate Index | 19-21% |

Securities Lending:  The Investment Manager's Daily EAFE with Securities Lending Fund and Passive Bond Market Index Securities Lending Fund permits securities lending. As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Daily EAFE Fund.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.  Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.  If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, the Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

The Investment Manager's S&P 500 Index Fund with Futures, S&P Midcap Index Fund, Daily Bond Market Fund, and Short Term Investment Fund do not permit securities lending.

F.    Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company  prior to any execution of trades, contracts or other agreements that may

bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.      <u>Reports</u>.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.      <u>Annual Compliance Statement</u>.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

> "State Street Bank and Trust Company certifies that it has managed the Balanced Index Fund - Aggressive Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of _____, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

EXHIBIT C-5

<u>INVESTMENT STRATEGY GUIDELINES</u>

(Mid-Cap Equity Index Fund)

A.    <u>Investment Objective</u>.

The investment objective of the Mid-Cap Equity Index Fund Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return on the S&P MidCap 400 Index after the inclusion of all fees and expenses.

B.    <u>Investment Strategy</u>.

The Investment Account seeks to provide returns which closely track those of the S&P MidCap 400 Index (the "Index").  The Investment Account is permitted to invest in units of participation, in the State Street Bank and Trust Company Investment Fund For Tax Exempt Retirement Plans -- S&P Midcap Index Securities Lending Fund, a commingled 81-100 fund managed in accordance with the Declaration of Trust, and the State Street Bank and Trust Company S&P Midcap Index Fund Declaration set forth in Exhibit E. The Investment Account is also permitted to invest in short-term instruments, other State Street Bank and Trust Company commingled funds, equity securities and equity derivative instruments such as futures contracts and options.

The strategy of the State Street Bank and Trust Company S&P Midcap Index Fund is to buy and hold securities, trading only when (i) there is a change to the composition of the Index, (ii) when cash flow activity occurs in the Fund, or (iii) to accommodate the receipt of dividend income into the Fund.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.    <u>Return Objective</u>.

The performance objective for the Investment Account is to provide an investment return which replicates the return of the Investment Account Benchmark (i.e. provides minimal tracking error) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the

annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods.  It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 10 basis points to 20 basis points.

The Investment Account Benchmark shall be the total return of the S&P MidCap 400 Index.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns.  The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager.  The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed upon attribution analysis versus the target.  Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager.  The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.  <u>Liquidity</u>.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be in the Investment Account.

For transaction requests of up to net $2.5 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee.

During days that the Investment Manager receives requests for transactions in excess of $2.5 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; <u>provided</u>, <u>that</u> the Investment Manager shall use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust and the State Street Bank and Trust Company S&P Midcap Index Fund Declaration, this Exhibit C-5 may not be amended without the written consent of the Investment Manager and the Company; provided however that the Declaration of Trust and the Fund Declaration may be amended in accordance with their terms.

E.     Restrictions and Standards.

Since the goal of the State Street Bank and Trust Company S&P Midcap Index Fund is to remain fully equitized at all times, the Investment Manager shall (i) have an average cash position of 0% (ii) hold contracts to maintain full exposure.  Approximately 1-5% of the Investment Account's value may be held in suitable CFTC approved unleveraged index futures contracts.  The Investment Manager shall also use futures, where available, to sweep cash and dividend receivables.  Any cash that remains in the fund shall be invested in a Short Term Investment Fund.  For liquidity purposes or otherwise, the Investment Account from time to time may be invested in public and private securities and derivative securities, including without limitation, options, and futures; provided, however, that BP Amoco ADSs shall not be included unless they are part of a broad-based fund.

Securities Lending:  Securities lending shall not be permitted.

F.     Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.     Reports.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.    <u>Annual Compliance Statement</u>.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

"State Street Bank and Trust Company certifies that it has managed the Mid-Cap Equity Index Fund Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement effective dated as of __, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-6**

**INVESTMENT STRATEGY GUIDELINES**

(International Equity Index Fund)

A.    Investment Objective.

The investment objective of the International Equity Index Fund Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return on the Morgan Stanley Capital International Europe Australia and Far East Index (the "Index") after inclusion of all fees and expenses.

B.    Investment Strategy.

The Investment Account seeks to provide returns which closely track those of the Index, while providing daily responsiveness to participants.   The Investment Account is permitted to invest in units of participation, in the Investment Fund For Tax Exempt Retirement Plans - Daily MSCI Europe Index Securities Lending Fund, Daily MSCI Japan Securities Lending Index Fund and Daily Pacific Basin Ex-Japan Securities Lending Index Fund.  The Investment Account is also permitted to invest in short-term instruments, other State Street Bank and Trust Company commingled funds, equity securities and equity derivative instruments such as futures contracts and options.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.    Return Objective.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 30 basis points to 60 basis points.

The Investment Account Benchmark shall be the total return of the Morgan Stanley Capital International Europe Australia and Far East Index.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns.  The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager.  The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed upon attribution analysis versus the target.  Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager.  The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.      Liquidity.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be added to the Investment Account.

For transaction requests of up to net $5 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee.

During days that the Investment Manager receives requests for transactions in excess of $5 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager will use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, and the State Street Bank and Trust Daily MSCI Europe Securities Lending Index Fund, Daily MSCI Japan Securities Lending Index Fund and Daily Pacific Basin Ex-Japan Securities Lending Index Fund Declarations this Exhibit C-6 may not be amended without the written consent of the Investment Manager and the Company; provided, however, that the Declaration of Trust and Fund Declaration may be amended in accordance with their terms.

E.    <u>Restrictions and Standards</u>.

<u>Use of Derivatives (Futures)</u>:    The Investment Manager shall only use futures in countries within the index where CFTC approved contracts exist, currently the following eight countries are eligible for futures:  Japan (TOPIX and Nikke 300), UK (FTSE - 100), Germany (DAX), France (CAC-40), Hong Kong (Hang Seng), Australia (All Ords), Italy (MIB - 30) and Sweden (OMX).

<u>Cash</u>:  The impact of cash is minimized by maintaining fully invested equity portfolios. However, increases in cash and equivalents do occur from dividends and corporate actions.  In countries for which there exist liquid exchange traded CFTC approved index futures contracts, the Investment Manager shall invest daily net cash in the futures markets to maintain equity exposure.  Futures positions are never leveraged and are marked-to-market daily to assure appropriate exposure.  The Investment Manager shall limit the use of such derivatives to no more than 5% of the total portfolio value.

<u>Emerging Markets Securities</u>:  The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by the Company prior to the transaction.

<u>Currency Instruments</u>:    Currency instruments shall only be used to facilitate funds transfers.  The international currency exposure shall not be hedged.

<u>Securities Lending</u>:  The Investment Manager's Daily MSCI Europe Index Securities Lending Fund, Daily MSCI Japan Securities Lending Index Fund and Daily Pacific Basin Ex-Japan Securities Lending Index Fund permits securities lending.  As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Daily MSCI Europe Index Securities Lending Fund, Daily MSCI Japan Securities Lending Index Fund and Daily Pacific Basin Ex-Japan Securities Lending Index Fund.

Counterparty Default Indemnification:  The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.  If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, the Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds (as hereafter defined) for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.  "Commingled Funds" shall mean any other commingled investment funds maintained by the Trustee.  Any portion of such management fees

attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

For liquidity purposes or otherwise, the Investment Account from time to time may also be invested in public and private securities and derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that BP Amoco ADSs shall not be included in the stock component unless they are part of a broad-based fund.

F.      Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.      Reports.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.      Annual Compliance Statement.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

> "State Street Bank and Trust Company certifies that it has managed the International Equity Index Fund Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of ____, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-7**

**INVESTMENT STRATEGY GUIDELINES**

(International Equity Index Fund - Europe)

A.    Investment Objective.

The investment objective of the International Equity Europe Index Fund Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return on the Morgan Stanley Capital International Europe Index (the "Index") after inclusion of all fees and expenses.

B.    Investment Strategy.

The Investment Account seeks to provide returns which closely track those of the Index, while providing daily responsiveness to participants.  The Investment Account is permitted to invest in units of participation, in the Investment Fund For Tax Exempt Retirement Plans - Daily MSCI Europe Index Securities Lending Fund.  The Investment Account is also permitted to invest in short-term instruments, other State Street Bank and Trust Company commingled funds, equity securities and equity derivative instruments such as futures contracts and options.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.    Return Objective.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 30 basis points to 60 basis points.

The Investment Account Benchmark shall be the total return of the Morgan Stanley Capital International Europe Index.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns. The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.    Liquidity.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be added to the Investment Account.

For transaction requests of up to net $2.5 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Trustee.

During days that the Investment Manager receives requests for transactions in excess of $2.5 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager will use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee  if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, and the State Street Bank and Trust Daily MSCI Europe Index Securities Lending Fund Declaration this Exhibit C-7 may not be amended without the written consent of the Investment Manager and the Company; provided, however, that the Declaration of Trust and Fund Declaration may be amended in accordance with their terms.

E.    <u>Restrictions and Standards</u>.

<u>Use of Derivatives (Futures)</u>:   The Investment Manager shall only use futures in countries within the index where CFTC approved contracts exist, currently the following eight countries are eligible for futures:  Japan (TOPIX and Nikke 300), UK (FTSE - 100), Germany (DAX), France (CAC-40), Hong Kong (Hang Seng), Australia (All Ords), Italy (MIB - 30) and Sweden (OMX).

<u>Cash</u>:  The impact of cash is minimized by maintaining fully invested equity portfolios. However, increases in cash and equivalents do occur from dividends and corporate actions.  In countries for which there exist liquid exchange traded CFTC approved index futures contracts, the Investment Manager shall invest daily net cash in the futures markets to maintain equity exposure.   Futures positions are never leveraged and are marked-to-market daily to assure appropriate exposure.  The Investment Manager shall limit the use of such derivatives to no more than 5% of the total portfolio value.

<u>Emerging Markets Securities</u>:  The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by Amoco prior to the transaction.

<u>Currency Instruments</u>:   Currency instruments shall only be used to facilitate funds transfers.  The international currency exposure shall not be hedged.

<u>Securities Lending</u>:   The Investment Manager's Daily MSCI Europe Index Securities Lending Fund permits securities lending.  As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Daily MSCI Europe Index Securities Lending Fund.

Countperparty Default Indemnification: The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.   If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, The Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds (as hereafter defined) for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.  "Commingled Funds" shall mean any other commingled investment funds maintained by the Trustee.  Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

For liquidity purposes or otherwise, the Investment Account from time to time may also be invested in public and private securities and derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that BP Amoco ADSs shall not be included in the stock component unless they are part of a broad-based fund.

F.     Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.     Reports.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.     Annual Compliance Statement.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

"State Street Bank and Trust Company certifies that it has managed the International Equity Index Fund  - Europe Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of ___, 2000 and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-8**

**INVESTMENT STRATEGY GUIDELINES**

(International Equity Index Fund - Far East)

A.     Investment Objective.

The investment objective of the International Equity Index Fund - Far East Investment Account (the "Investment Account") is to provide daily responsiveness to participants pursuant to the Plan while attempting to match the investment return on the Morgan Stanley Capital International Far East Index (the "Index") after inclusion of all fees and expenses.

B.     Investment Strategy.

The Investment Account seeks to provide returns which closely track those of the Index, while providing daily responsiveness to participants.  The Investment Account is permitted to invest in units of participation, in the Investment Fund For Tax Exempt Retirement Plans - Daily MSCI Japan Index Securities Lending Fund and Daily MSCI Pacific Basin Ex-Japan Index Securities Lending Fund.  The Investment Account is also permitted to invest in short-term instruments, other State Street Bank and Trust Company commingled funds, equity securities and equity derivative instruments such as futures contracts and options.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.     Return Objective.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 30 basis points to 60 basis points.

The Investment Account Benchmark shall be the total return of the Morgan Stanley Capital International Far East Index.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns. The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.      Liquidity.

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be added to the Investment Account.

For transaction requests of up to net $2.5 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Plan Record Keeper.

During days that the Investment Manager receives requests for transactions in excess of $2.5 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; provided, that the Investment Manager will use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee  if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day. The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, and the State Street Bank and Trust Daily MSCI Japan Index Securities Lending Fund and Daily MSCI Pacific Basin Ex-Japan Index Securities Lending Fund Declarations this Exhibit C-8 may not be amended without the written consent of the Investment Manager and the Company; provided,

however, that the Declaration of Trust and Fund Declarations may be amended in accordance with their terms.

E.      Restrictions and Standards.

Use of Derivatives (Futures):   The Investment Manager shall only use futures in countries within the index where CFTC approved contracts exist, currently the following eight countries are eligible for futures:  Japan (TOPIX and Nikke 300), UK (FTSE - 100), Germany (DAX), France (CAC-40), Hong Kong (Hang Seng), Australia (All Ords), Italy (MIB - 30) and Sweden (OMX).

Cash:  The impact of cash is minimized by maintaining fully invested equity portfolios. However, increases in cash and equivalents do occur from dividends and corporate actions.  In countries for which there exist liquid exchange traded CFTC approved index futures contracts, the Investment Manager shall invest daily net cash in the futures markets to maintain equity exposure.  Futures positions are never leveraged and are marked-to-market daily to assure appropriate exposure.  The Investment Manager shall limit the use of such derivatives to no more than 5% of the total portfolio value.

Emerging Markets Securities:  The Investment Manager shall not acquire any emerging market securities or instruments unless such acquisition is approved by Amoco prior to the transaction.

Currency Instruments:   Currency instruments shall only be used to facilitate funds transfers.  The international currency exposure shall not be hedged.

Securities Lending:  The Investment Manager's Daily MSCI Japan Index Securities Lending Fund and Daily MSCI Pacific Basin Ex-Japan Index Securities Lending Fund permits securities lending.  As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Daily MSCI Japan Index Securities Lending Fund and Daily MSCI Pacific Basin Ex-Japan Index Securities Lending Fund.

Counterparty Default Indemnification:  The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.   If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, The Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds (as hereafter defined) for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net

asset value of such funds.  "Commingled Funds" shall mean any other commingled investment funds maintained by the Trustee.  Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

For liquidity purposes or otherwise, the Investment Account from time to time may also be invested in public and private securities and derivative securities, including without limitation, options and futures, including foreign futures; provided, however, that BP Amoco ADSs shall not be included in the stock component unless they are part of a broad-based fund.

F.    Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.    Reports.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.    Annual Compliance Statement.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

> "State Street Bank and Trust Company certifies that it has managed the International Equity Index Fund - Far East Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of __, 2000, and the

Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT C-9**

<u>**INVESTMENT STRATEGY GUIDELINES**</u>

**(Bond Index Fund - Long Duration)**

A.    <u>Investment Objective</u>.

The investment objective of the Bond Index Fund – Long Duration Investment Account (the "Investment Account") is to provide daily responsiveness to the Plan participants pursuant to the Plan while attempting to match the investment return on the Lehman Brothers Long Government/Corporate Bond Index after the inclusion of all fees and expenses.

B.    <u>Investment Strategy</u>.

The Investment Account seeks to provide returns which closely track those of the Index, while providing daily responsiveness to participants.   The Investment Account is permitted to invest in units of participation, in the Investment Fund For Tax Exempt Retirement Plans - Long U.S. Government  Index Securities Lending Fund and the Long Corporate Index Securities Lending Fund.  The Investment Account is also permitted to invest in short-term instruments, other State Street Bank and Trust Company commingled funds, debt securities and debt derivative instruments such as futures contracts and options.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

C.    <u>Return Objective</u>.

The performance objective for the Investment Account is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.  The total risk as measured by the annualized standard deviation of the investment return over rolling 3 year periods should fall within a range of 98%-102% of the total risk of the Investment Account Benchmark measured over the same period.  The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3 year periods. It is anticipated that the annualized tracking error for the Investment Account shall be in a range of 0 basis points to 20 basis points.

The Investment Account Benchmark shall be the total return of the Lehman Brothers Long Government/Corporate Bond Index.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns.  The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager.  The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Account performance, including a mutually agreed-upon attribution analysis versus the target.  Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager.  The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.    <u>Liquidity.</u>

The Investment Manager shall attempt to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be added to the Investment Account.

For transaction requests of up to net $1 million per day, the Investment Manager guarantees next day delivery or acceptance of funds as directed by the Plan Record Keeper.

During days that the Investment Manager receives requests for transactions in excess of $1 million net, either into or out of the Investment Account, the Investment Manager in its sole discretion, as it determines to be in the best interests of the participants in the Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the Investment Account; <u>provided</u>, <u>that</u> the Investment Manager will use its best efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity and all the requested transactions that day.  The Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

The Investment Manager shall monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

The Investment Manager shall use independent, approved brokers who shall be selected based on their ability to trade the anticipated volume of securities at a reasonable cost.

Notwithstanding the Declaration of Trust, and the State Street Bank and Trust Long U.S. Government  Index Securities Lending Fund and the Long Corporate Index Securities Lending Fund Declarations this <u>Exhibit C-9</u> may not be amended without the written consent of the Investment Manager and the Company; provided, however, that the

Declaration of Trust and Fund Declarations may be amended in accordance with their terms.

E.    Restrictions and Standards.

The Investment Account shall be comprised of (i) predominantly the Long U.S. Government Index Securities Lending Fund and the Long Corporate Index Securities Lending Fund, and (ii) shall also be comprised of other debt, equity and derivative securities, short-term credit instruments and other instruments and securities.

Securities Lending:  The Investment Manager's Long U.S. Government Index Securities Lending Fund and the Long Corporate Index Securities Lending Fund permits securities lending.  As such, the Investment Manager will receive as a fee for its securities lending services one-half (1/2) of the income generated from the securities lending program.  The remaining securities lending revenues will accrue to the benefit of the Long U.S. Government Index Securities Lending Fund and the Long Corporate Index Securities Lending Fund.

Counterparty Default Indemnification:  The Investment Manager indemnifies clients for the value of the loaned securities in the event that the borrower defaults and fails to return borrowed securities when due.  The Investment Manager, acting as agent for its lending clients, will utilize collateral held to purchase replacement securities which may have appreciated in value subsequent to the default.  If the replacement securities have appreciated to a value which exceeds the value of the collateral tendered, The Investment Manager is responsible for funding the shortfall.  This indemnification does not include funding a collateral deficiency due to credit or market risk of the collateral portfolio.

In addition, the collateral received in exchange for the loaned securities will be invested in certain of the Commingled Funds (as hereafter defined) for which the Investment Manager charges investment management and other fees equal to 7 basis points of the net asset value of such funds.  "Commingled Funds" shall mean any other commingled investment funds maintained by the Trustee.  Any portion of such management fees attributable to the securities lending cash collateral invested in such Commingled Funds shall constitute additional compensation to the Investment Manager for its securities lending services.

For liquidity purposes or otherwise, the Investment Account from time to time may also be invested in public and private securities and derivative securities, including without limitation, options and futures.

F.    Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by

Amoco and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.   <u>Reports</u>

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.   <u>Annual Compliance Statement</u>

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

> "State Street Bank and Trust Company certifies that it has managed the International Equity Index Fund - Far East Investment Account during the year ended _____, continues to manage this account in conformity with the Investment Manager Agreement dated as of __, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

**EXHIBIT D**

**"24 Hour Clock"**

<u>Responsible Parties are as follows</u>:

1. State Street Bank (Defined Contribution Services):
    A. Pricing Team
    B. Cash Team
    C. Trading Team
    D. Client Relations Team
2. State Street Bank (Stock Management)
3. Fidelity:
    A. Asset Services
    B. Client Services Group
    C. Bank Services/Financial Operations
4. Investment Managers
5. State Street Investment Manager Services

| TIME | TASK | RESPONSIBLE PARTY | DELIVERABLE |
|---|---|---|---|
| 7:00 AM | Recordkeeping system transmits Daily Activity File Feed | 3B | EDT feed to 1 |
| 8:00 AM | Prior day US Savings Bonds redemption activity needs to be communicated to State Street's Stock Management Area | 3A | Fax to 2 |
| 8:00 AM | Prior day trading deadline for Barclays Global Investors | 1C | Fax to 4 |
| 8:30 AM | Prior day trading deadline for SSGA funds | 1C | Fax trades to SSGA |
| 9:00 AM | Prior day STIF balance in the Income Fund to Dwight | 1B | E-mail to Dwight |
| 9:00 AM | Transmit prior day net trades to mutual fund window partners. | 3C | |
| 9:30 AM | Trading Deadline with Brinson Partners | 1C | Fax trades to 4 |
| 9:30 AM | Daily trades are received from Loomis,Sayles, PIMCO, J.P. Morgan for the Income Fund | 4 | Fax to 5 |
| 10:00 AM | Trade activity communicated  core fund options | 4 | Fax to 1 |
| 2:00 PM | Trading Deadline for Bankers (AE10, AE11, AE12, AE24) | 1C | Fax trade tickets to Bankers |

**EXHIBIT D**

**"24 Hour Clock" (Continued)**

| | | | |
|---|---|---|---|
| 2:00 PM | Trading Deadline for SEI (Income Fund) | 1C | Call trade into 1-800-858-7233 |
| 3:30 PM | Communicate trading estimates for the following core fund options: <br> -- SSgA (BP Amoco Stock Fund) <br> —Deutsche Asset Management <br>   (all Funds) <br> —BGI (all Funds) -- | 3B | E-mail estimate to 4 |
| 6:30 PM* | Fund managers provide asset position changes and closing prices to State Street on core fund options. | 4 | Fax prices to 1 |
| COB** | Wire transfers are sent and received between SSB and Ims | 1B | Fed wires via the Federal Reserve |
| COB** | Fidelity settles trades on the Mutual Fund Window | 3C | Fed wires via the Federal Reserve |
| COB** | Wire transfers are sent and received between State Street and Fidelity | 1C, 3C | Fed wires via the Federal Reserve |
| 7:15 PM* | Core fund prices are electronically transmitted from State Street to Fidelity | 1 | Transmit NAV outbound file to 3 <br> Fax stock price to 3 |
| 7:00 PM | Mutual Fund Window fund managers transmit prices to Fidelity. | 4 | |
| 8:00 PM | Recordkeeping nightly cycle begins | 3B | |

\*  Telephonic communication should commence if information can't be timely sent.
\*\* COB = Close of business at NY Federal Reserve (typically 6:00 p.m.)
All times are Eastern Standard Time

The Investment Manager agrees to take all reasonable efforts necessary to meet this deadline and to minimize any delay after the deadline in supplying these prices, even if it appears to the Investment Manager that it may not or will not be able to meet the deadline.  The Investment manager further agrees that, if it knows or reasonably expects that the deadline will not or may not be met, it will immediately (i) so notify the Trustee, and (ii) provide the Trustee with its best estimate as to when the delayed pricing information should be available to the Trustee.

## EXHIBIT F-1

## <u>COMPUTATION OF INVESTMENT MANAGEMENT FEE</u>

### (BP Amoco Stock Fund)

The market value of the Investment Account AE01 under management by the Investment Manager shall be computed on a daily basis as provided in Section 6(a) of this Agreement and <u>Exhibit D</u> to this Agreement. One fourth of the annual Investment Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account under management by the Investment Manager.  The management fee for the quarter will be one fourth of the annual fee (expressed as a percentage) computed according to the following formula:

| <u>Incentive Fee</u> | <u>Fee (Basis Points)</u> | <u>Tracking Deviation</u> |
|---|---|---|
| Base Fee | 0.60 | >= 1.00% |
| Incentive Fee – Tier One | 0.25 | 0.67% - 0.99% |
| Incentive Fee – Tier Two | 0.30 | 0.33% - 0.66% |
| Incentive Fee – Tier Three | 0.35 | < 0.33% |

Where the "Tracking Deviation" is defined as:  The absolute value of the difference between the return of the Fund and the return on the underlying common stock, divided by the absolute value of the return of the underlying common stock.

Each incentive fee tier is cumulative such that the fee represents the sum of the base fee and each tier that is achieved.  For example, if the tracking deviation were less than 0.33%, than the annual fee would be (0.60 + 0.25 + 0.20 + 0.35) or 1.50 basis points.

Subject to the following constraint:

In no case will an incentive fee be paid if the Fund's risk exceeds the maximum acceptable level as defined in Exhibit C-1, paragraph C of this agreement.

Until there is a full year of performance history from the effective date hereof, the performance fee schedule will be phased in as follows:

Quarter 1-4:   ¼ of 0.60 Basis Points, with performance fee at the end of the first year based upon the preceding 12 months.

Quarter 5 on:  ¼ of the Incentive Fee as defined above.

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE01.
In addition to the fees above the investment manager may pass through actual cost for proxy solicitation and tabulation.

**EXHIBIT F-2**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(Balanced Index Fund - Conservative)

The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement, including as of the close of trading on the last business day of each month.

The annual management fee (the "Management Fee") for those assets in the Investment Account which are invested in the Investment Manager Funds (set forth in Exhibit D), will be .08 of 1% of the market value of the Investment Account under management.

One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE26 under management by the Investment Manager.  The Management Fee includes investment advisory charges, custody charges (including any sub-custodial charges) for the safekeeping of securities, charges for the purchase and sale of securities, and accounting charges for participation in the Investment Manager funds in which the Investment Account may invest.  The Investment Account's proportional share of any custody and transaction charges assessed against any of the investment manager funds in which the Investment Account invests, shall be treated as a credit against the management fee.  The management fee for participation in the investment manager funds will be charged to the Investment Account.

In addition, the following fees will be charged for management, accounting and custody of the assets of the Investment Account which are held outside the Investment Manager funds for the daily liquidity needs of Plan participants ("Liquid Assets"):  (i) $60,000 annual fee for management of the Liquid Assets, (ii) another annual management fee of .25% of the amount of Liquid Assets, and (iii) an annual fee of .005% of the amount of Liquid Assets for custody fees for the Liquid Assets.  These fees shall be payable quarterly; the fees under (ii) and (iii) above shall be computed on the average of the daily valuations of the Liquid Assets during the quarter.  However, with respect to calculating items (ii) and (iii) listed above, at no time during which the net asset value of the Investment Account exceeds $200 million shall the Company be charged a Liquid Asset Fee in an amount greater than the fee which would be charged in the event that 10% of the assets of the Investment Account were designated Liquid Assets, and during such time any assets designated as Liquid Assets in excess of 10% of the Investment Account shall be included in calculating the Management Fee.

The following shall be charges to the net asset value of the Investment Account (on a daily basis) for transactions in the Liquid Assets:

|                   |   |                        |
|-------------------|---|------------------------|
| Wire Transfers    | - | $7.50 per wire transfer |
| Future Contracts  | - | $25.00 per contract]    |

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE26.

**EXHIBIT F-3**

## COMPUTATION OF INVESTMENT MANAGEMENT FEE

(Balanced Index Fund - Moderate)

The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement, including as of the close of trading on the last business day of each month.

The annual management fee (the "Management Fee") for those assets in the Investment Account which are invested in the Investment Manager Funds (set forth in Exhibit D), will be .08 of 1% of the market value of the Investment Account under management.

One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE12 under management by the Investment Manager.  The Management Fee includes investment advisory charges, custody charges (including any sub-custodial charges) for the safekeeping of securities, charges for the purchase and sale of securities, and accounting charges for participation in the Investment Manager funds in which the Investment Account may invest.  The Investment Account's proportional share of any custody and transaction charges assessed against any of the investment manager funds in which the Investment Account invests, shall be treated as a credit against the management fee.  The management fee for participation in the investment manager funds will be charged to the Investment Account.

In addition, the following fees will be charged for management, accounting and custody of the assets of the Investment Account which are held outside the Investment Manager funds for the daily liquidity needs of Plan participants ("Liquid Assets"):  (i) $60,000 annual fee for management of the Liquid Assets, (ii) another annual management fee of .25% of the amount of Liquid Assets, and (iii) an annual fee of .005% of the amount of Liquid Assets for custody fees for the Liquid Assets.  These fees shall be payable quarterly; the fees under (ii) and (iii) above shall be computed on the average of the daily valuations of the Liquid Assets during the quarter.  However, with respect to calculating items (ii) and (iii) listed above, at no time during which the net asset value of the Investment Account exceeds $200 million shall the Company be charged a Liquid Asset Fee in an amount greater than the fee which would be charged in the event that 10% of the assets of the Investment Account were designated Liquid Assets, and during such time any assets designated as Liquid Assets in excess of 10% of the Investment Account shall be included in calculating the Management Fee.

The following shall be charges to the net asset value of the Investment Account (on a daily basis) for transactions in the Liquid Assets:

|  |  |  |
|---|---|---|
| Wire Transfers | - | $7.50 per wire transfer |
| Future Contracts | - | $25.00 per contract] |

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE12.

**EXHIBIT F-4**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(Balanced Index Fund - Aggressive)

The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement, including as of the close of trading on the last business day of each month.

The annual management fee (the "Management Fee") for those assets in the Investment Account which are invested in the Investment Manager Funds (set forth in Exhibit D), will be .08 of 1% of the market value of the Investment Account under management.

One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE27 under management by the Investment Manager.  The Management Fee includes investment advisory charges, custody charges (including any sub-custodial charges) for the safekeeping of securities, charges for the purchase and sale of securities, and accounting charges for participation in the Investment Manager funds in which the Investment Account may invest.  The Investment Account's proportional share of any custody and transaction charges assessed against any of the investment manager funds in which the Investment Account invests, shall be treated as a credit against the management fee.  The management fee for participation in the investment manager funds will be charged to the Investment Account.

In addition, the following fees will be charged for management, accounting and custody of the assets of the Investment Account which are held outside the Investment Manager funds for the daily liquidity needs of Plan participants ("Liquid Assets"):   (i) $60,000 annual fee for management of the Liquid Assets, (ii) another annual management fee of .25% of the amount of Liquid Assets, and (iii) an annual fee of .005% of the amount of Liquid Assets for custody fees for the Liquid Assets.  These fees shall be payable quarterly; the fees under (ii) and (iii) above shall be computed on the average of the daily valuations of the Liquid Assets during the quarter. However, with respect to calculating items (ii) and (iii) listed above, at no time during which the net asset value of the Investment Account exceeds $200 million shall the Company be charged a Liquid Asset Fee in an amount greater than the fee which would be charged in the event that 10% of the assets of the Investment Account were designated Liquid Assets, and during such time any assets designated as Liquid Assets in excess of 10% of the Investment Account shall be included in calculating the Management Fee.

The following shall be charges to the net asset value of the Investment Account (on a daily basis) for transactions in the Liquid Assets:

| | | |
|---|---|---|
| Wire Transfers | - | $7.50 per wire transfer |
| Future Contracts | - | $25.00 per contract] |

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE27.

**EXHIBIT F-5**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(Mid-Cap Equity Index Fund)

The annual Management Fee shall be equal to .04% of the market value of the Investment Account under management.  The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement. One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE13 under management by the Investment Manager.  Except as identified below, the Management Fee includes all investment advisory charges, custody charges (including any sub-custodial charges) for safekeeping of securities, charges for purchases and sale of securities and accounting charges for participation in the Investment Account.  The Management Fee will be charged to the Mid-Cap Equity Index Fund.

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE13.

**EXHIBIT F-6**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(International Equity Index Fund)

The annual Management Fee shall be equal to .08% of the market value of the Investment Account under management.  The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement. One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE14 under management by the Investment Manager.  Except as identified below, the Management Fee includes all investment advisory charges, custody charges (including any sub-custodial charges) for safekeeping of securities, charges for purchases and sale of securities and accounting charges for participation in the Investment Account.  The Management Fee will be charged to the International Equity Index Fund.

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE14.

**EXHIBIT F-7**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(International Equity Index Fund - Europe)

The annual Management Fee shall be equal to .08% of the market value of the Investment Account under management.  The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement. One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE22 under management by the Investment Manager.  Except as identified below, the Management Fee includes all investment advisory charges, custody charges (including any sub-custodial charges) for safekeeping of securities, charges for purchases and sale of securities and accounting charges for participation in the Investment Account.  The Management Fee will be charged to the International Equity Index Fund - Europe

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE22.

**EXHIBIT F-8**

**COMPUTATION OF INVESTMENT MANAGEMENT FEE**

(International Equity Index Fund - Far East)

The annual Management Fee shall be equal to .08% of the market value of the Investment Account under management.  The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement. One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE23 under management by the Investment Manager.  Except as identified below, the Management Fee includes all investment advisory charges, custody charges (including any sub-custodial charges) for safekeeping of securities, charges for purchases and sale of securities and accounting charges for participation in the Investment Account.  The Management Fee will be charged to the International Equity Index Fund - Far East.

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE23.

**EXHIBIT F-9**

**<u>COMPUTATION OF INVESTMENT MANAGEMENT FEE</u>**

(Bond Index Fund - Long Duration)

The annual Management Fee shall be equal to .06% of the market value of the Investment Account under management.  The market value of the Investment Account shall be computed on a daily basis as provided in Section 6(a) of this Agreement and <u>Exhibit D</u> to this Agreement. One fourth of the annual Management Fee shall be billed in arrears on a quarterly basis, with such quarterly amounts to be calculated based upon the average daily net asset value of Investment Account AE25 under management by the Investment Manager.  Except as identified below, the Management Fee includes all investment advisory charges, custody charges (including any sub-custodial charges) for safekeeping of securities, charges for purchases and sale of securities and accounting charges for participation in the Investment Account.  The Management Fee will be charged to the Bond Index Fund – Long Duration.

The bills shall be forwarded to the Company for approval.  Upon approval, the Company will direct the Trustee of the Plan to pay the Management Fee out of Investment Account AE25.

**EXHIBIT G**

**AMOCO CORPORATION**
**COMMODITY FUTURES TRADING COMMISSION**
**AND FOREIGN FUTURES AND FOREIGN OPTIONS**
**RISK DISCLOSURE STATEMENT**

State Street Bank and Trust Company

THE RISK OF LOSS IN TRADING COMMODITY FUTURES CONTRACTS CAN BE SUBSTANTIAL.  YOU SHOULD, THEREFORE, CAREFULLY CONSIDER WHETHER SUCH TRADING IS SUITABLE FOR YOU IN LIGHT OF YOUR CIRCUMSTANCES AND FINANCIAL RESOURCES.  YOU SHOULD BE AWARE OF THE FOLLOWING POINTS:

1.  You may sustain a total loss of the funds that you deposit with your broker to establish or maintain a position in the commodity futures market, and you may incur losses beyond these amounts.  If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position.  If you do not provide the required funds within the time required by your broker, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

2.  Under certain market conditions, you may find it difficult or impossible to liquidate a position.  This can occur, for example, when the market reaches a daily price fluctuation limit ("limit move").

3.  Placing contingent orders, such as "stop-loss" or "stop-limit" orders, will not necessarily limit your losses to the intended amounts, since market conditions on the exchange where the order is placed may make it impossible to execute such orders.

4.  All futures positions involve risk, and a "spread" position may not be less risky than an outright "long" or "short" position.

5.  The high degree of leverage (gearing) that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you.  Leverage (gearing) can lead to losses as well as gains.

6.  You should consult your broker concerning the nature of the protections available to safeguard funds or property deposited for your account.

ALL OF THE POINTS NOTED ABOVE APPLY TO ALL FUTURES TRADING WHETHER FOREIGN OR DOMESTIC.  IN ADDITION, IF YOU ARE CONTEMPLATING TRADING FOREIGN FUTURES OR OPTIONS CONTRACTS, YOU SHOULD BE AWARE OF THE FOLLOWING ADDITIONAL RISKS:

7.     Foreign futures transactions involve executing and clearing trades on a foreign exchange. This is the case even if the foreign exchange is formally "linked" to a domestic exchange , whereby a trade executed on one exchange liquidates or establishes a position on the other exchange.  No domestic organization regulates the activities of a foreign exchange, including the execution, delivery, and clearing of transactions on such an exchange, and no domestic regulator has the power to compel enforcement of the rules of the foreign exchange or the laws of the foreign country.  Moreover, such laws or regulations will vary depending on the foreign country in which the transaction occurs.  For these reasons, customers who trade on foreign exchanges may not be afforded certain of the protections which apply to domestic transactions, including the right to use domestic alternative dispute resolution procedures.  In particular, funds received from customers to margin foreign futures transactions may not be provided the same protections as funds received to margin futures transactions on domestic exchanges.  Before you trade, you should familiarize yourself with the foreign rules which will apply to your particular transaction.

8.     Finally, you should be aware that the price of any foreign futures or option contract and, therefore, the potential profit and loss resulting therefrom, may be affected by any fluctuation in the foreign exchange rate between the time the order is placed and the foreign futures contract is liquidated or the foreign option contract is liquidated or exercised.

THIS BRIEF STATEMENT CANNOT, OF COURSE, DISCLOSE ALL THE RISKS AND OTHER ASPECTS OF THE COMMODITY MARKETS.

### FIRST AMENDMENT
### TO
### INVESTMENT MANAGER AGREEMENT

**(Dated April 5, 2000)**

WHEREAS, BP Amoco Corporation (the "Company") and State Street Bank and Trust Company ("Investment Manager") entered into an Investment Manager Agreement dated April 5, 2000 ("Agreement");

WHEREAS, the Investment Manager manages, as the delegate for the BP Amoco Investment Committee as "named fiduciary", certain designated investment options for Plans which are funded through the BP Amoco Master Trust for Employee Savings Plans ("Trust");

WHEREAS, the Company and State Street Bank and Trust Company, as Trustee of the Trust, have amended the Trust to provide for the merger into the Trust of the trusts for the ARCO Capital Accumulation Plan, the CH-Twenty Capital Accumulation Plan and the Vastar Resources Capital Accumulation Plan and to make certain other changes, including the offering of Vastar Resources, Inc. Common Stock ("Vastar Stock") as an investment option for the aforementioned plans under the Trust;

WHEREAS, a copy of the First Amendment to the Trust attached hereto is incorporated in Exhibit A of this Agreement;

WHEREAS, the Company desires to amend the Agreement to designate the Investment Manager as the Investment Manager of the Vastar Stock investment option to Plans under the Trust and the Investment Manager hereby accepts such designation; and

WHEREAS, pursuant to Section 10 of the Agreement, the Agreement can be amended upon the agreement of the Company and the Investment Manager.

NOW, THEREFORE, effective July 20, 2000, the Company and the Investment Manager amend the Agreement as follows:

1. By clarifying that, for purposes of this Agreement, "Plan" collectively refers to such qualified savings plans identified as participating plans in the Trust, as may be amended from time to time.

2. By adding the following to the end of Section 6a(i) of the Agreement:

"The Vastar Resources, Inc. Common Stock ("Vastar Stock") in the Investment Accounts shown in Exhibit B-10 will be managed as individual shares as specified in Exhibit C-10."

3. By adding the following to the end of Section 7(i) of the Agreement:

"The Investment Manager will handle the acquisition or redemption of Vastar Stock as set forth in Exhibit C-10."

4. By adding the following to the end of Section 15 of the Agreement:

"Notwithstanding the foregoing, and to the extent permitted by law, shares of Vastar Resources, Inc. Common Stock ("Vastar Stock") held by the Trustee for which the Trustee has not received timely voting or tender instructions will be voted or tendered by the Trustee in the same proportion as shares of Vastar Stock voted or tendered by the Trustee pursuant to Participants' written instructions."

5. By adding Exhibits B-10, C-10, and F-10 as attached hereto to the Agreement to immediately follow Exhibits B-9, C-9 and F-9, respectively.

The Agreement, as amended, will continue in full force and effect.

This Amendment may be executed by the parties in counterparts.

\* \* \* \* \*

Dated this __25th__ day of July, 2000.

BP AMOCO CORPORATION

By: _____

Title: _DIR.- TRUST INVESTMENTS, THE AMERICAS_

STATE STREET BANK AND TRUST COMPANY

By: _Timothy B. Harbert_

Title: _Executive Vice President_

3

## EXHIBIT B-10

## <u>INVENTORY OF ACCOUNT ASSETS</u>

(Vastar Stock)

The assets contained in Investment Accounts AE40, AE44, and AE45 at the State Street Bank and Trust Company represent the funds to be managed by the Investment Manager.

## EXHIBIT C-10

## INVESTMENT STRATEGY GUIDELINES

(Vastar Stock)

A.  Investment Objective.

The investment objective of the Vastar Stock Investment Accounts (the "Investment Accounts") is to provide responsiveness to Plan participants pursuant to the Plan while attempting to match the investment return on Vastar Resources, Inc. Common Stock (Vastar Stock). The investment return on Vastar Stock shall be deemed to include the reinvestment of dividends on Vastar Stock after the inclusion of all fees and expenses.

B.  Investment Strategy.

The Investment Account seeks to provide timely, cost-effective purchases and sales of shares of Vastar Stock and reinvestment of dividends into additional shares of Vastar Stock.

C.  Return Objective.

The performance objective for the Investment Accounts is to provide an investment return which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses.

The Investment Benchmark shall be as follows:

The total return of Vastar Stock.

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Accounts will be computed by linking the monthly returns. The Company shall, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager shall provide the Company with a monthly performance appraisal of the Investment Accounts performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after the Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.   Liquidity

    I.  The Investment Manager shall use its best efforts to complete all internal and open market trades at a reasonable cost.

    II.  The Investment Manager shall attempt to process all trades without affecting the price of Vastar Stock in so far as is practical.

    III.  The Investment Manager shall monitor all daily trading activity to measure the impact of its trading on the price of Vastar Stock.

    IV.  The Investment Manager shall use independent approved brokers or other approved third parties who will be selected based on their ability to trade Vastar Stock at reasonable cost.

    V.  Specific time periods for purchases and sales are set forth below:

**VASTAR STOCK**

SELLING STOCK:  Participant calls in before 4 pm ET, trade is initiated that day on the recordkeeping system, sold for the average sale price the next business day, there is a 3 day settlement period for the stock. Mutual fund will be purchased on the 5th business day (call date + 4) and appears in the participants account on the 6th business day (call date + 5). If participant calls after 4 pm ET the whole process is initiated a the following day's market close.

**Selling Stock (Indicates business days)**

| Day One | Stock Trade Date Day Two | T+1 Day Three | T+2 Day Four | MF Trade Date T+3 Day Five | Day Six |
|---|---|---|---|---|---|
| Participant calls to ask for an exchange from stock to MF. | Stock sell trade is executed and participant account is updated in the nightly cycle. | Participant can see stock shares redeemed | | Stock sell trade settles.  MF shares purchased. | Participant can see MF shares purchased. |

BUYING STOCK: Participant calls in before 4pm ET mutual fund is sold that day, and stock is purchased the following business day for the average purchase price, and appears in the participants account on the 3rd business day (call date + 2)

**Buying Stock (Indicates business days)**

| MF Trade Date Day One | Stock Trade Date Day Two | T+1 Day Four | T+2 Day Four | MF Trade Date T+3 Day Five |
|---|---|---|---|---|
| Participant calls to request an exchange transaction. MF/OF shares are redeemed and participant account is updated in the nightly cycle | Participant can call and see MF/OF shares are redeemed. Stock purchase trade is executed and participant account is updated in the nightly cycle. | Participant can call and see stock shares are purchased. | | Purchase of stock transaction settles. |

CONTRIBUTIONS: Funding for the contribution is received and the stock is purchased the same business day for the average purchase price, and appears in the participants account on the next business day.

**Contributions to Stock (Indicates business days)**

| Trade Date Day One | T+1 Day Two | T+2 Day Three | T+3 Day Four |
|---|---|---|---|
| Client sends contribution data and wire. Purchase trade is executed and participant account is updated in the nightly cycle. | Participant can see shares purchased in his/her account. | | Contribution trade settles. |

DISTRIBUTIONS: participant calls in before 4 pm ET, trade is initiated that day on the recordkeeping system, sold for the average sale price the next business day, there is a 3 day settlement period for the stock. Check is cut on the 5th business day after the settlement is complete.

**Distributions (Indicated business days)**

| Day One | Trade Date Day Two | T+1 Day Three | T+2 Day Four | T+3 Day Five |
|---|---|---|---|---|
| Participant requests pre-approved withdrawals or loan. | Sell trade is executed and participant account is updated in the nightly cycle. | Participant can see stock shares redeemed. | | Redemption trade settles. Check is created and issued. |

To the extent that the Investment Manager determines that it would not be prudent to execute all trades on a given day, (Day Two), then such trades will be completed over additional days as the Investment Manager may determine. This may result in additional business days being added to the above-described processes. In the event that the Investment Manager determines that trades will be executed over more than one business day, then the Investment Manager will notify the recordkeeper and the Trustee in a timely fashion.

E.  Restrictions and Standards.

The Investment Account shall be comprised of (i)Vastar Stock and (ii) cash equivalent accruals, and (iii) residual cash. Unless otherwise directed in writing by the Company, securities lending shall not be permitted.

F.  Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk.  It is acknowledged by BP Amoco and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes.  Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account.  It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.    Reports.

     The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company.  All such reports shall be true and correct and shall not contain any material misstatement or omission.

H.    Annual Compliance Statement.

     Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

     "State Street Bank and Trust Company certifies that it has managed the Vastar Stock Investment Accounts during the year ended _____, continues to manage these accounts in conformity with the Investment Manager Agreement dated as of _____, 2000, and the Investment Strategy Guidelines, and has informed BP Amoco Corporation of any real or perceived violations of the Guidelines in a timely manner."

## EXHIBIT F-10

## COMPUTATION OF INVESTMENT MANAGEMENT FEE

### (Vastar Stock)

The aggregate market value of the Investment Accounts AE40, AE44, and AE45 under management by the Investment Manager shall be computed on a daily basis as provided in Section 6(a) of this Agreement and Exhibit D to this Agreement. One twelfth of the annual Investment Management Fee shall be billed in arrears on a monthly basis, with such monthly amounts to be calculated based upon the average daily net asset value of the Investment Accounts under management by the Investment Manager. The management fee for the month will be one twelfth of the annual fee (expressed as a percentage) computed according to the following formula:

|                       |               |
|-----------------------|---------------|
| .10% of the first     | $20,000,000   |
| .05% of the next      | $30,000,000   |
| .02% of the next      | $100,000,000  |
| .01% over             | $150,000,000  |
| Annual Minimum Fee:   | $25,000       |

### Pass Through Costs:

At actual cost, including travel, special forms and supplies, postage, contract delivery services, proxy services.

## SECOND AMENDMENT TO INVESTMENT MANAGER AGREEMENT

This Second Amendment dated as of January 31, 2002 (this "Second Amendment") to that certain Investment Manager Agreement dated as of the 5th day of April 2000 (the "Agreement") by and between BP Corporation North America Inc., an Indiana corporation and formerly named BP Amoco Corporation (hereafter the "Company") and State Street Bank and Trust Company (hereafter the "Investment Manager").

## RECITALS

1. All capitalized terms used herein shall have the same meanings as ascribed to them in the Agreement unless otherwise provided herein.

2. The BP Amoco Employee Savings Plan has been renamed the BP Employee Savings Plan; the BP Amoco Partnership Savings Plan has been renamed the BP Partnership Savings Plan; the BP Amoco Direct Save Plan has been renamed the BP Direct Save Plan; and the ARCO Capital Accumulation Plan has been renamed the BP Capital Accumulation Plan.

3. The BP Amoco Master Trust for Employee Savings Plans dated as of April 1, 2000 has been amended and restated effective April 6, 2000 and has been renamed the BP Master Trust for Employee Savings Plans.

4. The Parties desire to add a new Investment Account to the Agreement.

IN CONSIDERATION OF THE MUTUAL COVENANTS CONTAINED HEREIN, THE PARTIES HERETO AGREE AS FOLLOWS:

1. A copy of the BP Master Trust for Employee Savings Plans as amended to the date hereof (referred to herein as the "Trust") is attached hereto as Exhibit A and is hereby made a part of the Agreement. The prior Exhibit A attached to the Agreement is superceded by the Exhibit A attached hereto and such prior Exhibit A is deleted from the Agreement.

2. Section 19 of the Agreement is amended by deleting the first address information in such Section and replacing it with the following:

   > BP Corporation North America Inc.
   > Attention: Manager Trust Investments
   > 200 East Randolph Drive, MC 2302
   > Chicago, IL 60601

3. Exhibits B -11, C-11 and F-11 attached hereto, are hereby made a part of the Agreement immediately to follow Exhibits B-10, C-10 and F-10, respectively.

1

4. The parties agree that Exhibit D attached to the Agreement will require amendment following the Transition Completion Date and the parties agree to use their best efforts to agree upon such amendment (and execute a written amendment of Exhibit D) as soon as practicable following the Transition Completion Date.

5. The investment strategy and certain fees marked with asterisks in Exhibits C-11 and F-11, respectively, will become effective only after February 28, 2002 (or such other date as may be designated in writing by the company and delivered to the Investment Manager; February 28, 2002 or such other date being referred to herein as the "Transition Completion Date") and after the Transition Completion Date only with respect to assets in the Investment Account AE02 which are then in the SSgA STIF and Fidelity Money Market (as those terms are defined in Exhibit C-11), or such other fund that is properly defined in Exhibit C-11 by subsequent amendment. All other portions of Exhibits C-11 and F-11 (and all other exhibits) will become effective upon the effective date of this Second Amendment, or upon the initial purchase of units in the SSgA STIF if the initial purchase occurs after the Effective Date. From the effective date of this Second Amendment to and including the Transition Completion Date, the Company will direct the Trustee to sell certain of the assets which are currently in Investment Account AE02 (such assets are referred to herein as "Existing Account Assets") and, with the proceeds of such sales, to purchase units in the SSgA STIF and the Fidelity Money Market.

6. Except as provided in this Second Amendment, the Agreement will continue in full force and effect.

7. This Second Amendment may be executed by the parties in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of January 31, 2002.

BP CORPORATION NORTH AMERICA INC.

By: _____

Title: DIRECTOR - TRUST INVESTMENTS

STATE STREET BANK AND TRUST COMPANY

By: _____

Title: _____

2

EXHIBIT A

## BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS

## EXHIBIT B-11

## INVENTORY OF ACCOUNT ASSETS

Short-Term Investments Fund

The assets contained in Investment Account AE02 represent the funds for the Short-Term Investments Fund to be managed by the Investment Manager, subject to the terms of the Investment Strategy Guidelines contained in Exhibit C-11 and the Second Amendment.

## EXHIBIT C-11

## INVESTMENT STRATEGY GUIDELINES

### Short-Term Investments Fund

### A.   Investment Objective.

The investment objective of the Investment Account (as defined below) for the Short-Term Investments Fund is to provide daily responsiveness to the Plan participants pursuant to the Plan, to seek to provide safety of principal, and to obtain a competitive yield, after the inclusion of all fees and expenses, similar to a registered money market mutual fund, by investing in high quality money market instruments.

### B.   Investment Strategy.[*]

The Short-Term Investments Fund is comprised of two separate investment funds:  One investment fund is invested in the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans – Short Term Investment Fund ("SSgA STIF"); this investment fund is referred to as the "SSgA STIF Investment Fund."  The other investment fund is to be invested in the Fidelity Management and Research Company Institutional Money Market Funds – Money Market Portfolio ("Fidelity Money Market"); this investment fund is referred to as the "Fidelity Money Market Investment Fund."  The SSgA STIF Investment Fund and the Fidelity Money Market Investment Fund are collectively referred to as the "Investment Account."

The SSgA STIF Investment Fund is a short-term investment fund which offers participants in such fund interest in the SSgA STIF, an institutional short-term investment fund designed to track the investment return of 91 day U.S. Treasury Bills as is consistent with the Fund Declaration for the SSgA STIF, a copy of which is attached to this Exhibit C-11.

The Investment Account is a short-term investment fund which offers participants in the Plan an interest in the following funds (the "Funds"):

(1) SSgA STIF
(2) Fidelity Money Market

Target Ranges and the Mid-Points for the Funds as follows:

| Fund | Target Mid-Point | Target Range |
|---|---|---|
| SSgA STIF | 70% | 60-80 |
| Fidelity Money Market | 30% | 20-40 |

---

[*] This investment strategy, including the ranges and mid-points, becomes effective as as of the Transition Completion Date. See Section 5 of the Second Amendment.

As of the last business day of each month the Investment Manager will move assets to and/or from the respective Funds as required to return each Fund to its respective target mid-point (if Funds are within $1 million or 1% of the target midpoint, whichever is smaller, no such rebalancing shall be required). Such monthly adjustments are referred to herein as the "Monthly Rebalance." The Investment Manager will use its discretion as to the manner and Funds it trades in order to accomplish the Monthly Rebalance taking into account costs of trading.

Daily movements of cash due to Plan participant transactions will normally go in and out of the SSgA STIF. The Investment Manager will review the target ranges as of the end of each business day. If as of the end of any business day the allocation of assets in the Investment Account has moved outside the target ranges set forth in the chart above then the Investment Manager will move assets as of the end of such day to and/or from the respective Funds as required to return each Fund to its target mid-point (if Funds are within $1 million or 1% of the target midpoint, whichever is smaller, no such rebalancing shall be required). Any such required daily adjustment is referred to herein as a "Daily Rebalance". The Investment Manager will use its discretion as to the manner and Funds it trades in order to accomplish a Daily Rebalance taking into account costs of trading.

If the Investment Manager is unable to accomplish a Monthly Rebalance or a Daily Rebalance in one business day or the Investment Manager believes attempting to complete a Monthly Rebalance or a Daily Rebalance in one business day would be imprudent or not in the best interests of the participants in the Short-Term Investments Fund, then the Investment Manager shall immediately (and no later than the end of the business day in which the Rebalance was to take place) (i) inform the Company that the Monthly or Daily Rebalance will not be completed that business day and (ii) shall make a recommendation to the Company as the appropriate course of action for the completion of the Rebalancing. In such case, the Investment Manager and the Company shall promptly discuss such recommendation and shall mutually agree upon the course of action the Investment Manager should take to complete the Rebalancing. The Investment Manager shall promptly thereafter take all necessary actions to complete the Rebalancing in accordance with the agreed upon course of action and taking into account at all times the best interests of the participants in the Short-Term Investments Fund.

In addition to the required Rebalancings described above, the Investment Manager shall have the discretion from time to time to rebalance the Investment Account to move towards the Target Mid-Points, provided such discretionary rebalancings are operationally efficient, cost effective, prudent and do not affect the Investment Manager's ability to obtain the Return Objective for the Investment Account provided for below.

The Investment Manager will keep abreast of new initiatives and be prepared to consult with the Company about the possibility of using such new initiatives.

The Investment Manager agrees to cooperate with the Trustee with respect to the daily pricing of the NAV for the Investment Account.

C.    Return Objective.

The Investment Manager shall not be responsible for the investment return of the Fidelity Money Market Investment Fund.

### SSgA STIF Investment Fund Return Objective.

The Fund Return Objective for the SSgA Investment Fund is to provide a return, net of fees, of up to 50 basis points (or more) on an annualized basis, over the SSgA STIF Investment Fund Benchmark (as defined below) and mirrors the risk profile of the underlying SSgA STIF Investment Fund Benchmark after inclusion of all fees and expenses. The total risk as measured by the annualized standard deviation of the investment return over rolling 3-year periods should be less than 15 basis points over the total risk of the SSgA STIF Investment Fund Benchmark measured over the same period. The residual risk, or tracking error, shall be measured as of the annualized standard deviation of the difference in returns between the SSgA STIF Investment Fund and the SSgA STIF Investment Fund Benchmark over rolling 3-year periods. It is anticipated that the annualized tracking error for the SSgA STIF Investment Fund shall be less than 15 basis points.

The SSgA STIF Investment Fund Benchmark shall be the total return of the 91-day U.S.Treasury Bill.

Quarterly and longer period returns for the SSgA STIF Investment Fund Benchmark and the SSgA STIF Investment Fund will be computed by linking the monthly returns. The Company shall, from time to time, alter the construction of the SSgA STIF Investment Fund Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager shall provide the Company with a monthly performance appraisal of the SSgA STIF Investment Fund performance, including a mutually agreed-upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

### Investment Account Return Objective

The performance objective for the Investment Account is to provide an investment return, which replicates the return (i.e. provides minimal tracking error) of the Investment Account Benchmark (as defined below) and mirrors the risk profile of the underlying Investment Account Benchmark after inclusion of all fees and expenses. The total risk as measured by standard deviation of the investment return over rolling 3-year periods should be less than 5 basis points over the total risk of the Investment Account Benchmark measured over the same period. The residual risk, or tracking error, shall be measured as the annualized standard deviation of the difference in returns between the Investment Account and the Investment Account Benchmark over rolling 3-year periods. It is anticipated that the annualized tracking error for the Investment Account shall be less than 1 basis point over rolling three-year periods.

The Investment Account Benchmark shall be constructed from specific indices with the following targeted weights:

| Benchmark Indices | Target Weight |
|---|---|
| SSgA STIF, net of fees | 70% |
| Fidelity Money Market, net of fees | 30% |

Quarterly and longer period returns for the Investment Account Benchmark and the Investment Account will be computed by linking the monthly returns. The Company will, from time to time, alter the construction of the Investment Account Benchmark upon reasonable advance notice to the Investment Manager. The Investment Manager will provide the Company with a monthly performance appraisal of the actual Investment Account performance, including a mutually agreed upon attribution analysis versus the target. Such performance appraisal shall be provided within one business day after all Benchmark Indices for the prior month are available to the Investment Manager. The Investment Manager shall notify the Company by the fifth business day following month end if such indices are not available and the appraisal will not be received by the Company by the fifth business day following month-end.

D.     Liquidity.

The Investment Manager will use reasonable efforts to process all trades without affecting the price of the securities in the Investment Account or securities proposed to be in the Investment Account. The Investment Manager will monitor trading activity to measure the impact of its trading on the price of securities in the Investment Account and proposed to be in the Investment Account.

For transactions made in accordance with estimates from the Trustee given in accordance with Exhibit D on a day the Savings Plan Administrator is open, the Investment Manager warrants next day delivery or acceptance of funds for the SSgA STIF Investment Account as directed by the Trustee up to but not exceeding $100 million per day (the "Maximum Daily Amount");

During days that the Investment Manager receives requests from the Plan in excess of the Maximum Daily Amount, the Investment Manager, after processing the Maximum Daily Amount, in its sole discretion, as it determines to be in the best interests of the participants in the SSgA STIF Investment Account, may suspend trading or take other actions it deems to be in the best interests of the participants in the SSgA STIF Investment Account.

However, notwithstanding the foregoing, in the event transaction requests from the Plan exceed the Maximum Daily Amount in any day the Investment Manager will apply reasonable efforts to complete all open market trades at a reasonable cost and will promptly advise the Company and the Trustee if the Investment Manager is unable to effect the requested liquidity that day or the Investment Manager will endeavor to ensure that adequate liquidity is available to meet withdrawal requests.

8

E.    Restrictions and Standards.

The SSgA STIF Investment Account will be invested solely in the SSgA STIF. The SSgA STIF does not permit securities lending. SSgA shall promptly notify the Company of any changes to the Fund Declaration. SSgA shall give the Company 30 days advance written notice of any changes to the Fund Declaration involving investment guidelines, including without limitation, with respect to the credit quality of investments in the SSgA STIF.

The Investment Manager will inform the Company as soon as possible and no later than the end of the same business day of becoming aware that (i) the securities of any one issuer in the SSgA STIF portfolio represents more than 5% of the SSgA STIF in terms of cost or market value, or (ii) more than 5% of the SSgA STIF in terms of cost or market value is invested in securities which are of lesser quality than "first tier securities" within the meaning of Rule 2a-7(a)(6) of the Investment Company Act of 1940 or not rated in the highest rating categories by at least two Nationally Recognized Statistical Rating Organizations.

F.    Amendments.

The Investment Strategy Guidelines may be revised or altered by mutual agreement of the Company and the Investment Manager if the Investment Manager (i) recommends to the Company that such revision or alteration is necessary for the proper articulation of the Investment Manager's strategy, (ii) recognizes changes in domestic or global market conditions, or (iii) recognizes any changes in conditions of risk. It is acknowledged by the Company and the Investment Manager that these Guidelines shall govern the Investment Manager's management of the Investment Account for all purposes. Any discrepancies, inconsistencies or questions that the Investment Manager has in connection with complying with the Guidelines must be immediately communicated to the Company prior to any execution of trades, contracts or other agreements that may bind the Investment Account, except to the extent any delay would be imprudent. It is expressly acknowledged that the Company may unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager.

G.    Reports.

The Investment Manager shall provide reports regarding the performance of the Investment Account in such form and at such intervals as shall be required by the Company. All such reports, including without limitation, all reports and information supplied by the Investment Manager and provided to participants in the Plan, shall be true and correct and shall not contain any material misstatement or omission.

H.      Annual Compliance Statement.

Not less frequently than annually or at such times as the Company and the Investment Manager agree, the Investment Manager will provide to the Company a written statement substantially in the form set forth below:

"State Street Bank and Trust Company certifies that it has managed the Short-Term Investments Fund Investment Account during the year ended ___ and continues to manage this account in conformity with the Investment Manager Agreement dated as of April 6, 2000, as amended effective January 31, 2002, and the Investment Strategy Guidelines, and has informed BP of any real or perceived violations of the Guidelines in a timely manner."

## Exhibit F-11

### Computation of Investment Management Fee

Short-Term Investments Fund

The market value of the units of participation in the SSgA STIF Investment Fund shall be computed on a Daily Basis as provided in Section 6(a) of the Agreement, including as of the close of trading on the last business day of each month. The Investment Management Fee for all assets in the SSgA STIF Investment Fund for the quarter shall be computed on the average daily valuations during the quarter and shall be one- quarter of:

.09 of 1% of the assets in the SSgA STIF Investment Fund

*plus one-quarter of an additional .0075 of 1% of all the assets in the Investment Account, for management of the Investment Account as described in Exhibit C-11. The Investment Manager Fee for each quarter is due at the end of the quarter upon receipt by the Company of a bill rendered by the Investment Manager in accordance with the foregoing. Upon approval of such bill the Company will direct the Trustee of the Plan to pay amount owed out of the Investment Account AE02.

---

* Such.0075 of 1% shall be payable to the Investment Manager effective only after the Transition Completion Date. See Section 5 of the Second Amendment.

11

## Amendment No. 3 to
## Investment Manager Agreement

This Amendment No. 3 dated July 1, 2003 (this "Amendment") to that certain Investment Manager Agreement dated as of the 5ᵗʰ day of April, 2000 (the "Agreement") between BP Corporation North America Inc., an Indiana corporation and formerly known as BP Amoco Corporation (hereinafter "Company") and State Street Bank and Trust Company (hereinafter "Investment Manager").

In consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1. Exhibit F-1 (Computation of Investment Management Fee) is amended as follows:

   Notwithstanding the provisions of Exhibit F-1:

   a. For the first quarter of 2003 the annualized total base fee shall be 1.4 basis points and there shall be no incentive fee.
   b. For the second quarter of 2003 until the parties establish a source of liquidity as an alternate to the lines of credit described in Exhibit C-1, Subsection D (second to last bullet point), the annualized total base fee shall be 1.0 basis points and there shall be no incentive fee.
   c. After such alternate source of liquidity is established the parties shall use good faith efforts to renegotiate a new base and incentive fee structure. If, after good faith attempts by the parties, a new fee structure has not been agreed upon within three months of the alternate source of liquidity being put in place, the original fee structure described in Exhibit F-1 shall again become in full force and effect, unless both parties agree to extend the period of negotiation. If the parties agree upon a new fee structure within such three-month time period, they shall execute a further amendment to the Agreement describing such fee structure and other pertinent matters.

2. Exhibit C-1 (Investment Strategy Guidelines) is amended as follows:

   The second to the last bullet under subsection D-Liquidity is deleted and replaced with the following:

   "The Company shall use good faith efforts to arrange $200 million in cost-effective lines of credit available for draw down on a daily basis to meet unusually high participant transaction activity. The Investment Manager shall assist in such arrangement if requested by the Company. If the Company is able to make such an arrangement, then the Investment Manager shall use good faith efforts to negotiate the terms of the lines of credit, including costs, security interest in the BP Stock Fund's assets, and other procedures relating to the administration of the lines of credit, subject in

each case to the written approval of the Company. If the Company is unable to so arrange or maintain $200 million in cost-effective lines of credit, it shall discuss with the Investment Manager alternative source or sources of liquidity; provided however, that the Company shall make the final determination. The Company and the Investment Manager shall cooperate in the implementation of any such alternative sources of liquidity."

3.      Exhibit D is deleted from the Agreement and replaced with Amended Exhibit D, "24 Hour Clock" attached hereto.

4.      All other provisions of the Agreement remain unchanged and in full force and effect.

        IN WITNESS WHEREOF, the parties hereby execute this Amendment No. 3 on the first date above written.

BP CORPORATION
NORTH AMERICA INC.

By: _____
Title: _DIRECTOR - TRUST INVESTMENTS_

STATE STREET BANK AND TRUST
COMPANY

By: _____
Title: _Vice President_

**Amended**
**Exhibit D**
**"24 Hour Clock"**
(As of July 1, 2003)

Responsible Parties are as follows:

1. State Street Bank (Defined Contribution Services):
    A. Pricing Team
    B. Cash Team
    C. Trading Team
    D. Client Relations Team
2. State Street Bank (Stock Management)
3. Fidelity:
    A. Asset Services
    B. Client Services Group
    C. Bank Services/Financial Operations
    D. Fidelity Institutional Investor Services (FIIS)
4. Investment Managers (IMs)
5. State Street Investment Manager Services
6. State Street Global Advisors (SSgA) Global Asset Allocation Group

| TIME | TASK | RESPONSIBLE PARTY | DELIVERABLE |
|------|------|-------------------|-------------|
| 7:00 AM* | Recordkeeping system transmits Daily Activity File Feed | 3B | EDT feed to 1C |
| 8:00 AM | Prior day trading deadline for Barclays Global Investors | 1C | Fax to 4 |
| 8:00 AM | Fidelity provides share balances for the Fidelity Institutional Money Market Fund on their website for SSB to access and confirm. | 3D | Updated share balance on Fidelity website for 1B to access. |
| 8:30 AM | Prior day trading deadline for SSgA funds | 1C | Fax trades to SSgA |
| 9:00 AM | Prior day STIF balance in the Income Fund to Dwight | 1B | E-mail to Dwight |
| 9:00 AM | Transmit prior day net trades to mutual fund window partners. | 3C | |
| 9:30 AM | Daily trades are received from Loomis Sayles, J.P. Morgan for the Income Fund | 4 | Fax to 5 |

| TIME | TASK | RESPONSIBLE PARTY | DELIVERABLE |
|---|---|---|---|
| 10:00 AM | Instructions from SSgA to move appropriate dollars to/from each investment within the Short-Term Investments Fund core option based upon BP rebalancing guidelines and procedures. | 6 | Fax to 1A |
| 11:00 AM | Trading deadline for State Street STIF | 1B | System entry |
| 11:00 AM | Fidelity to send SSB daily cash and unit reconciliation | 3C | E-mail to 1B |
| 11:30 AM | SSB to input its reconciliation data and send to Fidelity | 1B | E-mail to 3C |
| 2:00 PM | Trading Deadline for Northern (AE10, AE11, AE12, AE16, AE24) | 1C | Fax trade tickets to Northern |
| 2:00 PM | Trading Deadline for SEI (Income Fund) | 1C | Call trade into 1-800-858-7233 |
| 3:00 PM | Trading Deadline for Fidelity Institutional Money Market (Short-Term Investments Fund) | 1B | Fax trade to 3C; 3C to call, on a recorded line, to confirm*** |
| 3:30 PM | Communicate trading estimates for the following core fund options: -- SSgA (BP Stock Fund) —Northern Trust Investments (all Funds) —BGI (all Funds) -- | 3B | E-mail estimate to 4 |
| 4:00 PM | Trading Deadline for State Street (BP Stock Fund) | 2 | System entry |
| 4:00 PM | Wire transfers to/from Fidelity Institutional Money Market Fund based upon rebalancing instruction from SSgA. | 1C, 3D | Fed wires via the Federal Reserve |
| 5:00 PM | Fidelity to notify SSB of any daily cash unit reconciliation explanation, timing for fax. | 3C | E-mail to 1B |
| 5:00 PM | Fidelity provides accruals for the Institutional Money Market Fund via their website for SSB to access. | 3 | Updated accruals on Fidelity website for 1A to access. |

| TIME | TASK | RESPONSIBLE PARTY | DELIVERABLE |
|---|---|---|---|
| 6:30 PM* | Investment managers provide IM Price Information to State Street on core Fund ("IM Price Information Deadline") | 4 | Fax prices to 1A |
| COB** | Wire transfers are sent and received between SSB and IMs | 1B, 4 | Fed wires via the Federal Reserve |
| COB** | Fidelity settles trades on the Mutual Fund Window | 3C | Fed wires via the Federal Reserve |
| COB** | Wire transfers are sent and received between State Street and Fidelity**** | 1C, 3C | Fed wires via the Federal Reserve |
| 7:15 PM* | SSB Price Information are electronically transmitted from State Street to Fidelity ("SSB Price Information Deadline") | 1A | Transmit NAV outbound file to 3C Fax stock price to 3C |
| 7:30 PM | Transmit total market value of each investment in the Short-Term Investments Fund core option and the aggregate market value of the Short-Term Investments Fund core fund option to SSgA. | 1A | Email to 6 |
| 7:00 PM | Mutual Fund Window fund managers transmit prices to Fidelity | 4 | |
| 8:00 PM | Recordkeeping nightly cycle begins | 3B | |

\*   Telephonic communication should commence if information can't be timely sent.

\*\*   COB = Close of business at NY Federal Reserve (typically 6:00 p.m.)

\*\*\* This is a temporary procedure; the intent, subject to approval by legal counsel at both State Street and Fidelity, is to move towards transmitting trading through Fidelity's web site.  Until such agreement has been made between both parties, the temporary procedure noted here will be enforced.

\*\*\*\* This does not include the transfers related to the Fidelity Institutional Money Market – this wire to take place at 4:00 PM.

All times are Eastern Standard Time



**BP America, Inc.**

Trust Investments, The Americas

4101 Winfield Road

3 West

Warrenville, IL 60555

Fax: 630-821-3458

July 9, 2003

Ms. Jeannine Doyle
Assistant Vice President
CitiStreet
200 Newport Avenue, QN3
North Quincy, MA 02171

**RE: Amendment No. 3 to Investment Management Agreement**

Dear Jeannine:

Enclosed is a fully executed copy of Amendment No. 3 to the Investment Management
Agreement between BP Corporation North America Inc. and State Street Bank and Trust
Company. Please retain this copy for your records. We have kept the other copy for our files.

Please call me at (630) 821-3098 if you have any questions.

Sincerely,

Dawn Kust Gershman
Investment Manager

Enclosure

cc:     M. Damsma, 3W
        J. Klewin, 5W
        R. Glennon, SSgA

**Amendment No. 4 to**
**Investment Manager Agreement**

This Amendment No. 4 dated October 17, 2003 (this "Amendment") to that certain Investment Manager Agreement dated as of the 5th day of April, 2000, as amended (the "Agreement") between BP Corporation North America Inc., an Indiana corporation and formerly known as BP Amoco Corporation (hereinafter "Company") and State Street Bank and Trust company (hereinafter "Investment Manager").

In consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1. Exhibits (Investment Strategy Guidelines) C-2 (Balanced Fund – Conservative), C-4 (Balanced Fund - Aggressive), and C-6 (International Equity Fund) are amended as follows:

Notwithstanding anything in these Investment Strategy Guidelines to the contrary, all references to the Daily EAFE with Securities Lending Fund shall be deemed to refer to the Daily EAFE Securities Lending Fund Series T ("Series T Fund"). If the Turnover Rate (as defined in the Series T Fund Declaration) of the Investment Account exceeds 20% for the previous 30 day rolling period, the Investment Manager and the Company shall discuss, within 15 days of the Company receiving written notice from the Trustee of the Series T Fund (the "Notice"), reasonable alternatives for the assets of the Investment Account. Within 45 days of the Company receiving the Notice, the parties shall negotiate in good faith, taking into account the Investment Manager's fiduciary duty to the Series T Fund and the collective best interests of all of the Series T Fund's participants, to reach an agreement with respect to the assets of the Investment Account.

2. All other provisions of the Agreement remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereby execute this Amendment No. 4 on the first date above written.

BP CORPORATION
NORTH AMERICA INC.

By: _____
Title: _DIRECTOR - TRUST INVESTMENTS_

STATE STREET BANK AND TRUST
COMPANY

By: _____
Title: _____
        **Timothy Connolly**
        Sr. Principal

**Amendment No. 5 to**
**Investment Manager Agreement**

This Amendment No. 5 dated March 29, 2004 (this "Amendment") to that certain Investment Manager Agreement dated as of the 5th day of April, 2000, as amended (the "Agreement") between BP Corporation North America Inc., an Indiana corporation and formerly known as BP Amoco Corporation (hereinafter "Company") and State Street Bank and Trust company (hereinafter "Investment Manager").

In consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1. Exhibit (Investment Strategy Guidelines) C-2 (Balanced Fund - Conservative), is amended as follows:

Notwithstanding anything in these Investment Strategy Guidelines to the contrary, all references to the Daily EAFE Securities Lending Fund Series T ("Series T Fund") shall be deemed to refer to the Daily EAFE Securities Lending Fund .

2. All other provisions of the Agreement, including all Exhibits, as amended, remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereby execute this Amendment No. 5 on the first date above written.

BP CORPORATION
NORTH AMERICA INC.

By: _____
Title: Director, Trust Investments

STATE STREET BANK AND TRUST
COMPANY

By: _____
Title: _____
      **Timothy Connolly**
      Sr. Principal

## AMENDMENT NO. 6 TO
## INVESTMENT MANAGER AGREEMENT

This Amendment No.6 dated as of November 15, 2004 (this "Amendment") to that certain Investment Manager Agreement dated April 5, 2000, as amended, (the "Agreement") between BP Corporation North America Inc., an Indiana corporation formerly known as BP Amoco Corporation (hereinafter the "Company") and State Street Bank and Trust Company (hereinafter "Investment Manager").

In consideration of the mutual covenants contained herein and in the Agreement, the parties hereto agree as follows:

1. Exhibit C-1 (Investment Strategy Guidelines) is amended as follows:

 The second to the last bullet under Subsection D-Liquidity (as amended by Amendment No. 3 to the Agreement) is deleted and replaced with the following:

 •  "If available, and if needed to meet unusually high participant transaction activity, the Investment Manager shall draw down revolving loans from the Revolving Loan Agreement dated as of November 15, 2004 between the Company and the BP Master Trust for Employee Savings Plans, or any similar agreement with an affiliate of the Company (the "Revolving Loan Agreement"). The Investment Manager shall follow the procedures established by the Company for notification, borrowing, payment, and other activities under the Revolving Loan Agreement established by the Company from time to time."

2. Exhibit C-1 (Investment Strategy Guidelines) is amended as follows:

 Item (iii) in the first sentence of Subsection E is deleted and replaced with the following:

 "(iii) cash derived from revolving loans made under the Revolving Loan Agreement."

3. Exhibit C-1 (Investment Strategy Guidelines) is amended as follows:

 The last sentence of subsection A is deleted and replaced with the following:

> "The investment return on BP p.l.c. ADSs shall be deemed to exclude the impact of dividends on BP ADSs after the inclusion of all fees and expenses."

4.    Exhibit C-1 (Investment Strategy Guidelines) is amended by deleting "Amoco" where ever it appears.

5.    Exhibit F-1 (Computation of Investment Management Fee) is amended as follows:

> Notwithstanding the provisions of F-1, the annualized total base fee shall be 1.0 basis points and there shall be no incentive fee. Upon execution of the Revolving Loan Agreement dated as of November 15, 2004 between the Company and the BP Master Trust for Employee Savings Plans, the parties shall use good faith efforts to renegotiate a new base and incentive fee structure. If, after good faith attempts by the parties, a new fee structure has not been agreed upon within three months of the alternative source of liquidity being put in place, the original fee structure described in Exhibit F-1 shall again become in full force and effect, unless both parties agree to extend the period of negotiation. If the parties agree upon a new fee structure within such three-month time period, they shall execute a further amendment to the Agreement describing such fee structure and other pertinent matters.

6.    All other provisions of the Agreement remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereby executed this Amendment No. 4 on the first date above written.

BP CORPORATION                          STATE STREET BANK
NORTH AMERICA INC.                      AND TRUST COMPANY

By: _____            By: _____
Title: _____         Title: _____

i:\law\lawdept\klewin\e\oldhome\savplan\company loan - ims amend no 4.doc



"The investment return on BP p.l.c. ADSs shall be deemed to exclude the impact of dividends on BP ADSs after the inclusion of all fees and expenses."

4.   Exhibit C-1 (Investment Strategy Guidelines) is amended by deleting "Amoco" where ever it appears.

5.   Exhibit F-1 (Computation of Investment Management Fee) is amended as follows:

> Notwithstanding the provisions of F-1, the annualized total base fee shall be 1.0 basis points and there shall be no incentive fee. Upon execution of the Revolving Loan Agreement dated as of November 15, 2004 between the Company and the BP Master Trust for Employee Savings Plans, the parties shall use good faith efforts to renegotiate a new base and incentive fee structure. If, after good faith attempts by the parties, a new fee structure has not been agreed upon within three months of the alternative source of liquidity being put in place, the original fee structure described in Exhibit F-1 shall again become in full force and effect, unless both parties agree to extend the period of negotiation. If the parties agree upon a new fee structure within such three-month time period, they shall execute a further amendment to the Agreement describing such fee structure and other pertinent matters.

6.   All other provisions of the Agreement remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties hereby executed this Amendment No. 6 on the first date above written.

BP CORPORATION                      STATE STREET BANK
NORTH AMERICA INC.                  AND TRUST COMPANY

By:_____          By: Susan C. Daniels
Title: _____          Title: Vice President

i:\law\lawdept\klewinje\oldhome\savplan\company loan - ima amend no 4.doc

### REVOLVING LOAN AGREEMENT

This Revolving Loan Agreement, made as of November 15, 2004 (this "Revolving Loan Agreement"), and entered into by and between **BP CORPORATION NORTH AMERICA INC.**, an Indiana corporation (hereinafter referred to as "Lender"), and the **BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS**, a trust established under the laws of Massachusetts (hereinafter referred to as "Borrower").

### WITNESSETH

WHEREAS, Borrower is a trust for savings plans that provide benefits to the employees of Lender and its affiliates; and

WHEREAS, for good and sufficient business reasons Borrower desires to borrow up to Two Hundred Million United States Dollars (U.S.$200,000,000) from Lender and Lender is willing to make such amount available to Borrower upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the terms and conditions contained herein and other good and valuable consideration, Lender and Borrower hereby agree as follows:

1.  Revolving Loan Commitment. Subject to the terms and conditions of this Revolving Loan Agreement, Lender agrees to make loans to the Borrower on a revolving basis from time to time in such amounts as the Borrower may request; provided that the aggregate principal amount of all such loans outstanding shall not exceed $200,000,000 United States Dollars at any time and provided further that Lender must specifically approve of each Revolving Loan (as hereinafter defined). Lender's obligation to make any new loan hereunder shall terminate on November 15, 2006, unless the term is extended in writing by Lender and Borrower.

2.  Revolving Loan Note. All loans made pursuant to this Revolving Loan Agreement shall be called "Revolving Loans". All Revolving Loans shall be evidenced by the unsecured promissory note of Borrower (herein called a "Revolving Loan Note") in the form set forth in Exhibit A and repayable upon demand of the Lender, or if no demand is made, on the third Business Day following the day the Revolving Loan is made as set forth therein. "Business Day" shall mean a day on which banks are open for general banking business in Chicago, Illinois. The date and amount of each Revolving Loan made by Lender and each repayment of principal thereon received by the Lender shall be recorded by the Lender on the schedule attached to the Revolving Loan Note, and the aggregate unpaid principal amount shown on the schedule shall be refutable presumptive evidence of the principal amount owing and unpaid on the Revolving Loan

Note. The failure to record any such amount on such schedule shall not, however, limit or otherwise affect the obligation of the Borrower hereunder or under the Revolving Loan Note to repay the principal amount of the Revolving Loans.

Borrower shall have the right to make a Revolving Loan at any time and from time to time on request subject to the approval of the Lender. Lender reserves the right to approve each requested Revolving Loan and is not obligated to advance any funds under this Revolving Loan Agreement. Requests for a Revolving Loan must be made before 9:45 a.m. Eastern Time on a Business Day or the Revolving Loan will not be made that day, if approved. Revolving Loans shall be repaid by Borrower no later than 6:00 p.m. Eastern Time, on the third Business Day following the day on which the Revolving Loan is made. All Revolving Loans shall be repaid by Borrower by wire transfer to the account or accounts that Lender may from time to time designate in writing. The form of Loan Request by the Borrower of each Revolving Loan shall be in substantially the form attached hereto as Exhibit B, as may be amended from time to time by the Parties.

3.   Prepayment Rights and Obligations.  Borrower may from time to time prepay the Revolving Loan Note in whole or part without premium or penalty.

4.   Events of Default.  The occurrence of one or more of the following shall constitute an "Event of Default" hereunder:

   a.  Default and continuance thereof for three (3) Business Days in the payment of any Revolving Loan after demand is made by Lender for repayment; or
   b.  Default and continuance thereof for one (1) Business Day in payment after the third Business Day following the making of any Revolving Loan; or
   c.  Borrower fails to pay any other obligation for borrowed money as the same shall become due and payable, after giving effect to any and all applicable grace periods, whether at maturity, upon acceleration or otherwise.

Upon the occurrence of an Event of Default, the holder of the Revolving Loan Note may, by written notice to Borrower, declare the principal on the Revolving Loan Note to be due and payable. Such amount shall thereupon become immediately due and payable without presentment, demand, protest or notice of any kind, all of which are expressly waived.

5.  General.

    a.    No delay on the part of Lender or the holder of the Revolving Loan Note in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.

    b.    No amendment, waiver, modification, supplement or termination of any provision of this Revolving Loan Agreement or of the Revolving Loan Note nor any consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by the Lender and Borrower.

    c.    Any Notice hereunder to the Lender or Borrower shall be in writing and, if mailed, shall be deemed to be given when received. Until changed by a properly given notice, the mailing addresses for notices shall be as follows:

Borrower:
BP Master Trust for Employee Savings Plans
c/o State Street Bank and Trust Company
One Heritage Drive
(JP 4S)
North Quincy, MA 02171

Attention: Jeannine Doyle

With a copy to:
BP America Inc - Trust Investments
3rd Floor
4101 Winfield Road
Warrenville, IL 60555

Attention: Director - Trust
              Investments
              The Americas

Lender:
BP Corporation North America Inc.
c/o Finance Department
3rd Floor
4101 Winfield Road
Warrenville, IL 60555

Attention: Treasurer

    d.    Any term or provision of this Revolving Loan Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and

3

provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, Borrower and Lender agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Revolving Loan Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

e.  This Revolving Loan Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns. This Revolving Loan Agreement and the Revolving Loan Note is not assignable by Borrower, without the written consent of the Lender. The Lender shall give Borrower ten (10) days prior written notice of assignment of this Revolving Loan Agreement.

f.  This Agreement shall be in all respects governed by and construed in accordance with the laws of the State of Illinois.

g.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other party.

IN WITNESS WHEREOF, the parties hereby have caused this Revolving Loan Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS**

By: **STATE STREET BANK & TRUST COMPANY, TRUSTEE**

By:_____
Name:
Title:

**BP CORPORATION NORTH AMERICA INC.**

By: _____
Name: D.B. Pinkert
Title: Secretary



IN WITNESS WHEREOF, the parties hereby have caused this Revolving Loan Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS**

By: **STATE STREET BANK & TRUST COMPANY, TRUSTEE**

By: _Susan C. Daniels_

Name: SusAn C. Daniels

Title: Vice Presiaent

**BP CORPORATION NORTH AMERICA INC.**

By:_____

Name:

Title:

**EXHIBIT A**

## REVOLVING LOAN NOTE

U.S. $200,000,000.00                                                 November 15, 2004

FOR VALUE RECEIVED, the undersigned BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS, a trust organized under the laws of the Commonwealth of Massachusetts ("Borrower") hereby promises to pay to the order of BP CORPORATION NORTH AMERICA INC., an Indiana corporation ("Lender"), the principal sum of TWO HUNDRED MILLION UNITED STATES DOLLARS (U.S. $200,000,000.00), or, if less, the aggregate unpaid principal amount of each and every of the Revolving Loans made by the Lender to the Borrower as shown on Attachment A hereto and evidenced by this Note on November 15, 2004. Each Revolving Loan made under this Note shall be repaid upon demand of the holder or if no demand is earlier made, on the third Business Day following the day upon which such Revolving Loan was made. The outstanding principal amount of each Revolving Loan evidenced hereunder as shown on Attachment A hereto remaining unpaid from time to time shall accrue interest hereunder at a rate equal to zero percent (0%) per annum. "Business Day" shall mean a day on which banks are open for general banking business in Chicago, Illinois.

All Loans evidenced by this Note and all payments and prepayments on such loans and the respective dates thereof shall be entered by the Lender on Attachment A hereto or a continuation thereof or otherwise recorded by the Lender in its internal records and accounts; provided, however, that the failure of the Lender to make such a notation or entry or any error in such notation or entry shall not affect the obligations of the Borrower to repay the principal of such loans.

This Note is the Revolving Loan Note referred to in, and is subject to the terms and conditions of, that certain Revolving Loan Agreement between the Lender and the Borrower dated as of November 15, 2004 (and if amended, all amendments thereto) (the "Revolving Loan Agreement"). Reference is made to the Revolving Loan Agreement for, among other things, the prepayment rights and obligations of the Borrower, the definitions of terms not otherwise expressly defined herein and for a statement of the terms and conditions under which this Note may be accelerated. Upon the occurrence of any Event of Default, as specified in the Revolving Loan Agreement, the principal balance hereof may be declared to be forthwith due and payable.

All parties hereto, whether as makers, endorsers, guarantors, or otherwise severally waive presentment for payment, demand, protest and notice of dishonor.

This Note and the Revolving Loans evidenced hereby have been made in and shall be construed in accordance with and governed by the laws of the State of Illinois. If any provision of this Note or the application thereof is held invalid or unenforceable for any reason, the remainder of this Note and the application thereof will not be affected

7

thereby, the provisions of this Note being severable in any such instance. This Note and the Revolving Loans evidenced hereby shall not be transferred or assigned by the Borrower to any third party without the Lender's prior written approval.

Executed as of the 15 day of November, 2004.

**BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS,**

By: STATE STREET BANK & TRUST COMPANY

By: Susan C. Daniels

Name: Susan C. Daniels

Title: Vice President

thereby, the provisions of this Note being severable in any such instance. This Note and the Revolving Loans evidenced hereby shall not be transferred or assigned by the Borrower to any third party without the Lender's prior written approval.

Executed as of the 15 day of November 2004.

**BP MASTER TRUST FOR EMPLOYEE SAVINGS PLANS,**

By: STATE STREET BANK & TRUST COMPANY

By: _____
Name: _____
Title: _____

**Attachment A** to Revolving Loan Note of BP Master Trust for Employee Savings Plans payable to the order of BP Corporation North America Inc. dated as of November 15, 2004.

| ADVANCES AND PAYMENTS OF PRINCIPAL | | | | |
|---|---|---|---|---|
| Date | Amount of Loan | Amount of Principal Repayment | Unpaid Principal Balance of Each Loan | Aggregate Unpaid Principal Balance of All Loans |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT B
Form Of Loan Request

Date:

From:    Jeannine Doyle, State Street Company Stock Management

To:    Candy Roberts, BP Corporation North America, Inc. - Trust Investments

Subject:    Loan request under Revolving Loan Agreement dated as of November 15, 2004 ("Revolving Loan Agreement") between BP Corporation North America Inc., an Indiana corporation (the "Company") and BP Master Trust for Employee Savings Plans ("Master Trust")

Reference is made to that certain letter dated as of November 15, 2004 from the Company to State Street Bank & Trust Company ("State Street") describing the procedures for requesting and making loans under the Revolving Loan Agreement (the "Procedures Letter"). All capitalized terms used herein and not otherwise defined have the same meanings as set forth in the Procedures Letter. State Street certifies that additional liquidity is required for the BP Stock Fund according to the Standards described in the Procedures Letter.

State Street, as investment manager under the Investment Manager Agreement and on behalf of the Master Trust, requests today a revolving loan under the Revolving Loan Agreement in the amount of $_____.

STATE STREET BANK & TRUST COMPANY

By: _____

Title: _____

Receipt Acknowledged by BP Corporation North America Inc.

Revolving Loan (check one and initial)

| | |
|---|---|
| ☐ | ☐ |
| Approved | Denied |

By: _____

Title: _____

10

i:\law\lawdept\klewinje\oldhome\savplan\final revolving loan agreement.doc

November 15, 2004

State Street Bank
 & Trust Company
One North Enterprise Drive (SWB 5C)
North Quincy, MA 02171

Re: PROCEDURES FOR REQUESTING LOANS FOR BP STOCK FUND

Dear Ladies and Gentlemen:

As you are aware, BP Corporation North America Inc., an Indiana corporation (the "Company") and the BP Master Trust for Employee Savings Plans ("the "Master Trust") have entered into a Revolving Loan Agreement dated as of November 15, 2004 ("Revolving Loan Agreement") which permits the Master Trust to take Revolving Loans in the event of unusually high participant transactions in the BP Stock Fund. Each Revolving Loan must be specifically approved by the Company and will be in default if not paid within three business days following the date of the loan.

State Street Bank & Trust Company is the trustee of the Master Trust. State Street is also the investment manager under the Investment Manager Agreement dated April 5, 2000, as amended, (the "Investment Manager Agreement") between State Street and the Company, which among other matters provides for State Street's responsibilities as investment manager of the BP Stock Fund. State Street and the Company executed Amendment No. 6 to the Investment Management Agreement dated as of November 15, 2004, which among other matters, requires State Street to follow procedures established by the Company with respect to revolving loans under the Revolving Loan Agreement. These procedures are described in this letter.

Procedures:

1.     State Street will determine that additional liquidity (cash) is required in the BP Stock Fund in order for transactions to be completed on the current day. The standard for determining whether cash is required is if for any day the processing of the BP Stock Fund transactions reduces the cash in that fund to zero (0) and State Street determines that it does not anticipate receiving adequate cash from same day stock settlements for all BP Stock Fund transactions requiring cash that day.

2.     If State Street determines that additional liquidity is needed for that day, it will notify the Company, by 9:45 a.m. Eastern time, in writing pursuant to the form of Loan Request attached as Exhibit A, that it is requesting a Revolving Loan. State Street will also notify, via telephone, a representative of its Master Trust Administration department of the Loan Request.

3.     The Company will acknowledge receipt of the Loan Request and either approve or deny the Loan Request by executing the Loan Request as provided. If the Revolving Loan is approved, the Company will deliver an executed and approved Loan Request to its Treasury

Department. If the Revolving Loan is denied, the Company will deliver a copy of the acknowledged and denied loan request to State Street.

4.     If the Revolving Loan is approved, by 10:30 a.m. Eastern Time the Company will notify State Street if the Revolving Loan can be made that same day. If this notice is not received by State Street by 10:30 a.m. Eastern time, or if the notice states that the Revolving Loan cannot be made that day or if the loan is denied, State Street will notify the Company as a confirmation that a loan to the BP Stock Fund from the Company is not available.

5.     If notice of intent to provide the Revolving Loan is given by the Company by 10:30 a.m. Eastern time, the Company will wire transfer the amount of funds provided for in the Loan Request by 6:00 p.m. Eastern time on the day of the Loan Request to:

> State Street Bank and Trust Company
> Boston, MA
> ABA#: 011000028
> Account#: 02819605
> For further credit: BP Master Trust for Employee Savings Plans
> Attn: Jen Ferrari 781-302-6115

State Street will notify its Master Trust Administration Department of the trust accounting entries necessary to reflect the loan in the form attached as Exhibit B.

6.     If requested, the Company will notify State Street as to the Federal Funds reference number assigned to the wire.

7.     State Street will notify the Company as to the receipt of the wire transfer.

8.     On or before the third business day following the receipt of the funds from the loan by the Master Trust, the Revolving Loan will be repaid to the Company. State Street will notify the Company of the repayment date and will wire transfer funds by 6:00 p.m. Eastern Time on such date to:

> Bank One
> Chicago, IL
> ABA#: 071000013
> Account#: 5137152
> Account Name: BP Corporation North America Inc.

State Street will notify its Master Trust Administration Department of the trust accounting entries necessary to reflect the repayment of the loan in the form attached as Exhibit C.

9.     If requested, State Street will notify the Company as to the Federal Funds reference number assigned to the wire.

10.    Any notice pursuant to these Procedures will be provided by telephone (and if required in writing also by facsimile) to the following persons at the applicable organization in the order listed.

If the first person telephoned does not answer the phone, the next person(s) listed must be telephoned until a person listed answers the telephone. Messages left on telephone answering services will not constitute notice under these procedures.

**The Company**
4101 Winfield Road, 3 West
Warrenville, IL  60555            Fax: 630 821 3458
Attn: Candy Roberts              Phone: 630 821 3196
Marie Lukas                      Phone: 630 821 3112
Bruce Nemecek                    Phone: 630 821 3124
Michael Hoffart                  Phone: 630 821 2209

**State Street**                 Fax:  617-657-7433
Jeannine Doyle                   Phone 617 657 7467
Maria Cummings                   Phone 617 657 7460
Christine Walsh                  Phone 617 985 9736

**State Street - Master Trust Administration Department**
                                 Fax:   617-786-2027
Jen Ferrari                      Phone: 781 302 6115
Michelle Robbins                 Phone 781 302 5342

The procedures described in this letter may be modified in a writing executed by the Company and State Street Bank & Trust Company, as trustee of the Master Trust and as investment manager of the BP Stock Fund.

Please acknowledge and agree on behalf of the Master Trust, as trustee and in your capacity as investment manager of the BP Stock Fund to the Procedures above by executing all copies of this letter and returning two fully executed copies to the Company. You should keep one fully executed copy of the letter for your files.

Very truly yours,

BP CORPORATION NORTH
    AMERICA INC.

By: _____
Title: SECRETARY

STATE STREET BANK & TRUST
    COMPANY, as Investment
    Manager and Trustee

By: _____
Title: _____

i:\law\lawdept\klewinje\oldhome\savplan\company loan - procedures for requesting loans1.doc