PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

| | |
|---|---|
| In re: BP p.l.c. SECURITIES LITIGATION | **Civil Action No. 4:10-md-2185** |
| In re:  BP ERISA LITIGATION | **Civil Action No. 4:10-cv-4214** |
| | **JURY** |
| | **Honorable Keith P. Ellison** |

## FIRST AMENDED CONSOLIDATED ERISA COMPLAINT

**FILED UNDER SEAL
PURSUANT TO PROTECTIVE ORDER**

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 9 |
| III. | PARTIES | 10 |
| | **A.** | The Plaintiffs | 10 |
| | **B.** | Defendants | 12 |
| | **(i)** | BP Corporation North America Inc. | 12 |
| | **(ii)** | The Members of the BP North America Board of Directors | 13 |
| | **(iii)** | Designated Officers | 16 |
| | **(iv)** | The Appointing Officers | 20 |
| | **(v)** | The BP Corporation North America Inc. SPIOC and its Members | 20 |
| | **(vi)** | Plan Administrators | 27 |
| | **(vii)** | Doe Defendants | 27 |
| | **(viii)** | Corporate Defendants | 28 |
| IV. | THE PLANS | 30 |
| | **A.** | Description of the Plans | 30 |
| | **B.** | Plan Contributions | 31 |
| | **C.** | Investment Options | 32 |
| | **D.** | Plan Fiduciaries | 33 |
| | **(i)** | BP North America | 34 |
| | **(ii)** | BP North America Board of Directors | 37 |
| | **(iii)** | Designated Officer | 37 |
| | **(iv)** | Appointing Officers | 39 |
| | **(v)** | The SPIOC | 40 |
| | **(vi)** | Plan Administrator | 42 |
| | **(vii)** | Investment Manager | 44 |

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

**TABLE OF CONTENTS (cont.)**

**Page**

V.      IN THE ALTERNATIVE, CLASS ACTION ALLEGATIONS ...................... 44

VI.     FACTUAL ALLEGATIONS ............................................................. 47

    **A.**    Introduction.......................................................................... 47

    **B.**    BP's Safety Record Prior to the *Deepwater Horizon*
    Explosion .......................................................................... 49

    **C.**    The Baker Report Makes Recommendations BP Fails To
    Implement .......................................................................... 52

    **D.**    The Events Leading to Disaster on *Deepwater Horizon*
    Were the Materialization of the Risks that Resulted from
    BP's Deficient Safety and Risk Management Culture .......................... 53

    **E.**    BP Minimized the Reported Spill Rate After the *Deepwater
    Horizon* Disaster ................................................................ 61

    **F.**    BP ADSs Were Trading At Artificially Inflated Prices
    Throughout the Relevant Period ................................................ 64

VII.    MISMANAGEMENT OF THE PLANS' ASSETS ......................................... 77

    **A.**    Defendants closed or changed other investment options ...................... 78

    **B.**    BP's Poor Response To The Deepwater Horizon Spill
    Could Not Have Been Anticipated By The Participants ...................... 80

VIII.   CLAIMS FOR RELIEF UNDER ERISA ............................................. 81

    **A.**    REMEDIES.......................................................................... 83

    **B.**    CAUSATION ...................................................................... 84

    **(i)** Alternative One: Freeze, Limit or Restrict Company Stock
    Purchases.......................................................................... 86

    **(ii)** Alternative Two: Complete and Accurate Disclosure ................... 88

    COUNT I .......................................................................... 89

    COUNT II .......................................................................... 93

IX.     PRAYER FOR RELIEF ................................................................ 97

X.      JURY TRIAL DEMAND ................................................................ 98

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## I.    INTRODUCTION

1.    Plaintiffs, David M. Humphries, Jerry McGuire, Edward Mineman, Charis Moule, Frankie Ramirez, Maureen S. Riely, Thomas P. Soesman, Arshadullah Syed and Ralph Whitley (collectively, "Plaintiffs"), on behalf of the BP Employee Savings Plan ("ESP"), the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP"), and the BP DirectSave Plan ("DSP") (collectively, the "Plan(s)" or the "BP 401(k) Plans"), on behalf of themselves, and only to the extent deemed necessary by the Court, and on behalf of a class of similarly situated participants and beneficiaries of the Plans (the "Participants"), allege the following for their Consolidated Amended Complaint (the "Complaint").

2.    This Complaint is being filed pursuant to the Memorandum and Order dated January 15, 2015, granting in part Plaintiffs' Motion for Leave to File an Amended Complaint. At the direction of the Court, Plaintiffs have not included those claims in this Complaint that the Court has determined to be futile.  Plaintiffs reserve their rights to appeal the Court's decision with respect to those claims.

3.    Plaintiffs bring this action derivatively pursuant to §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3) to recover for fiduciary breaches at any time from January 16, 2007 through June 24, 2010, inclusive (the "Relevant Period").

4.    Alternatively, Plaintiffs bring this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3), on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of any of the Plans, whose accounts held units of the BP Stock Fund (the BP Stock Fund is a unitized fund comprised of BP p.l.c. American Depositary Shares ("ADSs") and cash to

1

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

facilitate daily transactions) that were held in the BP Master Trust, at any time during the Relevant Period (*i.e.*, from January 16, 2007 through June 24, 2010) and were damaged thereby. Excluded from the Class are Defendants and members of the Defendants' immediate families, any entity in which any Defendant has a controlling interest, and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest, and assigns).

5. Defendants (defined below) were tasked with the responsibility of managing the $3 billion BP Stock Fund that represented approximately one-third of the BP ESP, a plan whose sole purpose is to encourage employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement. Defendants breached their fiduciary duties of prudence and loyalty owing to Plaintiffs, the Plans, Participants, and the potential Class, in violation of ERISA sections 404(a) and 405, by continuing to offer, hold, and acquire additional units of the BP Stock Fund at a time when BP ADSs were an imprudent investment for Participants because certain fiduciary defendants knew of material, non-disclosed information relating to BP's serious mismanagement, securities and environmental violations, and criminal misconduct that caused the BP ADSs to be artificially inflated in price, or would have known of the non-disclosed information had they exercised appropriate procedural prudence.

6. In violation of their fiduciary duties under ERISA, Defendants did not adequately consider, evaluate, and/or disclose information pertinent to the value of BP ADSs relating to: (1) the actual status of BP's implementation of critical safety programs designed to prevent accidents like the *Deepwater Horizon*; (2) the status of BP's Operating Management Systems ("OMS") and the potential consequences that could result should BP fail to implement OMS on all rigs; (3) BP's inability to respond to catastrophic deepwater oil spills and the increased probability of such spills due to BP's failure to implement the recommendations set forth in the Baker Report (defined below); and (4) the actual magnitude of the oil spill after the April 20, 2010 *Deepwater Horizon* explosion, including the vast amount of oil that was spilling non-stop into the Gulf of Mexico as a result of the explosion.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

7.     The Individual Defendants (defined below) participated in, knew, or should have known of each of the undisclosed risks involved in investing in the BP Stock Fund as a result of their respective senior positions in BP and their specific responsibilities with regard to the safety and management of BP's operations and procedures in the Gulf of Mexico.   For example, **Defendant Robert Malone**, the President of BP North America, Inc. and a member of the Savings Plan Investment Oversight Committee ("SPIOC" or "Savings Plan Committee"), was particularly responsible for BP's safety, compliance, and regulatory affairs and had the benefit of direct reports for the issues of safety, operations, and compliance.   In addition, Malone had the final veto power on safety, operations, and compliance matters for BP in the United States. Defendant **Lamar McKay** was a BP North America Inc. Board member and Chairman of the SPIOC and was responsible for all the U.S.-based operations and for ensuring the implementation of the recommendations in the Baker Report (defined below), as well as BP's compliance with safety, regulatory, and environmental laws in United States.   Defendant **Anthony Hayward** was an Investment Named Fiduciary and Designated Officer of the Plans and was responsible for overseeing the development and implementation of OMS and for the safe and reliable operations of the Company.   He served as Chairman of the BP Group Operations Risk Committee ("GORC") and was regularly apprised of BP's safety breaches.   He also was the executive liaison to the Safety and Ethics Environment Assurance Committee ("SEEAC"), a committee responsible for ensuring that the Baker Panel's (defined below) recommendations were implemented.   Defendant **Neil Shaw** was an SPIOC member and BP's Senior Vice President and Strategic Performance Unit ("SPU") Leader in charge of the Gulf of Mexico from 2007 to 2009 and Chief Operating Officer of Developments in the Executive Office of BP's Global Exploration and Production Unit.   Shaw was responsible for all aspect of operations in the Gulf of Mexico, including drilling, contracts with BP's rig contractors, and production.   Defendant **James Dupree**, a member of the SPIOC and the Senior Vice President and Strategic Performance Unit Leader of BP's Gulf of Mexico division, was responsible for the implementation of OMS in the Gulf, and knew of BP's safety lapses and inability to handle the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

*Deepwater Horizon* spill or an accident of similar magnitude.  Dupree served as Senior Vice President and SPU Leader of BP's Gulf of Mexico division from November 2009 through at least the end of the Relevant Period.  In his role at SPU, Dupree had first-hand knowledge of BP's safety lapses and inability to handle the Deepwater Horizon spill.  He was the highest ranking BP officer responsible for implementing OMS in the Gulf.  Dupree had several Vice Presidents reporting to him, including Drilling, Health, Safety, Security and Environment, Resource, Operations and Thunderhorse.  When Dupree came on as the SPU Leader of Gulf of Mexico operations, he undertook measures to ensure he had the relevant information regarding BP's operations in the Gulf of Mexico by taking steps such as having standing meetings every Thursday for two to three hours with all of his direct reports, where he began the meetings with the topic of safety and where they stood on safety in the Gulf; obtaining reviews on drilling, operations, and the status of projects; performing a management change of process with Defendant Shaw; running the operation with quarterly performance reviews; and meeting with different organizations at different times to get up to speed on their issues.

8.     Defendants knew or should have known that the value of the BP ADSs was artificially inflated but failed to (1) prudently and loyally manage the BP Stock Fund; (2) monitor other Plan fiduciaries and to provide them with complete and accurate information; and (3) evaluate, consider and take alternative lawful actions that could have mitigated or avoided the loss of hundreds of millions of dollars of retirement assets suffered by the Plans and their Participants.

9.     Instead of protecting the Plans and acting solely in the interests of the Plans and their Participants, Defendants found themselves hopelessly conflicted and making imprudent decisions designed to maintain or inflate the value of the BP ADSs and to increase their own compensation or status at BP.

10.     Defendants' acts and omissions must be examined in the context of BP's numerous disastrous incidents, one right after the other, and the Company's inability or unwillingness to

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

improve its operations.  Beginning in January 2007, in response to multiple catastrophes that hampered its business and resulted in the loss of life and billions of dollars in liabilities between 2002 and 2007, BP publicly made unequivocal and repeated representations that it would focus on process safety, that it had adequate procedures in place to deal with oil spills in the Gulf of Mexico and elsewhere, and that it had established appropriate processes to ensure safety.

11.    The BP U.S. Refineries Independent Safety Review Panel issued a report of its findings and conclusions in January 2007 following its lengthy investigation of the explosion at BP's Texas City refinery (the "Baker Report").  The Baker Report detailed a substantive critique of significant problems with BP's safety culture.  BP announced in press releases, public filings, and investor presentations that it had taken material steps to address the recommendations of the Baker Report.

12.    In an analyst conference call on February 6, 2007, Defendant Anthony Hayward, the Chief Executive Officer ("CEO") of BP at the time and an Investment Fiduciary of the Plans, gave assurances that "[w]e have further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency."

13.    In stark contrast to Anthony Hayward's February 6, 2007 statements and his November 8, 2007 statements at a Houston Forum that BP was committed to implementing the Baker Panel's safety recommendations and making BP a "world leader in process safety," BP was woefully unprepared to safely conduct operations at the Macondo well in the Gulf of Mexico or respond to a well failure.  As a result, when the well's integrity failed, BP was unable to deal with the disaster.  Hayward acknowledged following *the Deepwater Horizon* explosion that BP "did not have the tools you would want in your tool kit" to contain the spill.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

14.     Unbeknownst to the Plans' Participants, Defendants were aware or should have been aware, during the Relevant Period, of the multiple and systemic safety problems and grave mismanagement that continued at BP and ultimately led to the *Deepwater Horizon* disaster.

15.     After the *Deepwater Horizon* explosion on April 20, 2010, certain Defendants concealed facts from the public and the Participants concerning the actual amount of oil that was spilling into the Gulf of Mexico and BP's efforts to stem the flow of oil.

16.     The massive discharge of oil was found to have been the result of BP's "gross negligence" and "willful misconduct."  *See* Findings of Fact and Conclusions of Law – Phase One Trial, In re: Oil Spill by the Oil Rig "*Deepwater Horizon*" in the Gulf of Mexico on April 20, 2010, MDL 2179, In the United States District Court for the Eastern District of Louisiana (Dkt. 13,355, Sept. 4, 2014), ¶¶ 470, 480, 499.  Similarly, BP's subsidiary, BP Exploration and Production, Inc. ("BP E&P"), entered a guilty plea to 14 criminal charges in 2012 (including 12 felony counts) related to the *Deepwater Horizon* disaster.  BP approved the plea, in which BP agreed to be bound by the guilty plea and to guarantee BP E&P's payment of a criminal recovery of $4 billion, including criminal fines of $1.25 billion, $2.744 billion in other criminal recoveries, five years of probation, and mandatory restitution for the families and businesses damaged by the *Deepwater Horizon*.  *See* Guilty Plea Agreement in *U.S. v. BP Exploration & Production, Inc.*, (E.D. La. Nov. 15, 2013) (*available at* http://www.justice.gov/iso/opa/resources/43320121115143613990027.pdf).

17.     Similar to the devastating situations involving fiduciaries of other large 401(k) plans that imprudently offered employer stock to their employees, such as Enron and WorldCom, this case presents extraordinary circumstances where the senior executives of one of the largest companies in the world, charged with the highest duty known to law, participated in, were aware

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of, or should have been aware of the Company's failure to disclose its significant management and operating problems.  This resulted in the artificial inflation of the value of the BP Stock Fund and later caused significant losses to the Plans.

18.    In January 2007, at the beginning of the Relevant Period, the BP Stock Fund comprised approximately $3.1 billion of the approximate $9.5 billion in total assets held by the combined Plans, or almost one third of the Plans' total assets.  The performance of the Plans' assets invested in BP ADSs was dependent on Defendants' execution of a comprehensive investment oversight process to ensure an adequate and ongoing evaluation of the prudence of the BP Stock Fund as an unrestricted investment option of the Plans, and a decision-making process to balance carefully the risks of the Plans' investment in BP ADSs with the probability of losses should BP's performance falter as a result of, among other things, further operational, safety or regulatory problems.  By the end of the Relevant Period, the BP Stock Fund's value had fallen to approximately $1.25 billion, due in significant part to the dramatic decline in the value of BP ADSs.  Fortunately, BP ultimately was able to cap the Macondo well and stop the spill, but not before the April 20, 2010 explosion of the *Deepwater Horizon* resulted in one of the largest environmental catastrophes in history.

19.    Neither BP nor the Plans have fully recovered from the incident, and although the price of the BP ADSs has rebounded to some extent with the rise in the value of the stock market, the Plans and the Participants have suffered hundreds of millions of dollars in losses that could have been avoided had the fiduciaries of the Plans acted loyally and prudently by freezing the BP Stock Fund when it became an inappropriate investment option and/or by making other lawful investment decisions that were consistent with the securities laws.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

20.     Prior to the explosion, BP ADSs were trading at approximately $60.  In the four years since the *Deepwater Horizon* disaster, the value of the BP ADS has never recovered to its pre-explosion price.

21.     Given the admitted crucial importance of safety to BP's business and the myriad of problems it experienced in the years leading up to the *Deepwater Horizon* disaster, prudent fiduciaries in similar circumstances would have considered themselves bound to limit, restrict, or terminate the BP Stock Fund during the period of time when it was imprudent to purchase additional units of BP ADSs.  Defendants did none of the above, and the minutes of the SPIOC indicate that Defendants failed to evaluate or consider these options or any other options designed to mitigate or eliminate the losses suffered by the Plans.  This case is not about requiring fiduciaries to make unreasonable predictions based on speculation; but rather it is about requiring fiduciaries to comply with their fiduciary responsibilities under ERISA, to conduct an adequate procedural investigation in evaluating and considering the suitability of an unrestricted BP Stock Fund at a time when BP was engaging in securities fraud, failing to meet important safety and regulatory requirements in connection with its oil and gas operations, and engaging in criminal conduct.

22.     In Count I, Plaintiffs allege that certain Defendant-fiduciaries – Defendants BP North America Inc. (defined below), Anthony Hayward, Neil Shaw, James Dupree and Lamar McKay – insiders with personal knowledge of the serious mismanagement at BP – failed to take appropriate actions to protect the Plans and Participants as news concerning the Macondo well blowout and the safety failures emerged.  Count I further alleges that the Corporate Defendants (defined below) are liable under the doctrine of *respondeat superior* for the breaches of fiduciary duty committed by Defendants BP North America Inc., Anthony Hayward, Neil Shaw, James

8

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Dupree and Lamar McKay because each Corporate Defendant knowingly and actively participated in the breaches of fiduciary duty committed by these employees.

23.   Defendants' actions and inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").  The express intent of these Plans was to provide Participants with the ability to save for retirement, and to do so Defendants had the duty to provide Participants with the information necessary to allow them to select suitable investments for their individual Plan accounts.

24.   Plaintiffs' Count II alleges that the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, the SPIOC Defendants, and the Corporate Defendants (defined below) breached their fiduciary duties by failing to adequately monitor other persons responsible for the management and administration of the Plans' assets, including State Street Bank and Trust ("State Street"), although such Defendants knew or should have known that such other fiduciaries were allowing the Plans to continue offering the BP Stock Fund as an investment option and investing the Plans' assets in the BP Stock Fund.

## II.   JURISDICTION AND VENUE

25.   Plaintiffs' claims arise under and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

26.   This Court has personal jurisdiction, both general and specific, over Defendants because ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and because all Defendants either reside in the United States or are subject to service of process in the United States.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

27.    Venue is appropriate in the Southern District of Texas pursuant to 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multi-District Litigation entered October 13, 2010.   Venue is also proper in the Northern District of Illinois pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because, during the Relevant Period, the Plans were administered in that District, some or all of the Defendants resided or maintained their primary place of business in that District, and some or all of the fiduciary breaches for which relief is sought occurred in that District.   By filing this Complaint in this District, Plaintiffs do not waive their right to have the action transferred to the Northern District of Illinois.

## III.    PARTIES

### A.    The Plaintiffs

28.    Plaintiff David M. Humphries is a resident of Texas.   He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).   During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Humphries' individual account.

29.    Plaintiff Jerry McGuire is a resident of Illinois.   He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).   During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff McGuire's individual account.

30.    Plaintiff Edward Mineman is a resident of Texas.   He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).   During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Mineman's individual account.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

31.    Plaintiff Charis Moule is a resident of Florida.  She is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Moule's individual account.

32.    Plaintiff Frankie Ramirez is a resident of California.  He is a participant in the CAP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Relevant Period, the CAP purchased or maintained units of the BP Stock Fund for Plaintiff Ramirez's individual account.

33.    Plaintiff Maureen S. Riely is a resident of Maryland.  She is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Riely's individual account.

34.    Plaintiff Thomas P. Soesman is a resident of Florida.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Soesman's individual account.

35.    Plaintiff Arshadullah Syed is a resident of Illinois.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a). During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Syed's individual account.

36.    Plaintiff Ralph Whitley is a resident of Florida.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Relevant Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Whitley's individual account.

### B.     Defendants

37.     As more fully described below, Defendants are: BP Corporation North America Inc., BP p.l.c., BP America Inc., BP North America Inc.'s Board of Directors, The Savings Plan Investment Oversight Committee, Lord John Browne, Corey Correnti, Marvin L. Damsma, Richard J. Dorazil, James Dupree, Patrick Gower, Anthony Hayward, Jeanne M. Johns, Robert A. Malone, Lamar McKay, Patricia H. Miller, Stephanie C. Moore, Stephen J. Riney, Brian D. Smith, Neil Shaw, Thomas L. Taylor, and Gregory T. Williamson.

38.     The "Individual Defendants" are:  Lord John Browne, Corey Correnti, Marvin L. Damsma, Richard J. Dorazil, James Dupree, Patrick Gower, Anthony Hayward, Jeanne M. Johns, Robert A. Malone, Lamar McKay, Patricia H. Miller, Stephanie C. Moore, Stephen J. Riney, Brian D. Smith, Neil Shaw, Thomas L. Taylor, and Gregory T. Williamson.

39.     Defendants BP p.l.c., BP America Inc. ("BP America"), and BP Corporation North America Inc. ("BP North America") are collectively referred to herein as the "Corporate Defendants."

40.     At all relevant times, under the governing Plan documents, the fiduciaries of the Plans that had the discretion, control, and/or authority over the BP Stock Fund and/or the duty to appoint and/or monitor the fiduciaries that had discretion, control, and/or authority over the BP Stock Fund, included BP North America, the members of the BP North America Board of Directors, the Designated Officer(s), the Appointing Officer, the Plan Administrator, and the SPIOC.

### (i)     BP Corporation North America Inc.

41.     Defendant BP Corporation North America Inc. ("BP North America") is an Indiana

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

corporation with its principal place of business in Warrenville, Illinois.  BP North America is a wholly-owned subsidiary of BP America Inc. and an indirect, wholly-owned subsidiary of BP p.l.c.

42.    At all relevant times, BP North America was the Plan sponsor and a fiduciary of each of the Plans, and it had the discretion, authority, and/or control to add, delete, and/or freeze the BP Stock Fund and to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment.

43.    BP North America, acting through its Board of Directors and its employees, appointed the persons who managed and administered the Plans on a day-to-day basis.  BP North America is legally responsible for the actions of its Board of Directors and appointed persons alleged herein.  BP North America is an Insider Defendant and a Corporate Defendant.

### (ii)    The Members of the BP North America Board of Directors

44.    Defendant Robert A. Malone ("Malone") was a BP North America Inc. Board member ("BP North America Board Member") during the Relevant Period (specifically, from June 15, 2006 through February 1, 2009), a member of the SPIOC from June 30, 2006 through February 1, 2009, a "Designated Officer" under the terms of the Plans from July 1, 2006 to February 1, 2009, an "Appointing Officer" and an "Appointing Officer Acting as Applicable Administrative Fiduciary" under the terms of the Plans during the Relevant Period.  During the Relevant Period, Malone was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

45.     During the Relevant Period, Malone was the President of BP North America Inc. (specifically, from 2007 through 2009).  He is a long-time BP executive with experience in operations and health, safety, security, and the environment.  From 2004 through 2006, Malone also served as CEO of BP Shipping Limited, where he was responsible for the operation of the petroleum industry's largest oil and natural gas fleet.  In June 2006, Malone was appointed Chairman of the Board of Directors ("Board") and President of BP America Inc., and he held these positions until 2009.  In his capacity as Chairman of the Board and President of BP America Inc., Malone reported to the Group Chief Executive, Defendant Lord John Browne. According to BP's January 2007 report to the BP Refineries Independent Safety Panel, Malone was particularly focused on safety, compliance, and regulatory affairs, and had the benefit of direct reports for the safety and operations function and the compliance and ethics function of BP North America Inc.  In addition, Malone had the ultimate veto power on safety, operations, and compliance matters for BP in the United States.  Less than two months after his appointment, Malone acknowledged to a Congressional committee that repeated safety problems had generated questions about BP's credentials and led to accusations that the Company had profited at the expense of employee safety.

46.     Defendant Lamar McKay ("McKay") was a BP North America Inc. Board member during the Relevant Period (specifically, from April 13, 2009 through at least the end of the Relevant Period), a "Designated Officer" under the terms of the Plans from December 18, 2007 to at least the end of the Relevant Period, an "Appointing Officer" under the terms of the Plans during the Relevant Period, a member and Chairman of the SPIOC from May 15, 2008 to at least the end of the Relevant Period, and an "Appointing Officer Acting as Applicable Named Fiduciary" under the terms of the Plans during the Relevant Period.  During the Relevant Period,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

McKay was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

47.     McKay has served as the Chairman and President of BP America during the Relevant Period, and has served as President of BP North America from 2009 through the present.  McKay is the chief representative of BP in the United States.  McKay is also a member of the BP p.l.c. executive management team and has led BP's special projects team from early 2008.  According to McKay's testimony before Congress on May 11, 2010, he is BP's lead representative in the United States and is responsible for broad oversight and connectivity across all of BP's U.S.-based operations.

48.     Defendant Stephen J. Riney ("Riney") was a BP North America Board member from March 1, 2005 to February 12, 2007, and a member of the SPIOC from February 1, 2005 to March 14, 2007.  During the Relevant Period, Riney was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

49.     Riney also served as Vice President of Finance for BP America and currently serves as Global Head of Mergers and Acquisitions for BP p.l.c.

50.     Defendant Brian D. Smith ("Smith") was a BP North America Board Member from June 15, 2009 to at least the close of the Relevant Period, and a member of the SPIOC from July

15

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

1, 2009 through at least the end of the Relevant Period.  During the Relevant Period, Smith was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

51.  Smith also served as Vice President and Chief Financial Officer ("CFO") of BP America and BP North America during the Relevant Period.  He currently serves as Vice President of Structured Finance for BP p.l.c.'s Western Hemisphere division.

52.  Defendant Thomas L. Taylor ("Taylor") was a BP North America Board Member from February 12, 2007 to July 1, 2009.  In addition, he was a member of the SPIOC from March 14, 2007 to September 1, 2009.  During the Relevant Period, Taylor was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

53.  Taylor also served as Vice President and CFO of BP North America, as well as Global Vice President, Business Financial Services and CFO for the Americas for BP p.l.c. from 2007 through 2009.

54.  Defendants Malone, McKay, Riney, Smith and Taylor will be referred to herein as the "BP North America Board Defendants."

### (iii)  Designated Officers

55.  Defendant Lord John Browne ("Browne") was a "Designated Officer" under the terms of the Plans during the Relevant Period (specifically, from December 31, 1998 to May 1,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

2007).   As a Designated Officer, he was also an Investment Named Fiduciary during the Relevant Period.   During the Relevant Period, Browne was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

56.    Browne joined BP in 1969 and has held a variety of exploration and production posts in Alaska, New York, California, Canada, and England.   In 1986, Browne became Executive Vice President and CFO of Standard Oil of Ohio and in 1987 became CEO of Standard Oil Production Company.   In 1989, he became Managing Director and CEO of BP Exploration based in London, England.   In September, 1991, he became Managing Director of BP p.l.c.'s Board of Directors.   Browne served as the Group Chief Executive of BP p.l.c. from 1995 until 2007.

57.    Defendant Richard J. Dorazil ("Dorazil") was a "Designated Officer" under the terms of the Plans during the Relevant Period (specifically from December 18, 2007 to at least the end of the Relevant Period), a member of the SPIOC from January 7, 2007 through at least the end of the Relevant Period, and a Plan Administrator and an Administrative Named Fiduciary, Applicable Administrative Named Fiduciary, and Applicable Named Fiduciary during the Relevant Period.   As a Designated Officer, he was also an Investment Named Fiduciary during the Relevant Period.   He signed BP p.l.c.'s Forms 11-K Annual Report (hereinafter, "Form 11-K") filed with the U.S. Securities and Exchange Commission ("SEC") and Form 5500s filed with the Department of Labor ("DOL") in his capacity as Plan Administrator during the Relevant Period.   During the Relevant Period, Dorazil was a fiduciary within the meaning of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

58.     While Dorazil was acting as a fiduciary with respect to the Plans, he was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the Relevant Period, Dorazil was an employee of BP North America with the title of Vice President, HR Total Rewards, Western Hemisphere, and his employment at BP North America included human resources work and implementation of BP North America's employee benefit programs, including the Plans.  The breaches of fiduciary duty committed by Dorazil described in this Complaint were committed while he was acting in the scope of his employment by BP North America Inc.

59.     Defendant Anthony Hayward ("Hayward") was a Designated Officer during the Relevant Period.  As a Designated Officer, he was also an Investment Named Fiduciary during the Relevant Period.  During the Relevant Period, Hayward was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

60.     Hayward began his career at BP in 1982.  By the time the Relevant Period began, he had risen to Group Chief Executive of BP p.l.c.

61.     At the beginning of his career, Hayward worked as a rig geologist and held a series of technical and commercial positions in BP E&P.  He came to the attention of then-CEO

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Browne at a leadership conference in Phoenix, Arizona, in 1990, and was named Browne's Executive Assistant at that time.   In 1999, he became Group Vice President of BP Amoco Exploration and Production.   In 2000, he was named Group Treasurer of BP p.l.c.   In that capacity, he was responsible for global treasury operations, corporate finance, and mergers and acquisitions.   In 2002, he became CEO of Exploration and Production, finally becoming Group Chief Executive of BP p.l.c. in May 2007.

62.    Defendant Hayward served as chairman of the GORC, whose members included executives from across BP's various segments and which held monthly meetings to oversee and build a foundation for consistent, safe, and reliable operations at BP.   In his capacity as Chairman of GORC, Hayward was regularly informed of accidents and safety breaches across all of BP's operations, and he was fully briefed on the outcome of investigations into those breaches.   Defendant Hayward was also the executive liaison to the SEEAC, a committee of the Company's Board of Directors responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations. GORC prepared regular safety reports for the SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book."

63.    Hayward was also responsible for overseeing the development and implementation of OMS, which was instituted in the wake of the Texas City disaster in 2005 and touted as a blueprint for achieving safety at BP.   Hayward was "responsible for the safe and reliable operations of the company" and was "the ultimate in the safety chain of command" across all of BP's operations.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

64.     Hayward has appeared in this District and elsewhere in the United States to make statements regarding BP's commitment to safety.  For example, Hayward appeared at a town hall meeting in Houston, Texas in the aftermath of the Texas City Refinery Explosion in 2006.  He gave a presentation at the Houston Forum on November 8, 2007, assuring those in attendance that BP would implement improvements to safety.  In addition, Hayward serves as a member of the MIT Energy Advisory Board and, in connection with that position he gave a speech at MIT in 2009.  He also spoke at the Stanford Business School that same year.  Hayward is currently involved as a partner in AEA Investors, a private equity firm based in New York.  Hayward appeared in television commercials that aired throughout the U.S. apologizing for the Gulf Spill tragedy.  Hayward also made this apology in full-page ads appearing in major daily U.S. newspapers, including *The New York Times*, *The Wall Street Journal*, *USA Today*, and *The Washington Post*.

65.     Defendant Malone (from July 1, 2006 to February 1, 2009) and Defendant McKay (from April 13, 2009 to at least the end of the Relevant Period) were Designated Officers and, as such, were also Investment Named Fiduciaries during the Relevant Period.

66.     Hereafter, Browne, Hayward, Dorazil, Malone and McKay shall be referred to as the "Designated Officer Defendants."

### (iv)     The Appointing Officers

67.     Additionally, Malone and McKay were Appointing Officers during the Relevant Period and shall hereafter be referred to as the "Appointing Officer Defendants."

### (v)     The BP Corporation North America Inc. SPIOC and its Members

68.     Defendant, the SPIOC, is a Named Fiduciary ("Named Fiduciary" means a named fiduciary within the meaning of ERISA, including, without limitation, sections 402, 403, or 405 of ERISA) of the Plans, as discussed below.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

69.     Defendant Corey T. Correnti ("Correnti") was a member of the SPIOC from July 1, 2009 through at least the end of the Relevant Period.  During the Relevant Period, Correnti was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

70.     Correnti began working for BP p.l.c. in London in 1998.  Prior to the start of the Relevant Period, he transferred to BP North America.  Correnti has held several positions in BP North America, including Chief Operating Officer ("COO"), Products Supply and Trading.  During the Relevant Period, Correnti served as President of BP North America's East and Gulf Coast fuels value chain.  Correnti currently holds the position of Vice President and Strategic Performance Unit Leader of BP Products North America.

71.     Defendant Marvin L. Damsma ("Damsma") was a member of the SPIOC from about September 20, 2004 to April 1, 2008, and the Director, Trust Investments, The Americas, from at least the beginning of the Relevant Period to June 10, 2008.  As Director, Trust Investments, The Americas, Damsma was also an Investment Named Fiduciary.  Pursuant to the Bylaws of the SPIOC, the Director, Trust Investments, The Americas, has the authority to act, in the case of an emergency, on behalf of the SPIOC to the extent he reasonably believes it is necessary to avoid a fiduciary breach under ERISA or to avoid a large loss by an ERISA plan or trust.  SPIOC Bylaws, Sec. 5.12.  During the Relevant Period, Damsma was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

72.    While Damsma was acting as a fiduciary with respect to the Plans, he was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the Relevant Period, Damsma was an employee of BP America with the title of Director of Trust Investments.  His employment included implementation of BP's employee benefit programs, including the Plans.  The breaches of fiduciary duty committed by Damsma described in this Complaint were committed while he was acting in the scope of his employment by BP America.

73.    Defendant James Dupree ("Dupree") was a member of the SPIOC from February 1, 2010 until at least the end of the Relevant Period.  During the Relevant Period, Dupree was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

74.    Dupree has served as Senior Vice President and Strategic Performance Unit ("SPU") Leader of BP's Gulf of Mexico division from November 2009 through at least the end of the Relevant Period.  In his role in the SPU, Dupree had first-hand knowledge of BP's safety lapses and inability to handle the *Deepwater Horizon* spill.  He was the highest ranking BP officer responsible for implementing OMS in the Gulf.  Dupree had several Vice Presidents reporting to him, including Drilling, Health, Safety, Security and Environment, Resource, Operations and Thunderhorse.  When Dupree came on as the SPU Leader of Gulf of Mexico operations, he undertook measures to ensure he had the relevant information regarding BP's

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

operations in the Gulf of Mexico by taking steps such as the following:  having standing meetings every Thursday for two to three hours with all of his direct reports, where he began the meetings with the topic of safety and where everyone within the Company at the meeting stood on safety in the Gulf; obtaining reviews on drilling, operations, and the status of projects; performing a management change of process with Defendant Neil Shaw; running the operation with quarterly performance reviews; and meeting with different organizations at different times to get up to speed on their issues.

75.     Dupree also served as Board member of BP America Inc.  Forbes reported on May 15, 2010, that Dupree testified to the House Energy and Commerce Committee that the Macondo well failed to pass the pressure test on the day of the explosion, and a follow-up test proved unsatisfactory as well.   Carl Gutierrez, "What's the Story BP?" *Forbes*, May 15, 2010. Illustrating the scope of his knowledge, Dupree also told Congressional staff that the well blew out fairly quickly after the negative pressure test.

76.     Defendant Patrick Gower ("Gower") was a member of the SPIOC from September 20, 2004 through May 15, 2008.  During the Relevant Period, Gower was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

77.     During the Relevant Period, Gower also served as Vice President of Refining, U.S. Region, BP North America, and his duties in that capacity included accountability for managing performances of refineries in the region.  In 2007, an internal BP investigation recommended that Gower, along with three other BP executives, be fired for management shortcomings in creating

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

a "culture of risk taking" at BP leading up to the 2005 explosion that killed 15 people at BP's Texas City refinery.

78.     Defendant Jeanne M. Johns ("Johns") was a member of the SPIOC from about September 20, 2004 to May 15, 2008.  Johns also served as President of BP's Asia Olefin and Derivatives division during the Relevant Period.  During the Relevant Period, Johns was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because she had discretionary authority or discretionary responsibility in the administration of the Plans.

79.     Defendant Patricia H. Miller ("Miller") was a member of the SPIOC from May 22, 2006 to January 7, 2008.  During the Relevant Period, Miller was the Plans' Administrator, Administrative Named Fiduciary, Applicable Administrative Named Fiduciary, and the Applicable Named Fiduciary (from May 22, 2006 to December 18, 2007).  During the Relevant Period, Miller was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because she had discretionary authority or discretionary responsibility in the administration of the Plans.

80.     While Miller was acting as a fiduciary with respect to the Plans, she was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the Relevant Period, Miller was an employee of BP North America with the title of Vice President of Human Resources for the Western Hemisphere, and her employment at BP North America included human resources work and implementation of BP North America's employee

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

benefit programs, including the Plans.  The breaches of fiduciary duty committed by Miller described in this Complaint were committed while Miller was acting in the scope of her employment by BP North America.

81.    Defendant Stephanie C. Moore (formerly Atkins) ("Moore") was a member of the SPIOC from February 9, 2006 through at least the end of the Relevant Period.  During the Relevant Period, Moore was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because she had discretionary authority or discretionary responsibility in the administration of the Plans.

82.    During the Relevant Period, Moore also served as Vice President of Human Resources for BP's Exploration and Production Technology division.  Moore worked in BP's Houston location.  In 2005, Moore was part of a team assembled to perform an internal accountability audit into executive responsibility following the Texas City refinery explosion, giving her insight into BP's safety and process lapses.

83.    Defendant Neil Shaw ("Shaw") was a member of the SPIOC from May 15, 2008 through February 1, 2010.  During the Relevant Period, Shaw was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

84.    Shaw also served as BP's Senior Vice President and Strategic Performance Unit Leader in charge of BP p.l.c.'s Gulf of Mexico division from 2007 to 2009.  Shaw also served as

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

COO of Developments in the Executive Office of BP's Global Exploration and Production unit through at least the end of the Relevant Period. He was responsible for "everything" in the Gulf of Mexico, including drilling and completions, productions, platforms, managing BP's leases, managing BP's contracts with drilling rig contractors, managing BP's contracts with service companies, and overseeing finances.

85. Defendant Gregory T. Williamson ("Williamson") was a member of the SPIOC from April 1, 2008, through at least the end of the Relevant Period. Williamson also served as Director of Trust Investments, The Americas, from June 10, 2008 through the present. Williamson's duties in this capacity included supervising and managing U.S. defined benefits plans and 401(k) plans. As the Director of Trust Investments, The Americas, Williamson was also an Investment Named Fiduciary. During the Relevant Period, Williamson was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to management of the Plans, and/or exercised authority or control with respect to management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

86. While Williamson was acting as a fiduciary with respect to the Plans, he was also acting as an agent and employee of one or more of the Corporate Defendants. In particular, during the Relevant Period, Williamson was an employee of BP America with the title of Director of Trust Investments (from June 10, 2008 to the present). His employment at BP America included human resources work and, as noted above, implementation of BP's employee pension programs, including the Plans. The breaches of fiduciary duty committed by Williamson described in this Complaint were committed while Williamson was acting in the scope of his employment by BP America.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

87.     As discussed above, the following Defendants were both members of the BP North America Board and members of the SPIOC during the Relevant Period:  Malone, McKay, Riney, Smith, and Taylor.  In addition, Dorazil, a Designated Officer during the Relevant Period, was also a member of the SPIOC.

88.     Defendants, the SPIOC, Correnti, Damsma, Dorazil, Dupree, Gower, Johns, Malone, McKay, Miller, Moore, Riney, Shaw, Smith, Taylor, and Williamson are referred to hereinafter collectively as the "SPIOC Defendants."

### (vi)     Plan Administrators

89.     As discussed above, Defendant Dorazil served as the Plan Administrator, Administrative Named Fiduciary and the Applicable Administrative Named Fiduciary during the Relevant Period (from December 18, 2007 through at least the end of the Relevant Period).  In addition, Defendant Miller served as the "Plan Administrator Administrative Named Fiduciary" and the "Applicable Administrative Named Fiduciary" during the Relevant Period (specifically from May 22, 2006 to December 18, 2007).

90.     Defendants Dorazil and Miller shall hereinafter be referred to collectively as the "Plan Administrator Defendants."

### (vii)     Doe Defendants

91.     Defendant Plan Fiduciary DOES 1-20 are fiduciaries of the Plans whose exact identities will be ascertained through discovery.  They may include, but not be limited to, members of the SPIOC, if appointed under the terms of the Plans; additional members of the SPIOC during the relevant time frame; individual members of the BP North America Board; and other named fiduciaries.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### (viii)   Corporate Defendants

92.    Defendant BP North America was the Plan Sponsor and a fiduciary of each of the Plans, and it had the discretion, authority, and control to add, delete, and/or freeze the BP Stock Fund and to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment.

93.    Defendant BP p.l.c. is a public limited liability company incorporated in England and Wales.  BP p.l.c.'s principal executive offices are located at 1 St. James Square, London SW1Y 4PD, England.  BP p.l.c. is one of the world's largest energy companies, with extensive contacts in the United States.  Through its own operations, and those of its subsidiaries and affiliates, it is the largest producer of oil and gas offshore in the Gulf of Mexico.  BP p.l.c.'s operations and assets in the Gulf of Mexico are the most significant part of its operations and assets in the world.  BP p.l.c., through its own operations and its subsidiaries and affiliates, operates tens of thousands of miles of pipelines in the U.S, has several refineries in the U.S., and is the second-largest gasoline marketer in the U.S.  Forty-five percent of the entity's oil reserves are in the U.S. (compared to only 9% in the U.K.), and the U.S. accounts for 54% of the Company's total refining, 40% of fixed assets, and 31% of petrochemical production.  BP p.l.c., its subsidiaries and affiliates have approximately 29,000 employees in the U.S., one-third of its total worldwide employees and twice as many employees as in the U.K.  BP p.l.c. grew to its current size through mergers with old-line American oil companies like Amoco and ARCO, which were spun off from Standard Oil generations ago.  During the Relevant Period, BP p.l.c. was a fiduciary within the meaning of ERISA because BP p.l.c., acting through its officers and directors, exercised discretionary authority and control with respect to the appointment of the Plans' fiduciaries, management and administration of the Plans and the Plans' assets.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

94.     Defendant BP America Inc. ("BP America") is a wholly-owned subsidiary of BP p.l.c.  BP America is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP America is BP p.l.c.'s single largest subsidiary.  BP America is designated as the claims administrator for the Plans.  During the Relevant Period, BP America was a fiduciary within the meaning of ERISA because BP America, acting through its officers and directors, exercised discretionary authority and control with respect to the appointment of the Plans' fiduciaries, management and administration of the Plans and the Plans' assets.

95.     The Corporate Defendants are liable under the doctrine of *respondeat superior* for the breaches of fiduciary duty committed by their employees because each Corporate Defendant knowingly and actively participated in the breaches of fiduciary duty committed by these employees.

96.     The Corporate Defendants knew or should have known that the BP Stock Fund was offered in the Plans because: (1) BP North America is the named sponsor of the Plans, (2) BP America is designated as the claims administrator for the Plans, and (3) BP p.l.c. filed Forms 11-K with the SEC stating that "Certain Master Trust investments include American Depositary Shares of BP p.l.c. ('BP ADSs')."

97.     The Corporate Defendants also were aware, based upon significant prior warnings as detailed herein, that BP was taking too many risks and cutting corners regarding safety in pursuit of growth and profits, and that, as a result, a disaster of the proportion of *Deepwater Horizon* was likely to happen and could cause material losses to the Plans, and that this risk of catastrophic loss rendered the BP Stock Fund an imprudent retirement investment for the Plans' Participants.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

98.     Thus, the Corporate Defendants knew or should have known that the BP Stock Fund was offered by the Plans for the Participants' accounts and that the BP Stock Fund was an imprudent investment for retirement.   But the Corporate Defendants, upon information and belief, never provided adequate warnings or instructions to their employees or assisted various Individual Defendants with the proper execution of their fiduciary duties under ERISA.

99.     Instead, the Corporate Defendants ignored their duty to monitor their employees' fiduciary performance and to communicate information to the Individual Defendants as needed for the proper performance of their fiduciary duties, and continued to allow the Individual Defendants (especially Defendants Dorazil, Williamson, Miller, and Damsma) to meet on Company property, during business hours, and use Company resources to administer the Plans and to continue to allow the Plans to hold and acquire BP ADSs.

100.   By virtue of their *de facto* control over their employees and agents, the Corporate Defendants also had effective control over the disposition of the Plans' assets.   The Corporate Defendants also had incentive to, and did, appoint fiduciaries who were likely to, and did, maintain the status quo of the Plans' investment in the BP Stock Fund because the Corporate Defendants reaped the benefits of the Company stock being offered and held as a Plan investment option, including tax benefits, keeping significant amounts of stock in friendly hands, and helping with the Corporate Defendants' cash flows.

## IV.     THE PLANS

### A.     Description of the Plans

101.   The relevant portions of the Plans are substantially similar except for the employees covered by each Plan and the contribution and matching provisions of each Plan, as set forth below.   *See* Form 11-K, dated June 16, 2010.  The Plans comingled their assets in the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

BP Master Trust for Employee Savings Plans ("BP Master Trust") and have a common group of fiduciaries and administrators.

102.   At all times relevant to this Complaint, each Plan was an "Employee Benefit Plan" within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

103.   Each Plan was a "Defined Contribution" and "Individual Account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that each Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to each such Participant's accounts.

104.   The purpose of each Plan was "to encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement."  Form 11-K, dated June 16, 2010.

### B.     Plan Contributions

105.   According to the Form 11-K, dated June 16, 2010 for the year ended December 31, 2009 ("2009 Form 11-K"), the Participants in the Plans could make contributions to each Plan as described below.  For the ESP:

> [P]articipating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to Internal Revenue Service ("IRS") limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to the IRS limits.  A specified portion of the employee contribution, up to a maximum of 7% of compensation, as defined, is matched by the Company.  Participants are permitted to rollover amounts into ESP representing distributions from other qualified plans.

*See also* ESP, Article III.
For the CAP, the 2009 Form 11-K states:

> Under CAP, participants may contribute up to 27% of their base pay, subject to IRS limits.  Participants who attain age 50 before the end of the applicable plan

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

year are eligible to make additional elective deferrals (catch-up contributions), subject to the IRS limits.  The Company makes matching contributions to the participant's account at 160% of the participant's pretax contribution, up to a maximum Company contribution of 8% of the participants' base salary. Participants are permitted to rollover amounts into CAP representing distributions from other qualified plans.

*See also* CAP, Sec. 4.

For the PSP, the 2009 Form 11-K states:

Under PSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions) subject to IRS limits.  A specified portion of the employee contribution, up to a maximum of 3% of compensation, as defined, is matched by the Company.  Participants are permitted to rollover amounts into PSP representing distributions from other qualified plans.

*See also* PSP Article III.

For the DSP, the 2009 Form 11-K states:

Under DSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits.  Participants who attain age 50 before the end of the applicable year are eligible to make additional elective deferrals (catch-up contributions) subject to IRS limits.  Except for eligible employees of Air BP, the Company makes matching contributions to the participant's account equal to $0.50 for each $1.00 of employee contributions up to 4% of compensation. Participants are permitted to rollover amounts into DSP representing distributions from other qualified plans.

*See also* DSP Article III.

## C.   Investment Options

106.   Contributions were invested in one or more of the investment options selected by Defendants and presented to Participants in the Investment Options Guide.  BP, INVESTMENT OPTIONS GUIDE (Apr. 2007); BP, INVESTMENT OPTIONS GUIDE (Aug. 2008).  At all relevant times, as described below, each of the Defendants, individually and/or collectively, maintained the discretion, authority, and/or control to add, delete, limit, or freeze any investment options

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

offered by the Plans, including the BP Stock Fund.  During the Relevant Period, approximately one-third of all the assets of each Plan were invested in the BP Stock Fund.

107.   At all relevant times, the Investment Options Guides dated April 2007 and August 2008 for the Plans constituted part of a prospectus covering the securities offered by the Plans. The Plan Prospectus also includes a summary of the Plans, the most recent Quarterly Investment Performance Statement and documents incorporated by reference and future supplements to all of the above documents.  The Summary Plan Description ("SPD") encouraged Participants to read the Investment Options Guide which, in turn, provides Participants with directions to obtain the relevant public filings.  *See, e.g.,* July 2009 ESP Summary Plan Description at 27.

### D.    Plan Fiduciaries

108.   Under the terms of the Plans, "Fiduciary" is defined as: (a) any individual or entity which a Designated Officer identifies to be an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the Plans; (b) any individual or entity which an Administrative Named Fiduciary, acting on behalf of the Plans, designated to be a Fiduciary; or (c) any other individual or entity who performs a fiduciary function under the plan as defined in section 3(21) of ERISA.  ESP, Sec. 1.52; PSP, Sec. 1.48; DSP, Sec. 1.48.

109.   At all relevant times, under the governing Plan documents, the fiduciaries of the Plans that had the discretion, control, and/or authority over the BP Stock Fund, or the duty to appoint and/or monitor the fiduciaries that had discretion, control, and/or authority over the BP Stock Fund, included BP North America, the members of the BP North America Board, the Designated Officer(s), the Appointing Officer(s), the Plan Administrator, SPIOC and its members, and State Street.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

> (i) **BP North America**

110. At all relevant times, BP North America was the Plan Sponsor of each Plan. ESP, Sec. 1.72; PSP, Sec. 1.66; DSP, Sec. 1.66.

111. At all relevant times, the Investment Options Guide provided that BP North America had the discretion, authority, and/or control to add, delete, and/or freeze the BP Stock Fund and to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment. BP, INVESTMENT OPTIONS GUIDE (Aug. 2008) at 35; BP, INVESTMENT OPTIONS GUIDE (Apr. 2007) at 41. Specifically, the 2007 and 2008 Investment Options Guides, which constitute part of a prospectus for the Plans, recognizes that BP retains the authority and discretion to liquidate all of the BP ADSs in the BP Stock Fund: "*Under limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADSs in the BP Stock Fund should the investment manager **or BP** determine such an investment is no longer prudent.*" (Italics in original; emphasis added.)

112. On or about April 5, 2000, BP North America entered into an Investment Management Agreement with State Street (the "Management Agreement") with respect to the investment of various investment accounts of the Plans, including the BP Stock Fund.

113. BP North America represented and warranted that, under the terms of the Plans and the Trust Agreement, it was authorized to enter into the Management Agreement and appoint State Street as the investment manager. Management Agreement, Secs. 1(c) and 20(iii). The Management Agreement was executed by State Street and BP Amoco Corporation (currently known as BP North America).

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

114.   The Management Agreement provides that BP North America could terminate the Management Agreement or the BP Stock Fund Investment Account at any time on written notice to State Street.  Management Agreement, Sec. 11.

115.   The Management Agreement provides: "Pursuant to resolutions, the Board of Directors of the Company and BP America, Inc. [sic] ('BP America') designated the Company's Investment Committee as the 'named fiduciary' under the Employee Retirement Income Security Act of 1974 ('ERISA') for purposes of selecting investment managers under the Company's and BP America's employee benefit plans.  Pursuant to this delegation of authority, the Investment Committee has selected the Investment Manager and, subject to the terms and conditions of this Agreement, hereby delegated fiduciary authority to the Investment Manager."  Management Agreement, ¶ 1 of the Recitals.

116.   The Management Agreement provides that BP North America "shall be responsible for the overall diversification of the Trust Fund and the Investment Manager's obligation to specifically diversify the Investment Accounts shall be subject to the Investment Strategy Guidelines attached hereto as Exhibit 'A' and hereby made part hereof."  Management Agreement, Sec. 2(b). (Emphasis in original.)

117.   Under the Management Agreement, unless otherwise directed in writing by BP North America, State Street had "full discretionary authority to" manage the investment of the assets in each Investment Account . . . *provided, however*, that for each Investment Account (i) any and all transactions that the Investment Manager enters into shall be undertaken by the Investment Manager in accordance with the Investment Strategy Guidelines applicable to such Investment Account and (ii) the Investment Manager shall not enter into any transaction

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

applicable to such Investment Account other than those specifically authorized by the Investment Strategy Guidelines."  Management Agreement, Sec. 3(a). (Emphasis added.)

118.  Under the Management Agreement, BP North America had the overriding ability to "cause cash or any Securities and other Property to be added to or withdrawn from any Investment Account in its *discretion*, and shall give or cause written notice of such additions or withdrawals to be given to the Investment Manager."   Management Agreement, Sec. 7. (Emphasis added.)  The "Securities or other Property" includes the BP Stock Fund.

119.  The Investment Strategy Guidelines provide that the BP Stock Fund could be comprised of BP ADSs and cash equivalents, and that it could use short-term lines of credit where appropriate.  In addition, upon prior approval of BP North America, the BP Stock Fund could invest in other public and private debt and equities securities, including debt and equity derivatives such as options and future contracts.  Management Agreement, Exh. C-1 (E).

120.  The Investment Strategy Guidelines further provide that the Investment Strategy Guidelines could be revised only by "mutual agreement" of BP North America and the Investment Manager and that BP North America could "unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager." Management Agreement, Exh. C-1 (F).

121.  Under the Management Agreement, State Street is required to provide to BP North America reports concerning the performance of the BP Stock Fund, as well as a compliance statement representing that State Street had managed the BP Stock Fund in accordance with the Investment Strategy Guidelines.  Management Agreement, Exh. C-1 (G) and (H).

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### (ii)   BP North America Board of Directors

122.   The Plans state that "[w]henever [BP North America] has the authority to take action under this Plan, [BP North America's] Board of Directors and each Designated Officer have the authority to act on behalf of [BP North America]. . . ."  ESP, Sec. 14.5; PSP, Sec. 14.5; DSP, Sec. 14.5; CAP, Sec. 10.4.

123.   BP North America, through the authority vested in its Board, enabled the Appointing Officer to have the authority, control and/or discretion to act, to the extent provided in the Plans, on behalf of the Plans, and enabled the Administrator to have the authority, control, or discretion to act, to the extent provided in the Plans, on behalf of the Plans.  ESP, Sec. 14.1(a); PSP, Sec. 14.1(a); DSP, Sec. 14.1(a); CAP, Sec. 10.1.

124.   At all relevant times, the BP North America Board was responsible for monitoring the SPIOC.  Once annually, or more or less frequently as requested by the BP North America Board, the SPIOC submitted a written report to the BP North America Board reflecting the SPIOC's actions for the subsequent to the last BP North America Board report.  SPIOC Bylaws, Sec. 5.4.

125.   █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### (iii)   Designated Officer

126.   "Designated Officer" means the Appointing Officer, the Vice President, and any other officer of the BP North America and/or BP p.l.c., the Group Chief Executive of BP p.l.c.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

and any other officer of BP p.l.c., to whom (but only to the extent specifically provided) authority to act on behalf of BP North America has been granted by the Board of Directors. ESP, Sec. 1.39; PSP, Sec. 1.35; DSP, Sec. 1.35; CAP, Sec. 1.16.

127.   At all relevant times, the Designated Officer, acting on behalf of the BP North America and/or BP p.l.c., had all the powers necessary or incidental to carry out the duties and rights assigned by the Plans to the Designated Officer acting on behalf of BP North America and/or BP p.l.c. or as may be granted to him from time to time, by the BP North America Board. By way of illustration and not limitation, these powers included: (a) with respect to the Appointing Officer, the power to identify any person or entity as a Named Fiduciary, and allocate to each such Named Fiduciary his/her/its duties and responsibilities; (b) the power to establish policies and make such delegations or designations as may be necessary or incidental to the Designated Officer's authority and control over the Plans acting on behalf of BP North America and/or BP p.l.c.; (c) the power to retain, monitor, and terminate such service providers and advisors as are considered appropriate to perform employer activities with respect to the Plans and to delegate any of his duties, as appropriate to such service providers and advisors; and (d) the power to take any other actions he deems necessary, incidental, or desirable to the performance of his duties as Designated Officer on behalf of BP North America and/or BP p.l.c., including the power to delegate that power to any person.  ESP, Sec. 14.1(b); PSP, Sec. 14.1(b); DSP, Sec. 14.1(b); CAP, Sec. 10.1(b).

128.   Upon information and belief, the Designated Officers are "Investment Named Fiduciaries" and "Administrative Named Fiduciaries."

129.   Under the Plans' terms, the "Investment Named Fiduciary" means a Named Fiduciary with respect to, among other things, "the exercise of discretionary authority or

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

discretionary control respecting management of the Plans or the exercise of any authority or control with respect to management or disposition of any assets of the Plans, within the meaning of Section 3(21)(A)(i) of ERISA."  ESP, Sec. 1.62; PSP, Sec. 1.57; DSP, Sec. 1.57; CAP, Sec. 1.28.

130.  Under the Plans' terms, "Administrative Named Fiduciary" means a Named Fiduciary with respect to, among other things, "the discretionary authority or discretionary control respecting management of the Plans or the exercise of any authority or control respecting management or disposition of any assets of the Plans, within the meaning of Section 3(21)(A)(i) of ERISA."  ESP, Sec. 1.5; PSP, Sec. 1.5; DSP, Sec. 1.5; CAP, Sec. 1.2.

### (iv)    Appointing Officers

131.   At all relevant times, the President of BP North America served as the Appointing Officer.  ESP, Sec. 1.13; PSP, Sec. 1.13 DSP, Sec. 1.13; CAP, Sec. 1.7.

132.  At all relevant times, the Appointing Officer, acting as an Applicable Administrative Named Fiduciary, had all the authority or discretion of an Administrative Named Fiduciary, including but not limited to, the authority or discretion to (a) select the person serving as Administrator, voting members of the Investment Committee or the SPIOC, and any Named Fiduciary with respect to the Plans, and (b) remove the person serving as Administrator, voting members of the Investment Committee or SPIOC, and any Named Fiduciary with respect to the Plans.  ESP, Sec. 14.1(c); PSP, Sec. 14.1(c); DSP, Sec. 14.1(c); CAP, Sec. 10.1(c); SPIOC Bylaws Section 1.3(a).

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(v)    **The SPIOC**

133.   For each Plan, the Investment Committee means SPIOC, the members of which are designated by the Appointing Officer for the Plans.  ESP, Sec. 1.60; PSP, Sec. 1.55; DSP, Sec. 1.55; CAP, Sec. 1.27.

134.   At all relevant times, the SPIOC was designated as an "Investment Named Fiduciary" as defined under Section 402(a)(2) of ERISA with the discretion, control, and authority under the Plans to appoint, monitor, and remove trustees; select, direct, monitor and terminate external investment managers; develop investment strategies and policies; and direct the trustee as to the investment and reinvestment of the trust.  ESP, Sec. 1.62; PSP, Sec. 1.57; DSP, Sec. 1.57; CAP, Sec. 1.28; SPIOC Bylaws, Sec. 1.2.

135.   At all relevant times, the SPIOC and the Designated Officer of the Plans had the discretion, control, and/or authority to add, delete, limit, and/or freeze an investment option, including the BP Stock Fund:

> Investment Options.  The Plan's Investment Options are indicated in Appendix 1.58.  In addition, a Designated Officer may, from time to time, as directed by the Investment Committee:
>
> > (a)    limit or freeze investment in, or transfers from, an Investment Option;
> >
> > (b)    add funding vehicles thereunder;
> >
> > (c)    liquidate, consolidate, or otherwise reorganize an existing Investment Option; or
> >
> > (d)    add new Investment Options to, or delete Investment Options from Appendix 1.58.

ESP, Sec. 6.3; *see also* PSP, Sec. 6.3; DSP, Sec. 6.3.

136.   The SPIOC had discretion, authority, and/or control over the administration of the Plans and the selection of various investment funds as investment options under the Plans,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

including the BP Stock Fund. In addition, on information and belief, the SPIOC was an "Applicable Investment Named Fiduciary," an "Applicable Named Fiduciary," and an "Investment Named Fiduciary" under the terms of the Plans during the Relevant Period.

137. The SPIOC members were fiduciaries of the Plans as a result of their membership on the SPIOC and a fiduciary and "administrator" of the Plans during the Relevant Period. The SPIOC is an investment committee that oversees investment options in the Plans. Under the terms of the Plans, SPIOC members' fiduciary responsibilities included, without limitation: (a) the authority to establish and select various investment funds as investment options under the Plans, including the BP Stock Fund which invested in BP ADSs; (b) the responsibility for establishing and carrying out a funding policy consistent with the Plans' objectives; and (c) the responsibility for performing the fiduciary functions allocated to the SPIOC under the Plans, insofar as SPIOC members served as members of and comprised the SPIOC unless BP North America specified otherwise. SPIOC Bylaws, Sec. 1.2(a). As a result of such express authority, and by virtue of any actions exercised and functions undertaken in furtherance of such authority during all relevant time frames, SPIOC members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(a).

138.

139.

41

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

███████████████ █████████████████████████

█████████████████████████████████████████████

███████████████████████████████ These documents

demonstrate that the Plan Administrator and the SPIOC knew they should periodically evaluate

investment options; they knew they had authority to change investment options; and they

exercised that authority.  They did not, however, subject the BP Stock Fund to the scrutiny given

to other investment options.

140.  In a December 2008 mailing to Participants, entitled "Benefitting you" and

regarding Annual Enrollment 2009, Defendant Dorazil, the Appointing Officer, Plan

Administrator, and member of the SPIOC, assured Participants that "Any investment may go up

or down.  We all know that.  The BP Savings Plan Investment Committee (SPIOC) monitors the

investments options in our 401(k) plan.  SPIOC can't control gains and losses, but it can evaluate

the quality of our investment choices."  To the Plaintiffs' detriment, the SPIOC did not monitor

or evaluate the BP Stock Fund as an investment option.

### (vi)   Plan Administrator

141.  At all relevant times, the "Administrator" was the "Plan Administrator" and had

the discretion, authority, and control to restrict investment options in each plan.  At all times

during the Relevant Period, the Plan Administrator was the Vice President of Human Resources

and/or the Vice President, Total Rewards, Western Hemisphere.  ESP, Secs. 1.6 and 1.94; PSP,

Secs. 1.6 and 1.86; DSP, Sec. 1.6 and 1.86; CAP, Secs. 1.3 and 1.40; April 2007 Investment

Options Guide, at 2; August 2008 Investment Options Guide, at 2; SPIOC Bylaws, Sec. 1.2(a).

142.  Under the Plans, the Administrator reserved "the right to take any and all action he

determined to be appropriate to minimize plan disruptions, and to protect the interest of all Plan

42

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Participants . . . for any other reason."  Such actions included establishing rules that operate to limit or restrict Participant rights under the Plans to effectuate transactions.  The Plan Administrator could implement such actions without prior notice to the Participants.  ESP, Sec. 6.5; PSP, Sec. 6.5; DSP, Sec. 6.5; CAP, Sec. 6.2(d).

143.   Under the Plans, the Administrator had the power to establish rules applicable to Investment Elections (an election by which a participant directs the investment of his or her contributions or amounts allocated to his account) and to limit the investment options that may be elected by the participant.  ESP, Sec. 1.61; PSP, Sec. 1.56; DSP, Sec. 1.56; CAP, Sec. 6.2(b).

144.   Under the Plans, the "Administrative Named Fiduciary" is a Named Fiduciary with respect to:  "(a) the authority to control and manage the operation and administration of the Plan or the Trust, within the meaning of Section 402(a)(1) of ERISA; (b) the discretionary authority or discretionary responsibility in the administration of the Plan or the trust within the meaning of Section 3(21)(A)(ii) of ERISA; or (c) the exercise of discretionary authority or discretionary control respecting management of the Plan or the trust or the exercise of any authority or control respecting management or disposition of any assets of the Plan or the Trust, within the meaning of Section 3(21)(A)(i) of ERISA."  ESP, Sec. 1.5; PSP, Sec. 1.5; DSP, Sec. 1.56; CAP, Sec. 1.2.

145.   The Plans' Administrator acting as an Applicable Administrative Named Fiduciary has: (a) all the authority or discretion of an Administrative Named Fiduciary, including but not limited to, the authority or discretion to (b) construe and apply the provisions of the Plans, (c) appoint and compensate such specialists (including attorneys, actuaries, consultants, and accountants) to aid in the administration of the Plans, (d) settle or compromise any litigation against the Plans or a fiduciary with respect to which the Plans have a claim filed against them or an indemnity obligation to a third party, (e) delegate Authority or Discretion to a fiduciary, and

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(f) take any other actions necessary incidental, or desirable to the performance of the Authority or Discretion of the Administrator.  ESP, Sec. 14.1(d); PSP, Sec. 14.1(d); DSP, Sec. 14.1(d); CAP, Sec. 10.1; SPIOC Bylaws, Sec. 1.2 (a).

### (vii)   Investment Manager

146.  On or about April 6, 2000, BP North America and State Street entered into the Management Agreement whereby BP North America delegated certain of its fiduciary responsibilities to State Street with respect to several investment accounts in the Plans, including the BP Stock Fund.

147.  Notwithstanding the delegation, BP North America maintained the ultimate discretion, control, and authority over the BP Stock Fund by, among other things, mandating that State Street follow the Investment Strategy Guidelines that could be unilaterally amended by BP North America without notice or revised based on a mutual agreement between BP North America and State Street.  Management Agreement, Exh. C-1(F).  In addition, BP North America maintained the power to terminate the Management Agreement at any time. Management Agreement, Sec. 11.

## V.   IN THE ALTERNATIVE, CLASS ACTION ALLEGATIONS

148.  Plaintiffs bring this action as a class action in the alternative in the event that class action procedures are deemed necessary by the Court, pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3), on behalf of Plaintiffs and the following Class of persons similarly situated:

> All persons who were participants in or beneficiaries of any of the Plans, whose accounts held units of the BP Stock Fund (the BP Stock Fund is a unitized fund comprised of BP p.l.c. American Depositary Shares ("ADSs") and cash to facilitate daily transactions) that were held in the BP Master Trust, at any time during the Relevant Period (from January 16, 2007 through June 24, 2010) and were damaged thereby.  Excluded from the Class are Defendants and members of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

the Defendants' immediate families, any entity in which a Defendant has a controlling interest, and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest, and assigns).

149. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, tens of thousands of members of the Class. For example, as of December 31, 2009, the ESP had 40,937 participants of whom, upon information and belief, several thousand are members of the Class.

150. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether Defendants were fiduciaries;

    (b)    whether Defendants breached their fiduciary duties to the Plans by failing to conduct an appropriate investigation into the prudence of the BP Stock Fund;

    (c)    whether Defendants breached their fiduciary duties by (i) continuing to offer the BP Stock Fund as an investment option for the Plans and the Participants, (ii) investing Plan assets in the BP Stock Fund, and/or (iii) investing Fund assets in BP ADSs;

    (d)    whether Defendants in supervisory roles failed in their monitoring of the SPIOC Defendants;

    (e)    whether the Plans suffered losses as a result of Defendants' breaches; and

    (f)    whether the Plans and/or the Participants are entitled to damages or other relief.

151. Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and all members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of ERISA, as complained of herein.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

152.   Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests are coincident with and not antagonistic to the interests of the other Class members.   Plaintiffs have retained able counsel with extensive experience in class action, complex, and ERISA litigation.

153.   Class action status is also warranted under Rule 23(b)(1) because prosecution of separate actions by members of the Class would, as a practical matter, be dispositive of the interests of the other members who are not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

154.   Class action status is also warranted under the other subsections of 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

155.   Defendants' actions and inactions apply generally to all Participants such that final relief is appropriate with respect to the Class as a whole.

156.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for individual Class members to seek redress for the wrongful conduct alleged.   Plaintiffs know

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## VI.    FACTUAL ALLEGATIONS

### A.    Introduction

157.    The *Deepwater Horizon* accident was a disaster of epic proportion that took the lives of 11 people and brought environmental catastrophe to the Gulf of Mexico and the U.S. Gulf Coast.    BP received unprecedented, high-profile and daily negative news coverage for months following the April 20, 2010 explosion.    BP's stock price suffered material and deep drops as a result of the disaster.    Yet, given the dysfunctional state of BP's safety and risk management procedures, the disaster and its consequences were or should have been no surprise to BP and the fiduciaries of the Plans.    Because of the admitted crucial importance of safety to BP's business, the myriad of safety problems BP experienced in the years leading up to the *Deepwater Horizon* disaster, and BP's persistent failure to put safety and risk management ahead of cost-cutting, reasonable fiduciaries would have considered themselves bound to freeze or divest BP ADSs from the Plans.    This case is not about making unreasonable predictions based on speculation but, rather, objective analysis considering the state of Company affairs and a fiduciary's responsibility to understand that a disaster like *Deepwater Horizon* would (and did) bring about great losses to the Plans.    Therefore, Defendants knew or should have known that BP ADSs were an imprudent investment for the Plans.    Defendants failed to protect the Participants' retirement savings from being imprudently invested in the BP Stock Fund and, as a result, the Plans suffered losses, for which Defendants are liable.

158.    Safety is plainly crucial to BP, a fact BP has conceded in its public statements. According to *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling - Report to*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

*the President* ("Presidential Report") dated January 2011, BP had, prior to the *Deepwater Horizon* disaster, "proclaimed the importance of safety for its vast worldwide operations."  As noted in the Presidential Report, BP repeatedly admitted in its Sustainability Review 2009 that safety was crucial for the Company's success.  For example, the BP Sustainability Review 2009 included statements such as (1) "[s]afety is fundamental to our success as a company" and (2) "[o]ur goal of 'no accidents, no harm to people and no damage to the environment' is fundamental to BP's activities."

159.  Carl-Henric Svanberg ("Svanberg"), BP's Chairman, commented on the enormous risk BP faces in its daily operations, and standards the Board sets in overseeing the mitigation of that risk.  Specifically, Svanberg stated in BP's 2009 Annual Report:

> **Risk remains a key issue for every business, but at BP it is fundamental to what we do.** We operate at the frontiers of the energy industry, in an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight.  (Emphasis added.)

160.  Not only did BP admit that safety was essential to its success, but it repeatedly and publicly stated that its business operated with proper safety and risk management procedures, as detailed below.  Despite the fact that BP recognized that safety was of paramount importance, its actual commitment to safety was sorely lacking.  The Presidential Report describes BP's problems with safety as <u>chronic</u>:

> Yet despite the improvement in injury and spill rates during that decade, BP has caused a number of disastrous or potentially disastrous workplace incidents that suggests its approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes—and thus has been unable to meet its professed commitment to safety.  BP's safety lapses have been chronic.

48

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

161.   These chronic safety lapses were ultimately responsible for the *Deepwater Horizon* disaster.  The *Deepwater Horizon* Study Group, a group of experts and professionals in the field of offshore drilling, issued a report on March 1, 2011, entitled *Final Report on the Investigation of the Macondo Well Blowout* (the "DHSG Report").  The DHSG Report documents BP's long-standing and multiple failures to operate safely:

> The multiple failures (to contain, control, mitigate, plan, and clean-up) that unfolded and ultimately drove this disaster appear to be deeply rooted in a multi-decade history of organizational malfunctions and shortsightedness. There were multiple opportunities to properly assess the likelihoods and consequences of organizational decisions (i.e., Risk Assessment and Management) that were ostensibly driven by BP management's desire to "close the competitive gap" and improve bottom-line performance. Consequently, although there were multiple chances to do the right things in the right ways at the right times, management's perspective failed to recognize and accept its own fallibilities despite a record of recent accidents in the U.S. and a series of promises to change BP's safety culture.

## B.    BP's Safety Record Prior to the *Deepwater Horizon* Explosion

162.   As mentioned in the above reports, BP was responsible for many accidents and disasters in the years leading up to the *Deepwater Horizon* tragedy.  These incidents show BP's reckless pattern of compromising safety in order to save time and money.  Many of the earlier incidents were caused by problems similar to those that befell the *Deepwater Horizon*, including equipment failures, failure to properly cement a well, poor team communication, and the inability to properly identify and confront problems and crises.  The fact that like events occurred on the *Deepwater Horizon* evidences an inability or reckless disregard of BP to learn from past mistakes.  BP's "accidents" were more frequent and severe than those of its competitors, belying the notion that such incidents are simply an expected by-product of operating in a technologically-challenging industry.

163.   BP's chronic disregard for safety was illustrated by the fact that, during the Relevant Period, BP was among the top violators of OSHA's regulations.  BP owned the dubious

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

distinction of having its own OSHA web page, detailing BP's numerous safety violations and resulting fines. In the past, OSHA had not leveled this type of criticism at BP's competitors.

164. BP experienced one adverse incident after another – incidents that frequently were caused or exacerbated by BP's poor operational control and disregard for safety. In 2002, the Ocean King, a drilling rig under the operational control of BP, suffered two catastrophic blowouts within a roughly three month period. In 2003, another drilling rig, the Transocean Discoverer Enterprise, operated by BP, came very close to a major disaster when a broken riser caused damage to the blowout preventer. Later that same year, BP's Forties Alpha platform experienced a near-catastrophic incident when a corroded gas line ruptured, engulfing the platform in a cloud of highly flammable gas. The following year, BP experienced yet another catastrophic blowout, this time on the GSK Adriatic IV, a gas drilling rig operating off the coast of Egypt, operated by BP as part of a joint venture with Italy's ENI and Egypt's General Petroleum Corporation.

165. On March 23, 2005, BP's Texas City Refinery suffered one of the worst industrial disasters in U.S. history. The refinery explosion left 15 people dead, injured an additional 180 people, and resulted in financial losses to BP exceeding $1.5 billion. This watershed event made it abundantly clear to BP that serious deficiencies were embedded in the Company's safety culture. The Chemical Safety Board ("CSB") found significant, underlying safety breaches including failures of safety alarms, lack of supervisory oversight, inadequately-trained personnel, poor communication between personnel, poor communication during shift turnover, fatigue from over-work, and outdated procedures. The CSB report found that inadequate and ineffective safety processes, together with equipment failures and structural oversights, led to this disaster.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

166.   In March 2006, BP discovered a leak in a pipeline in the Western Operating Area of the Prudhoe Bay in Alaska (the largest oil field in the U.S.), which caused a spill of more than 200,000 gallons of oil.   A second leak occurred five months later.   Due to the leaks, BP's operations in the region were temporarily halted.   In a separate incident in April 2006, OSHA fined BP $2.4 million for unsafe operations at its Oregon, Ohio refinery.   Investigators had found 32 "willful" violations that were remarkably similar to safety issues identified after the fatal explosion in Texas City.

167.   The vast majority of incidents that had occurred at BP-owned or operated facilities were directly attributable to BP's deeply-embedded culture of putting cost cutting before safety. The CSB found that cost-cutting, failure to invest, and production pressures from BP are the factors that impaired process safety performance at Texas City.   In addition, the BP Board did not provide effective oversight of BP's safety culture and major accident prevention programs. The Board did not have a member responsible for assessing and verifying the performance of BP's major accident hazard prevention programs.

168.   The CSB found that BP's problems were <u>systemic</u> and were not isolated to this particular incident at this particular location.   In fact, the CSB found that the "Texas City disaster was caused by organizational and safety deficiencies at all levels of the BP Corporation. ***Warning signs of a possible disaster were present for several years, but company officials did not intervene effectively to prevent it.***   The extent of the serious safety culture deficiencies was further revealed when the refinery experienced two additional serious incidents just a few months after the March 2005 disaster.   In one, a pipe failure caused a reported $30 million in damage; the other resulted in a $2 million property loss." (Emphasis added.)

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

169.  After the Texas City tragedy OSHA uncovered 301 egregious, willful Company violations for which BP paid a $21 million fine.  The fine was, at the time, the largest ever issued by OSHA in its 35-year history.  But even prior to OSHA's issuance of the citations and fine, the refinery experienced two additional and extremely serious incidents.

170.  On October 30, 2009, BP was fined an additional $87 million for "outstanding life threatening safety problems" in connection with the Texas City Refinery explosion. Nevertheless the Secretary of the DOL stated that there still existed 439 "willful and egregious safety violations" that could result in another catastrophic accident.  As an OSHA official explained, "Just the fact that there are still so many outstanding problems, life-threatening problems, at this plant, indicates that they still have a systemic safety problem."  Thus, even though BP claimed that it would clean up its safety record, it did not do so.

171.  The Prudhoe Bay incident and the Texas City disaster led to the resignation of Browne, BP's former CEO.  BP promised again that it would change and improve its safety.

###  C.      The Baker Report Makes Recommendations BP Fails To Implement

172.  In the wake of the 2005 Texas City explosion, the CSB recommended that BP establish an independent panel of experts to examine BP's corporate safety management systems, safety culture, and oversight of the North American refineries.

173.  BP commissioned the BP U.S. Refineries Independent Safety Review Panel, chaired by former Secretary of State James Baker, III (the "Baker Panel"), which issued its findings in the Baker Report in January 2007.  The Baker Panel focused its findings into three categories: corporate safety culture; process safety management systems; and performance evaluation, corrective action, and corporate oversight.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

174.   The Baker Panel found that one of BP's biggest shortfalls was its inability to learn from its experiences.  The Baker Report states that "significant deficiencies existed in BP's site and corporate systems for measuring process safety performance, investigating incidents and near misses, auditing system performance, addressing previously identified process safety-related action items, and ensuring sufficient management and board oversight.  Many of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents, including process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000."

175.   The Baker Panel's recommendations made crystal clear what BP had to do to fix its grossly deficient safety and risk management culture.  These recommendations focused on actions that needed to be taken by, first and foremost, BP's senior management.  BP's senior management, including certain Defendants, despite professions to the contrary, ignored these red flags and failed to implement the Baker Panel's recommendations.  The result was yet another series of crippling debacles, as shown by the cascade of events leading to the April 20, 2010 explosion on the *Deepwater Horizon* and the 87-day oil spill that followed.

> **D.**   **The Events Leading to Disaster on *Deepwater Horizon* Were the Materialization of the Risks that Resulted from BP's Deficient Safety and Risk Management Culture**

176.   As one of BP's major profit centers – and where mistakes could imperil lives, property, and the environment – the deepwater Gulf of Mexico arena should have showcased BP's professed commitment to safe operations.  Instead, the events leading to the April 20, 2010 explosion on the *Deepwater Horizon* demonstrate that the safety and risk management culture discussed by Defendants during the Relevant Period did not exist.  In reality, rather than a company striving to conduct its business in the safest manner possible, BP, as a company, was stagnant in addressing its previous failures.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

177.   BP purported to have built on what it learned from its prior incidents and also from industry best practices to develop the new OMS during 2006 to reduce risk in its operations and represented that OMS applied to all BP operations.  However, BP did not disclose that OMS did not govern safety practices at contractor-owned sites, such as the *Deepwater Horizon*.  BP thus did not implement what it saw as appropriate safety practices at numerous sites for which it was responsible.

178.   In 2008, Defendant Hayward received and read portions of a book, titled "Failure to Learn," which analyzed the Texas City explosion of 2005 and was widely circulated within BP. The book reported that BP's "blindness to major risk" and focus on cost-cutting measures significantly impaired BP's process safety and directly contributed to the Texas City accident.

179.   A piece of steel tubing ruptured on BP's Atlantis platform in the Gulf of Mexico in 2008, causing 192 barrels of oil to spill from the rig.  While BP investigators were questioning Atlantis's lean operation and its poor effect on safety in connection with the spill, top BP executives were praising the cost-shaving effort.  According to a June 28, 2010 *Wall Street Journal* article, in early April 2008 Defendant Shaw, former head of BP's Gulf of Mexico operations and SPIOC member, met with top managers with the aim, according to an internal BP communication, to instill a "much stronger performance culture" in the organization, based on strictly managing costs and the notion that "every dollar counts."   While managing costs is necessary, BP publicly assured that it would not do so at the expense of safety, lives or the environment.  Defendant Shaw knew that the Company line did not match internal practices.  A former BP employee told the *Wall Street Journal* that the Gulf of Mexico under Defendant Shaw was focused on meeting performance targets, which determined bonuses for top managers and low-level workers alike.  Plan fiduciaries like Defendant Shaw would set the stage for what was

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

about to become the most devastating oil spill in history, with resultant losses to the many individuals, including Participants in the Plans.

180.    Despite warnings after the Texas City explosion that BP's focus on cost-cutting significantly impaired BP's process safety and directly contributed to the Texas City explosion, Hayward boasted in an April 2009 speech that, as part of the expansive cost-cutting measures he instituted since taking over as CEO of BP, he eliminated nearly 20 percent of the Company's senior positions and reduced the number of BP's employees by around 3,000 people in 2008 and planned to reduce 5,000 more employees by the middle of 2009.

181.    In BP's 2010 Drilling Excellence Plan, provisions on the Company's performance focus emphasized that "every rig minute counts," "every minute matters" and "time is money." In early April 2010, Defendant Hayward announced he had further reduced head count "by 7500 to date and [brought] cash costs down by more than $4 billion in 2009."  Five days after this announcement, the Macondo well exploded due to hasty operations and a lack of emphasis on safety.

182.    Accounts by survivors of the *Deepwater Horizon* confirm that BP's focus on cost-cutting above safety caused the disaster.  On May 16, 2010, a survivor informed *60 Minutes* that BP had initially estimated work to take 21 days.  However, as the time for setting up the well extended to six weeks, BP's management became agitated and ordered workers to speed up the schedule, and that an earlier problem with the well had cost BP an extra $25 million.  BP's management pressured the workers on the rig to make up that loss.  The *Deepwater Horizon* survivor told *60 Minutes* that BP was continuously pressuring them to work quickly.  When the timeline for drilling the Macondo well became delayed, coupled with the loss of $25 million in the earlier incident, BP managers ordered the drillers to work even faster.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

183.   On May 29, 2010, *The New York Times* reported in an article, entitled "Documents Show Early Worries About Safety of Rig," that BP recognized ongoing safety concerns about the *Deepwater Horizon* months before the explosion.   That article explained, in part, that: "Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* far earlier than those the company described to Congress last week."   The article further stated that: "The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of 'well control.'  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer."

184.   A June 14, 2010 letter from the U.S. Congressional Subcommittee on Oversight and Investigations to Defendant Hayward details serious questions about the decisions made by BP in the days and hours before the explosion on the *Deepwater Horizon*:

> On April 15, five days before the explosion, BP's drilling engineer called Macondo a "nightmare well."  In spite of the well's difficulties, **BP appears to have made multiple decisions for economic reasons that increased the danger of a catastrophic well failure**.  In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors.  **In effect, it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk.**
>
> At the time of the blowout, the Macondo well was significantly behind schedule. This appears to have created pressure to take shortcuts to speed finishing the well. In particular, the Committee is focusing on five crucial decisions made by BP: (1) the decision to use a well design with few barriers to gas flow; (2) the failure to use a sufficient number of "centralizers" to prevent channeling during the cement process; (3) the failure to run a cement bond log to evaluate the effectiveness of the cement job; (4) the failure to circulate potentially gas-bearing drilling muds out of the well; and (5) the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below. The common feature of these five decisions is that they posed a trade-off between cost and well safety. (Emphasis added.)

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

185.  BP continuously touted its compliance with and implementation of the Baker Report, but as the DHSG Report notes, there are striking similarities between the Texas City Refinery disaster and the *Deepwater Horizon* disaster, including:

- Multiple system operator malfunctions during a critical period in operations;

- Not following required or accepted operations guidelines (i.e., "casual compliance");

- Neglected maintenance;

- Instrumentation that either did not work properly or whose data interpretation gave false positives; and

- Inappropriate assessment and management of operations risks.

186.  As detailed throughout the Presidential Report and the DHSG Report, the *Deepwater Horizon* catastrophe did not occur because of a single misstep or one person's mistakes.  Rather, the disaster happened due to a chain of errors, over a course of years that were unquestionably a result of a culture at BP that failed to prioritize safety and risk management when conducting such difficult and dangerous operations.  BP was well aware of these problems. As the DHSG Report concluded, "[t]he Macondo well disaster was an organizational accident whose roots were deeply embedded in gross imbalances between the system's provisions for production and those for protection."

187.  According to the Presidential Report, "[c]ementing an oil well is an inherently uncertain process" and "things can go wrong even under optimal conditions."  Despite this, BP compromised contractor Halliburton's recommended cementing design in four different ways. BP did this, not out of concern for safety or the environment, but out of concern that oil would seep through cracks of the well into the surrounding earth, making that oil unrecoverable for production and sale.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

188.   BP's selection of casing – choosing a long-string design which posed greater risks of leaks rather than a more stable, but also more costly and time-intensive liner tieback design – exacerbated problems with cementing and well integrity.  According to the DHSG Report, long-string production casing would have provided an additional barrier to hydrocarbon intrusion into the well but would have required additional funds and three days' more time.  BP also skimped on centralizers because the proper equipment was not readily available at the well site.

189.   BP cut corners on pressure-testing as well.  Rather than undertaking this crucial test with the utmost care, the BP team acted as if the goal was simply to finish the test so they could move to the next step, rather than to produce test results that were accurate. The Presidential Report concluded that "[t]he failure to properly conduct and interpret the negative-pressure test was a major contributing factor to the blowout."  The negative-pressure test produced data that "were not ambiguous."  The results repeatedly showed "that formation fluids, in this case hydrocarbons, were flowing into the well."  BP's deficient safety culture was responsible for this failure.

190.   The blowout preventer failed to contain the well both before and after the explosions.  According to the Presidential Report, after the first explosion, the crew attempted to engage the emergency disconnect system, which should have sealed the well and disconnected the *Deepwater Horizon* from the blowout preventer.   But the *Deepwater Horizon* never disconnected.  The blowout preventer's automatic mode function, also known as the "deadman" system, should have triggered the blind shear ram after the power, communication, and hydraulics connections between the rig and the blowout preventer were cut, but this system did not work either.

191.   A disaster of the magnitude of the *Deepwater Horizon* was foreseeable to those

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

who knew of the lack of a safety and risk management culture and the focus on cost and corner-cutting at BP.

192.   Defendant Hayward knew that the *Deepwater Horizon* blowout was "certainly one of the highest risks for the corporation" and "the highest risk in the Gulf of Mexico and one of the highest risks for the Exploration and Production Unit." One month before the blowout, he had been informed that no major accident risk assessment had been performed on that rig, as BP had no plan to contain a blowout in the Gulf, other than drilling a relief well should the blowout preventer fail.

193.   On February 5, 2008 Hayward informed Shaw that he did not plan to respond to employees' complaints about safety issues in the Gulf of Mexico.

194.   Hayward knew or should have known about safety deficiencies plaguing BP's operations, including significant process-safety concerns in the Gulf of Mexico, as pointed out in an internal December 2088 strategy document discussed in greater detail below.

195.   BP's Initial Exploration Plan submitted to the United States Department of the Interior's Minerals Management Service ("MMS") contained boilerplate language copied from other exploration plans and not based on the site where *Deepwater Horizon* was located.  BP also submitted an oil spill response plan for the Gulf of Mexico claiming that it and its subcontractors had the necessary containment and recovery equipment to respond effectively to spills.  Hayward and McKay would later admit that BP's contingency plans were inadequate and that BP did not have the capability or technology to respond to the *Deepwater Horizon* oil spill.

196.   Certain Defendants, including Hayward, the Designated Officer of the Plans, who served, *inter alia*, as the chairman of the GORC and special liaison to SEEAC, Shaw, who was SPU Leader for the Gulf of Mexico until October 2009, and McKay, who was responsible for

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

safety and operational integrity in the Gulf of Mexico, all testified that they knew that OMS were not in place on contractor-owned sites such as the *Deepwater Horizon*.

197.   As the person responsible for OMS, Hayward knew of, but ignored, important warnings of lax safety standards at BP.  For example, Hayward knew implementation of OMS "was not fully complete in all of the operations" at BP on the date of the Macondo blowout, nearly four years after OMS was instituted.

198.   Defendant Dupree was the highest ranking BP officer responsible for overseeing and implementing OMS within the Gulf.

199.   In addition, Dupree, in his role as SPU Leader in the Gulf of Mexico, had been told of either lost circulation or an in-flow event at the *Deepwater Horizon* prior to April 20, 2010, but he did nothing to investigate those events and he did nothing to follow up.

200.   With their knowledge that BP was putting cost-cutting ahead of safety and risk-management, the Defendants knew or should have known that the BP Stock Fund and BP ADSs were an imprudent investment for Participants and the Plans.

201.   The Macondo Well disaster resulted in loss of life.  Eleven workers were killed and no fewer than 16 were injured.  The massive oil leak polluted the Gulf of Mexico and its shoreline, killing wildlife, endangering human health, and halting fishing, tourism, and other activity in the affected areas.

202.   The price of BP ADSs was $60.48 at the close of trading on April 20, 2010, just hours before the blowout on the *Deepwater Horizon*.  Over the next month, the price of BP ADSs declined to $42.95 on Friday, May 28, 2010.

203.   On the trading day following the May 29, 2010 *New York Times* article, reporting that BP recognized ongoing safety concerns about the *Deepwater Horizon* months before the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

explosion, the price of BP ADSs fell another approximately 13%, closing at $36.52 on June 1, 2010.  BP ADSs have not recovered to pre-spill prices.

### E.    BP Minimized the Reported Spill Rate After the *Deepwater Horizon* Disaster

204.   Following the explosions, *Deepwater Horizon* burned for nearly two days before it sank to the bottom of the Gulf of Mexico.  When the rig sank, the marine riser connecting the blowout preventer and the well to the rig separated from the rig and fell to the bottom of the Gulf.  **For more than 12 weeks,** massive amounts of oil spewed from the broken riser into the Gulf of Mexico.  According to the Presidential Report, "BP had no available, tested technique to stop a deepwater blowout other than the lengthy process of drilling a relief well."

205.   After the explosion on April 20, 2010, Defendant Dupree was called in to join the business support team which ensured the Company's resources went toward supporting the response/operation team — a part of the incident command system set up by BP as the first response to the *Deepwater Horizon* disaster.

206.   Within 12 to 14 hours of the disaster, Dupree was put in charge of source control efforts in Houston.  Source control was part of the incident command system and its purpose was to try to control the source of the hydrocarbons.  Dupree and his team sat in the source control room at the Houston crisis center for 150 days, watching everything that was occurring, including the attempts to activate the blowout preventer and close or activate the shear rams, and flying over the blowout preventer directly after the rig sank.  In addition, Dupree personally interfaced on a daily basis with government officials, including Interior Secretary Salazar and Energy Secretary Chu to assist on the response to the spill.

207.   Up until the flow of oil was stopped in July 2010, BP continually downplayed the amount of oil gushing into the Gulf, misled the public, including the Participants, regarding the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

gravity of the *Deepwater Horizon* spill and its inability to limit the damages.  All the while, the Defendant fiduciaries did not consider or undertake any action to prevent or limit the damage to the Plans' assets stemming from the Plans' investments in the BP Stock Fund.

208.   On April 28, 2010, Admiral Landry announced that due to the discovery of an additional leak from the well, the National Oceanic and Atmospheric Administration ("NOAA") increased its estimate to 5,000 barrels of oil spilling into the Gulf each day.

209.   On the news of the increased estimates of oil spilling into the Gulf, the price of BP ADSs declined 8.34%, or $4.78 from $57.34, to a close of $52.56 on April 29, 2010.

210.   On the following day, Douglas Suttles, Chief Operating Officer of BP E&P, expressed disagreement with NOAA's estimated flow rate, stating, "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." However, an internal BP document later surfaced which shows that on April 27, 2010, BP had arrived at an estimate of 5,758 barrels per day, ranging up to a high of 14,266 barrels per day.

211.   The correct calculation of the amount of oil released from the Macondo well was important, not only to assess the environmental impact (resources and responses needed), but also to determine the amount of the fine to be paid by the offending parties (namely, BP), who would be paying by the barrel.  From April 27 through May 1, 2010, several independent scientists used various methodologies to calculate the amount of oil leaking from the well.  These estimates, which appeared in the national press as early as April 29, 2010, ranged from 5,000-26,500 barrels per day.  However, on May 5, 2010, Hayward told the *Houston Chronicle*, "A guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

212.   According to an affidavit by FBI Special Agent Barbara O'Donnell, BP Drilling and Completions Project Engineer Kurt Mix sent a text message on April 29, 2010, estimating a

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

spill rate of 1,000 to 146,000 barrels of oil per day.  (O'Donnell Aff. at ¶ 11).  At that time and

for many weeks after, BP consistently told the public that it estimated only approximately 5,000

barrels per day were leaking from the Macondo well.  (*Id*. at ¶ 12.)

213.   Mix later was indicted for deleting numerous electronic records relating to

*Deepwater Horizon*, including records concerning the amount of oil potentially flowing from the

Macondo well.  He deleted this sensitive information after being repeatedly informed of his

obligation to maintain these records.  According to FBI Special Agent O'Donnell's affidavit,

"the recovered information Mix deleted includes real-time flow-rate analysis during the Top Kill

operation indicating that Top Kill was not working, contrary to BP's public statements at the

time." (O'Donnell Affidavit at ¶ 6.)

214.   As government and independent party spill estimates rose, BP remained steadfast

in downplaying the severity of the oil flowing into the Gulf.  For example, on May 30, 2010, BP

executive director Robert Dudley stated that the original estimates by government and BP

officials of 5,000 barrels a day were based on satellite pictures and that the then current estimate

of 12,000 to 19,000 barrels was "issued without an actual flow measurement."

215.   Late on August 3, 2010, a "static kill" procedure was successful in stopping the

flow from the well.  According to the Presidential Report, the federal government released a

report on August 4, 2010, titled *BP Deepwater Horizon Oil Budget: What Happened to the Oil?*,

which provided the federal government's first public estimate of the total volume of oil leaked

into the Gulf of Mexico, an estimate of 4.9 million barrels.  This was based on the estimates of

the daily rate of oil flow, which ranged from 62,200 barrels per day on April 22 to 52,700 barrels

per day on July 14.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

216.  The precipitous decline in the price of BP ADSs since the first day of the *Deepwater Horizon* explosion caused a lot of public speculation regarding whether BP could survive as a going concern given the tens of billions of dollars in potential clean-up costs, restoration, litigation costs, fines and penalties.  As a result, rating agencies downgraded BP's debt and equity.  BP suspended its dividend and was compelled to sell billions of dollars in assets to pay clean-up costs.

### F.      BP ADSs Were Trading At Artificially Inflated Prices Throughout the Relevant Period

217.  The incidents detailed above raised red flags to alert Defendants that the Company's safety and risk management practices were utterly deficient and that BP was at extreme risk for another catastrophe.  BP and other Defendants made statements promising that safety was being improved, demonstrating that they recognized the red flags, understood that BP needed to fix its deficient safety and risk management culture, and understood the consequences that would result if that culture were allowed to continue.

218.  Despite these statements, Defendants were aware that BP's culture remained the same as before, emphasizing cost cutting to the detriment of safety.  As a result of BP's inaccurate assurances, BP ADSs were trading at artificially inflated prices throughout the Relevant Period.

219.  On January 16, 2007 (the first day of the Relevant Period), BP held a press conference to address the public release of the Baker Report.  At that press conference, Defendant Browne assured investors — in the wake of Texas City, Prudhoe Bay, and several other catastrophic disasters — of BP's commitment to follow the Baker Panel's recommendations to improve its process safety.  Defendant Browne explained that the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

company's "aim now is to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."

220.   On March 6, 2007, BP filed its 2006 Annual Report with the SEC on Form 20-F, which was signed by Browne.  In the Annual Report, BP touted the Gulf of Mexico as one of its new "profit centres" and a primary economic driver, while minimizing the expected environmental liabilities from those operations.

221.   On April 24, 2007, BP held an earnings conference call with analysts and investors and Byron Grote, CFO of BP p.l.c., assured the public, including Plan Participants, of BP's continued focus on safe operations, including exploration and production operations in the Gulf of Mexico.  Specifically, Grote stated that BP's "strategy is unchanged and our current focus remains on safe and reliable operations and the delivery of improved performance."  Again, BP omitted disclosing that it still suffered from inadequate safety and risk management procedures, as made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion.

222.   On May 9, 2007, BP issued its 2006 Sustainability Report, touting OMS as a comprehensive program being applied across all of BP's business segments, in an effort to safeguard and standardize BP's safety processes around the world.  In particular, this report provided that:

> During 2006, we undertook specific investments and targeted programmes in response to the Texas City incident as well as building more comprehensive systems for managing process safety across the group. . . .  During 2006, we built on the learning from more recent incidents and industry best practice to develop a new operating management system (OMS) to achieve further improvements and reductions in risk.  Our goals remain unchanged:  no accidents, no harm to people and no damage to the environment.  The OMS is a comprehensive system that covers all aspects of our operations, including three dimensions of safety – personal safety, process safety and the environment.

\*       \*       \*

65

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

> The new OMS will apply to all operations by the end of 2010 and includes safety, integrity, environmental management and health. . . .  Each site will have its own local OMS, based on a consistent group-wide framework. . . .  The aim of the OMS is to have consistent standards of design, construction, operating procedures and maintenance that help to ensure the reliability and integrity of our plants.

*       *       *

> In 2006, this approach was approved as a group practice, part of the new OMS, defining the environmental impact management processes and requirements to which BP will operate.

223.    The statements in BP's 2006 Sustainability Report misrepresented to the investing public, including Participants, that OMS applied across all lines of BP's business, when, in fact, OMS did not govern safety practices at contractor-owned sites (where BP leased the drilling rigs), such as the *Deepwater Horizon*.  These facts which were not disclosed to the public, including Plan Participants, were known or should have been known by certain Defendants, including Defendant Hayward, the Designated Officer of the Plans, who served, *inter alia*, as the Chairman of the GORC and special liaison to the SEEAC.

224.  On May 16, 2007, Defendant Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  Echoing Browne's comments following the release of the Baker Report, Malone misleadingly claimed that "[t]oday, I want to assure you that we get it.  We have learned the lessons of the past."  In Defendant Malone's written statement to the Committee, he explained:

> BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy . . . .

*       *       *

> I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.

66

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

\*      \*      \*

BP does not tolerate retaliation against workers who raise safety concerns.

225.   BP failed to disclose that BP continuously compromised its safety performance for budgetary reasons and was therefore not properly committed to safety.

226.   On July 24, 2007, Defendant Hayward stated the following during BP's conference call with analysts and investors, including Participants:

> First, safety.  We are ensuring that we have consistent, safe, reliable operations across BP.  We are implementing the Baker Panel recommendations.  We are also in the early days of establishing a new way of operating in BP – with the progressive rollout of a common group-wide Operating Management System.

227.   Hayward's statements made during BP's July 24, 2007 conference call failed to disclose to the investing public, including Participants, that OMS governed the safety protocol only at rigs that were fully owned by BP; it did not govern sites where BP leased the rigs from other contractors as it did with the *Deepwater Horizon* rig.

228.   On September 25, 2007, Andrew Inglis, the then-CEO of BP E&P and an executive director of the Company, stated the following with regard to OMS at the Sanford Bernstein Fourth Annual Strategic Conference:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide.

229.   As with the previous statements issued by BP regarding OMS, the above statement failed to disclose that OMS did not, in fact, apply to "all aspects of operations throughout BP," and that contractor-owned sites, such as the *Deepwater Horizon* rig, were not subject to OMS.

230.   On October 25, 2007, BP filed with the SEC a Form 6-K and a press release announcing the resolution of various law enforcement investigations, including those relating to

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

the Texas City Refinery explosion and the Prudhoe Bay oil spill.  The press release quoted Defendant Malone stating, in part, that: "[i]n the months and years since these violations occurred, we have made real progress in the areas of process safety performance and risk management." Malone failed to disclose, among other things, that OMS had not been implemented in the Gulf of Mexico at that time, and that OMS applied only to rigs that were fully owned by BP, not to BP's operations where BP leased rigs from others, as it did with the *Deepwater Horizon* rig.

231.    At the Houston Forum, held on November 8, 2007, Hayward assured the public, including Participants, that BP would implement improvements to safety recommended by the Baker Panel.  Hayward misrepresented BP's intention to implement the recommendations detailed in the Baker Report, and did not disclose that, in fact, BP was failing to implement the procedures to improve the safety of its operations, in contravention to the recommendations in the Baker Report intended to improve BP's safety culture and processes.

232.    In particular, Hayward stated that:

We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.  BP remains absolutely committed to taking these lessons and becoming a leader in process safety.

233.    On February 27, 2008, BP released its 2007 Annual Review, containing the "Group chief executive's review."   In his Executive Review, Hayward again reassured the public, including Participants, that safety was BP's top priority.  For instance, Hayward stated that "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations.  I set out three priorities:  safety, people and performance."

234.    On February 27, 2008, Hayward stated the following at BP's 2008 Strategy Presentation during a conference call with analysts and investors:

Notwithstanding this track record our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Panel and have begun to implement a new Operating Management System across all of BP's operations.  Integrity related accidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.

Safe and reliable operations remain our number one priority.

235.   In these statements, Hayward again misrepresented BP's intention to implement the recommendations detailed in the Baker Report, and did not disclose that, in fact, BP was failing to implement the procedures to improve the safety of its operations, in contravention to the recommendations in the Baker Report.  Furthermore, Hayward did not disclose that OMS did not govern the company's operations at contractor-owned sites, such as on the *Deepwater Horizon* rig.

236.   On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In the report, BP again listed deepwater Gulf of Mexico drilling operations among its "profit centres" and assured investors that the company was operating safely.  Specifically, the Form 20-F stated, in part, as follows:

We believe that BP has a strong portfolio of assets . . . . Profit centres are, or are expected to become, areas that provide significant production and income for the segment. Our current areas of major development include the deepwater Gulf of Mexico, Azerbaijan, Algeria, Angola, Egypt and Asia Pacific where we believe we have competitive advantage and that we believe provide the foundation for volume growth and improved margins in the future.

\*       \*       \*

Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 . . . .  We have made material progress throughout the group across all of the panel's 10 recommendations.

\*       \*       \*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses.

*       *       *

Although the cost of any future remediation could be significant and may be material to the result of operations in the period in which it is recognized, we do not expect that such costs will have a material effect on the group's financial position or liquidity. We believe our provisions are sufficient for known requirements; we do not believe that our costs will differ significantly from those of other companies engaged in similar industries, or that our competitive position will be adversely affected as a result.

237.   The statements above failed to disclose that BP had not "made material progress throughout the group across all of the [Baker] panel's 10 recommendations" as shown by the events leading up to the April 20, 2010 explosion.

238.   On April 17, 2008, BP posted on its corporate website a transcript of the speech made by Hayward at the Company's 2008 Annual General Meeting.   In relevant part, the transcript provided that:

When I took over as chief executive last May, I said that we would focus on three basic priorities:  safety, people, and performance.  Everyone at BP understands these priorities.  And while I am in this role they will remain the priorities.

Safety is our number one priority and in 2007 our overall safety record continued to improve.  Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

Our intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.  This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard.

239.   As with his previous statements, Hayward did not disclose BP's actual progress in implementing the safety policies recommended in the Baker Report.  Furthermore, Hayward did

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

not disclose that OMS did not govern the Company's operations at the contractor-owned sites, such as the *Deepwater Horizon* rig.

240.    On December 17, 2008, BP posted on its corporate website a transcript of the speech given by Hayward at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum, in which Hayward reassured the investing public, including the Participants, that BP was continuing to bolster its safety operations. In particular, Hayward stated that:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground.  And we have continuously reported progress against a response plan and against an independent external report.
>
> One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat.

241.    Hayward knew or should have known that his statements touting the Company's progress with improving safety processes "right across BP," were inaccurate, because, among other things, BP's OMS did not apply to contractor-owned sites, such as the *Deepwater Horizon* rig.

242.    Furthermore, Hayward knew or should have known, at the time of the safety deficiencies plaguing BP's operations discussed in an internal BP strategy document issued in December 2008 ("December 2008 Document") that alerted, among other BP executives, the GORC members, including Hayward, of significant process-safety concerns in the Gulf of Mexico.  In particular, the December 2008 Document, later disclosed in a January 24, 2011 *Fortune* magazine article, entitled "BP:  An Accident Waiting to Happen," noted the following

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

process safety "gaps" in the Gulf of Mexico:

> It has become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

The December 2008 Document concluded that BP employees required "major hazard awareness" training.  Hayward did not disclose any of the safety concerns highlighted in the December 2008 Document to the investing public, including the Participants.

243.    On February 24, 2009, BP issued its 2008 Annual Review, advising the investing public, including the Participants, that the Company was continuing to make safety its top priority:

> Safety, both personal and process, remains out highest priority.  Since 2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry.  During the year we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement.  The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008.

244.    The 2008 Annual Review contained the "Group chief executive's review," in which Hayward reassured investors, including the Participants, that safety was BP's "number one priority" and indicated that the Company's operations in the Gulf of Mexico were "safe and reliable." In particular, Hayward stated that:

Q:  At the start of the year what priorities did you set out for BP?

> Safety, people and performance, and these remain our priorities.  Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.  Good policies and processes are essential but, ultimately, safety is about how people think and act.  That's critical at the front line but it is also true for the entire group.  Safety must inform every decision and every action.  The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

\*   \*   \*

Q:  How did Exploration and Production perform?

It was an excellent year, with many projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream.  That, together with safe and reliable performance from our existing operations, contributed to undertaking production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricane Ike and Gustav and other operational issues.

245.    Hayward knew or should have known that his statement, that OMS governed the management of "every BP project, site, operation and facility" was inaccurate, because, among other things, OMS did not apply to contractor-owned sites, such as the *Deepwater Horizon* rig. Hayward also knew or should have known, at the time of the "major hazards and risks" undercutting BP's safety procedures in the Gulf of Mexico that were addressed in the December 2008 Document. Yet, Hayward did not disclose to the public, including the Participants that BP's operations in the Gulf of Mexico did not conform to acceptable safety processes.

246.    On February 25, 2009, Defendant McKay testified before the U.S. House of Representatives' Committee on Natural Resources.  In his written statements submitted to the Committee, McKay assured the Committee of the safety of drilling in the deepwater Gulf of Mexico, even though he knew or should have known of the serious safety risks threatening BP's operations in that region.

247.   On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In the report, BP again assured the public that the company and its leadership, including Defendant Hayward, were committed to safety in the company's operations.  The 2008 Annual Report indicated, *inter alia*, that BP's operations in the Gulf of Mexico complied with OMS, and its Company-wide safety practices.

73

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

248.   On March 10, 2009, BP's Initial Exploration Plan ("EP"), which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The EP was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009. The EP inaccurately stated, in part, that:

> I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan.
>
> *        *        *
>
> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.
>
> *        *        *
>
> In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.
>
> *        *        *
>
> An accidental oil spill from the proposed activities could cause impacts to beaches.  However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.  Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources.

249.    These statements failed to disclose that BP did not have the capability to properly respond to a "worst-case discharge."  In reality, BP was unable to stop the deluge of oil spilling

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

into the Gulf of Mexico after the April 20, 2010 explosion on the *Deepwater Horizon*.  BP acknowledged on May 10, 2010 that: "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

250.  Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its EP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservative practices, and would not cause undue or serious harm or damage to human or marine health, or the coastal environment.  30 C.F.R. §§250.201, 250.202.  BP did not have such a plan or a means of conducting its proposed activities.

251.  Furthermore, BP inaccurately represented that the EP was based on an analysis of the Mississippi Canyon Block 252 site, when, in fact, the EP was boilerplate language copied from one or more exploration plans that MMS had previously approved for two other distinct drilling sites.

252.  The above statements in the EP also misrepresented BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared.

253.  Moreover, the above statements in the EP misrepresented that an oil spill from BP's proposed activities would not adversely impact beaches and other environmentally sensitive areas.

254.  Defendants did not disclose that BP lacked sufficient internal safety and risk management processes to satisfy the above-referenced regulation.  Hayward later admitted that "BP's contingency plans were inadequate," and that the Company had been "making it up day to

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

day."  Hayward further admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because "[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the *Deepwater Horizon* explosion.

255.   Subsequently, Defendant McKay also admitted in his May 12, 2010 testimony to the House Subcommittee on Oversight and Investigations, Committee on Energy and Commerce that BP did not have the capability and technology to respond to the *Deepwater Horizon* oil spill.

256.   The Presidential Commission also concluded that "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job."

257.   On April 16, 2009, BP issued its 2008 Sustainability Review, which contained a "Group Chief executive's review," in which Hayward stated:  "You can see a similar balanced approach in our new operating management system (OMS), which is to be implemented at each BP site.  It covers everything from compliance and risk management through to governance and measuring results."

258.   Despite his knowledge to the contrary, Hayward did not disclose that in fact OMS did not apply "at each BP site," and that in particular it did not govern BP's operations at contractor-owned sites where the Company leased rigs from others, as it did with the *Deepwater Horizon*.

259.   On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico, entitled "Regional Oil Spill Response Plan – Gulf of Mexico."

260.   Regional Oil Spill Response Plan for the Gulf of Mexico explicitly states that BP and its subcontractors could recover approximately 491,721 barrels of oil per day in the event of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

an oil spill in the Gulf of Mexico.  BP further claimed and provided certified statements to the MMS that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."

261.  Moreover, Defendant Shaw, who was SPU leader for the Gulf of Mexico until October 2009, knew that OMS were not in place on the *Deepwater Horizon*.

262.  On March 5, 2010, in BP's Annual Report, BP continued to tout its ability to deliver safety in its operations:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. OMS includes mandatory practices, such as integrity management and incident investigation, which are designed to address particular risks. In addition, it enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.

263.  The statements in this Form 20-F, less than two months before the explosion on the *Deepwater Horizon*, contain the same inaccuracies about the BP's commitment to and level of safety.

## VII.   MISMANAGEMENT OF THE PLANS' ASSETS

264.  Throughout the Relevant Period, the Insider Defendants (defined below), all high-level executives or BP personnel who had or should have had knowledge of the misleading and inaccurate statements about BP's safety programs and processes and the extraordinary deficiencies in BP's operations, had the discretion, control, and authority, under the terms of the Plans, to divest the Plans from investment in the BP Stock Fund; stop future contributions from being invested in the BP Stock Fund; appoint, monitor, and remove trustees; select, direct, monitor and terminate external investment managers of the BP Stock Fund; develop investment

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

strategies and policies for the BP Stock Fund; and direct the trustee as to the investment and reinvestment of the Plans' assets.

265.   Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants owed the highest duty known to law to discharge their responsibilities with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless, under the circumstances, it is clearly prudent not to do so.

266.   During the Relevant Period, the fiduciaries had the ability and duty to close investment options and change the investment menu of the Plans after evaluating those options and determining that a particular investment was no longer prudent.

### A.      Defendants closed or changed other investment options

267.   In October 2008, Defendants made changes to four core investment options offered by the Plans after the investments suffered losses related, in part, to securities lending activities.   On October 14, 2008, the Plan Administrator sent a notice to all Participants informing them that the SPIOC, "which oversees all investment options, has determined that the BP savings plan will no longer allow contributions to these investment options."   The Plan Administrator further stated "the Savings Plan Committee requested that we commence a process to transfer these plan assets to new investment options under a different plan manager."

268.   After noting that the U.S. economy was "undergoing significant turmoil in both the equity and credit markets" and that four of the investment options suffered losses and had underperformed their respective benchmarks, the Plan Administrator advised Participants that

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

SPIOC had decided to: (1) close the Northern Trust investment options to further investment, allowing participants only to move funds out of the NTI Options; (2) redirect certain monies from the closed options to target date funds; and (3) transition funds from the NTI Options to commingled funds managed by State Street Global Advisors.  Participants were further advised that SPIOC "will continue to monitor all investment options in the BP savings plans as information is made available."

269.    In an attached questions and answer paper provided by the Plan Administrator, Participants were advised that "the investment options in the BP savings plans are monitored by SPIOC, and that monitoring has been heightened given the current volatile economic situation."

270.    Defendants represented to Participants that all the investment options in the BP Plans were monitored by the SPIOC.  In connection with the Northern Trust investments — where the Defendants had no conflict of interest — SPIOC knew exactly what to do to protect Participants.  The SPIOC ensured that imprudent investment options were closed to further investment and Participants' assets redirected to suitable investment choices.

271.    Defendants breached their fiduciary duties by, among other things, failing to: divest the Plans of the BP Stock Fund; discontinue further contributions of BP ADSs to the Plans; remove or take other, similar action as to BP ADSs as an investment option for the Plans; properly monitor State Street as the independent fiduciary regarding the appropriateness of an investment in BP ADSs; and resign as fiduciaries of the Plans if, as a result of their employment by BP, they could not loyally serve the Plans and the Participants.  In fact, Defendants continued to invest and to allow investment of the Plans' assets in the BP Stock Fund even though they knew or should have known of the misleading and inaccurate statements made to the investing public about BP's safety protocols for its gas and oil operations.  Once the true corporate culture

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of BP became known as a result of the *Deepwater Horizon* explosion, the price of the inflated BP ADSs substantially decreased in value, causing hundreds of millions of dollars of losses to the Plans.

272.   Defendants withheld material, non-public facts from Participants and provided inaccurate and incomplete information to them regarding the Company's safety protocols in its drilling operations and the soundness of BP ADSs as an investment vehicle.  As a consequence, Participants did not exercise independent control over their investments in the BP Stock Fund.

273.



**B.     BP's Poor Response To The Deepwater Horizon Spill Could Not Have Been Anticipated By The Participants**

274.   While drilling for oil involves risk, BP had not devised a proper recovery plan to stop a leak on the ocean floor —  one of the inherent risks of ocean drilling — transforming the Gulf spill from a tragic accident into one of the world's greatest environmental debacles. Significantly, Hayward admitted that the Company had no ability to stop the flow of oil a mile below the water's surface, telling the BBC on November 9, 2010, that the Company's emergency response plans were being made up "day to day."  On May 4, 2012, *The Huffington Post* reported in an article, entitled "Ex-BP CEO Chooses Sea Protection Forum to Talk About Spill," that Hayward admitted that "[w]e had no equipment to contain and stop the oil on the seabed…. No

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

such equipment existed.  We found ourselves having to design and build it -- improvising, as it were, on prime-time television."

275.   These facts demonstrate that while Participants might have been aware of the risky nature of BP's business, they were unaware of a different risk:  the risk that the Company in which they invested was woefully unprepared to meet the foreseeable challenges of its industry even after repeatedly promising to live up to industry standards.

## VIII.   CLAIMS FOR RELIEF UNDER ERISA

276.   At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

277.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

278.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

279.   ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

280.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and have been described by some courts as the "highest known to the law."  They entail, among other things:

(a)   The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)   A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor, and;

(c)   A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

281.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

. . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

282.   Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for Plan-wide relief, under ERISA §§ 409(a) and 405(a), to recover losses sustained by the Plans

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §
404(a)(1) and  405(a).

### A.    REMEDIES

283.   Plaintiffs, on behalf of the Plans, seek alternative types of relief under ERISA.

284.   First, with respect to calculation of the losses to the Plans, breaches of fiduciary
duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have
made or maintained investments in the challenged investment and, where alternative investments
were available, that the investments made or maintained in the BP Stock Fund would have
instead been made in the most profitable alternative investment available.  In this way, the
remedy restores the Plans' lost value and puts Participants in the position they would have been
in if the Plans had been properly administered by their fiduciaries.  Accordingly, Plaintiffs, on
behalf of the Plans, seek lost profits as a result of Defendants' breaches.  In particular, Plaintiffs,
on behalf of the Plans, seek the profit that had been lost by investing in the BP Stock Fund
instead of investing in other prudent funds that were available to the Plans at the time and which
have outperformed the returns on the BP Stock Fund.

285.   Second, Plaintiffs, on behalf of the Plans, seek to recover the losses incurred by
investing their retirement funds in units of the BP Stock Fund when BP ADSs were an imprudent
investment.

286.   Plaintiffs and the Plans, are therefore entitled to relief from Defendants in the form
of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans
resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial
based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);
(ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii)

reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g),

the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these

amounts, as provided by law; and (v) such other legal or equitable relief as may be just and

proper.

287.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered

by the Plans in this case.

### B.   CAUSATION

288.   The price of BP ADSs collapsed by approximately 50% during the Relevant

Period and has never fully recovered despite the record-setting levels achieved by the stock

market.   The Plans' losses would have been avoided, in whole or in part, had Defendants

complied with their ERISA fiduciary duties, including, but not limited to investigating,

evaluating, and deciding whether BP ADSs were a prudent retirement investment in light of BP's

failure to comply with the Baker Report's recommendations; implementing OMS in the Gulf;

stopping or limiting additional purchases of BP ADSs by the Plans; and/or making a complete

and appropriate disclosure of the facts relevant to investment in BP stock.

289.   The Plans suffered hundreds of millions of dollars in losses because substantial

assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in

Company securities during the Relevant Period, in breach of Defendants' fiduciary duties.   These

losses were reflected in the diminished account balances of the Plans' Participants.

290.   Defendants failed to accurately apprise the Participants of the problems within the

Company (as set forth above) and of the fact that the BP Stock Fund was generally an imprudent

investment option due to, *inter alia*, numerous undisclosed safety breaches, which once revealed

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

when the explosion of the *Deepwater Horizon* occurred, caused the price of BP ADSs to suffer. Moreover, the Individual Defendants, all senior officers and/or directors of BP, lulled Participants into believing that BP was complying with the Baker Report and that the probability of another major disaster was remote. As a consequence of Defendants' actions, regardless of any ability to divest, Participants did not exercise independent control over their investments in the BP Stock Fund, and Defendants remain liable under ERISA for losses caused by the investment in the BP Stock Fund when it was imprudent to make such investments.

291. Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including, but not limited to, disclosing material information harmful to the price of BP ADSs, and therefore the Plans' assets, the Plans and Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in the BP Stock Fund. As succinctly stated by the court in an analogous action, "[d]isclosure might not have prevented the Plan from taking a loss on [company] stock it already held; but it would have prevented the Plan from acquiring (through Plaintiffs' uninformed investment decisions and through continued investment of matching contributions) additional shares of overpriced [company] stock: the longer the fraud continued, the more of the Plan's good money went into a bad investment; and full disclosure would have cut short the period in which the Plan bought at inflated prices." *In re Honeywell Int'l ERISA Litig.*, No. 03-1214 (DRD), 2004 U.S. Dist. LEXIS 21585, at *42-*43 (D.N.J. Sept. 14, 2004).

292. Despite their fiduciary duties, Defendants failed to protect Participants' retirement savings from being imprudently invested in BP ADSs and, as a result, the Plans and the Participants suffered substantial losses. A prudent fiduciary facing similar circumstances would not have stood idly by, as Defendants did here, while the Plans lost hundreds of millions of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

dollars through continued investing in additional imprudent BP ADSs. Instead, as shown in the Plans' Forms 11-K, Defendants allowed the Plans to purchase hundreds of thousands of additional shares throughout the Relevant Period.

293. The following alternative options—which are pled as alternative statements under Fed. R. Civ. P. 8(d)(2) — were available to Defendants and: (a) could have been done without violating the securities laws or any other laws; (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA; and (c) would not have been more likely to harm the BP Stock Fund than to help it.

### (i) Alternative One: Freeze, Limit or Restrict Company Stock Purchases

294. Article VI, Section 6.3 of the BP Employee Savings Plan (Amended and Restated as of January 1, 2009), provides that a "Designated Officer, may, from time to time, as directed by the Investment Committee … limit or freeze investments in, or transfers from, an Investment Option."

295. The Investment Options Guide provided that BP North America had the discretion, authority, and control to add, delete, or freeze the BP Stock Fund or to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment. BP, Investment Options Guide (Aug. 2008) at 35; BP, Investment Options Guide (Apr. 2007) at 41. Specifically, the 2007 and 2008 Investment Options Guides, which constitute part of a prospectus for the Plans, recognizes that BP retains the authority and discretion to liquidate all of the BP ADSs in the BP Stock Fund: "Under limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADSs in the BP Stock Fund *should the investment manager **or BP** determine such an investment is no longer prudent*." (Italics in original; emphasis added.)

86

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

296.  In addition, under the Management Agreement with State Street, BP North America had the overriding ability to "cause cash or any Securities and other Property to be added to or withdrawn from any Investment Account in its ***discretion***, and shall give or cause written notice of such additions or withdrawals to be given to the Investment Manager." Management Agreement, Sec. 7.  (Emphasis added.)  The "Securities or other Property" include the BP Stock Fund.

297.  The Investment Strategy Guidelines provide that the BP Stock Fund could be comprised of BP ADSs and cash equivalents, and that it could use short term lines of credit where appropriate.  In addition, upon prior approval of BP North America, the BP Stock Fund could invest in other public and private debt and equities securities, including debt and equity derivatives such as options and future contracts.  Management Agreement, Exh. C-1 (E).

298.  Defendants could have and should have directed that all Company and participant contributions to the BP Stock Fund be held in cash, rather than be used to purchase or acquire additional BP ADSs.

299.  The refusal to purchase or acquire BP ADSs in the BP Stock Fund is not a "transaction" within the meaning of insider trading prohibitions.

300.  These actions would not have required any independent public disclosures under the securities laws that could have had a material adverse effect on the stock price.

301.  Alternatively, Defendants should have closed the BP Stock Fund to further contributions and directed that contributions be diverted from the BP ADSs Fund into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plans' default investment option.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### (ii) Alternative Two: Complete and Accurate Disclosure

302.    A less significant stock price drop would have occurred upon an earlier disclosure of the material information concerning BP's process safety and disaster recovery issues.  Given BP's history of not disclosing the true risks of its operations, the market may have continued to discount BP ADSs after the Macondo well catastrophe, treating the Company as something of a "black box" because investors feared that other risks were being hidden.  *See* King, R. "The Liar's Discount," *Forbes*, May 30, 1988 (noting that firms with a reputation for being less than forthcoming about impending bad news trade at a discount to other stocks).  Earlier disclosures would have, contrarily, caused investors to be willing to pay more for BP ADSs due to the assurance of management's candor. *Id.* ("[g]etting bad news out fast and straight is perhaps the cardinal rule of effective public relations.")

303.    Early and candid disclosures would have caused the stock to drop less because, among other things, disclosure would have mitigated reputational damage to the Company, minimized the risk of nondisclosure claims arising from the *Deepwater Horizon* explosion, and lessened the risk of defending against governmental investigations and paying the associated penalties.  *See* Richard A. Booth, Article: *Class Conflict in Securities Fraud Litigation*, 14 U. Pa. J. Bus. L. 701, 708-09 ("holders suffer a further loss because of the expenses suffered by the corporation in defending itself against the class action and any other enforcement proceedings (not to mention possible fines and intangible costs of management distraction).  Moreover, the corporation may suffer reputational harm that increases its cost of capital and further drives down its stock price.  Although buyers may recover for these losses because they are built into the total decline in stock price, they are losses suffered by all of the stockholders and not merely those who bought during the fraud period.") (footnotes and citations omitted).

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

304.    Despite the availability of these options, Defendants took no meaningful action to protect Participants from losses as a result of the BP Stock Fund's imprudence.

## COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405)**
**(Against the Insider Defendants and Corporate Defendants)**

305.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

306.    At all relevant times, as alleged above, BP North America, Hayward, McKay, Shaw, and Dupree ("Insider Defendants") were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

307.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent and that the assets within a plan are prudently invested.  The Insider Defendants were responsible for ensuring that all investment options offered to Participants, including BP ADSs, were invested prudently and that such investments were consistent with the purpose of the Plans.

308.    A fiduciary's duty of loyalty and prudence requires the fiduciary to disregard plan documents or directives that the fiduciary knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may the fiduciary allow others, including those whom he directs or who are directed by the plan, including plan trustees, to do so.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

309.   ERISA and its regulations provide that when making investment decisions, the duty of prudence requires the fiduciary to give "appropriate consideration" to the facts and circumstances that the fiduciary knows or should know are relevant to a particular investment or investment strategy, including the role that the investment (or strategy) will play in the plan's portfolio, and the fiduciary must act in accordance with the conclusions that were reached after that appropriate consideration has been undertaken.

310.   Consideration of facts and circumstances that the fiduciary should know means that it is insufficient to consider only readily available information about the merits of the investment if additional information can be found through thorough investigation and due diligence.  Appropriate consideration includes a determination by the fiduciary that a particular investment or investment strategy is reasonably designed to further the purposes of a plan, taking into consideration the risk of loss and the opportunity for gain associated with the investment.

311.   The Insider Defendants knew or should have known of the serious mismanagement of BP and the nondisclosure relating to the deficient safety process and the actual amount of oil being spilled into the Gulf after the *Deepwater Horizon* explosion. Moreover, the Insider Defendants either directly participated in the improper conduct and non-disclosures or should have known of the safety and spill rate issues given their high-level positions with BP.

312.   As discussed above, Hayward knew that implementation of OMS was incomplete, there was no plan in place to contain a blowout in the Gulf, and that no risk assessment had been performed on the *Deepwater Horizon*.  Defendant McKay knew that OMS were not implemented on the *Deepwater Horizon* and that there was a high risk of a blowout at the Macondo well. Defendant Dupree was very familiar with BP's safety lapses in his role as SPU Leader in the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Gulf of Mexico. In particular, he had been informed of specific, unresolved safety deficiencies on the *Deepwater Horizon* prior to the blowout and was personally involved in efforts to stop the flow of oil after the blowout. Defendant Shaw, as an SPU Leader in the Gulf of Mexico, had knowledge of the lack of safety controls at BP, knew that OMS were not implemented on *Deepwater Horizon*, and knew of prior safety hazards and incidents.

313. The minutes of the SPIOC show that the committee failed to give appropriate consideration to the facts and circumstances that it knew, or should have known, of the risks relevant to the investment in the BP Stock Fund. Rather, the SPIOC relied on State Street to manage the BP Stock Fund, knowing that State Street lacked the information it required to evaluate the BP Stock Fund as an investment option. The Insider Defendants who were members of the SPIOC knew or should have known that State Street lacked this information both before and after the spill because, for example, State Street was not privy to the status of the implementation of OMS and the correct estimate of the amount of oil gushing from the Macondo well.

314. During the Relevant Period, the Insider Defendants failed to take any meaningful steps to protect Participants from the inevitable losses that they knew, or should have known based upon a proper investigation, would ensue as BP's material problems, described herein, became public.

315. Pursuant to the terms of the Plans, several alternative options were available to the Insider Defendants, including (a) exercising their discretion to freeze, limit, or restrict further purchases of BP ADSs by the BP Stock Fund (which option was explicitly acknowledged as an available alternative measure by the SPIOC); (b) making complete and accurate disclosures without violating the securities laws or any other laws; and (c) developing an investment strategy

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

to ensure that the above actions of restricting purchases and/or making disclosures would not have been more likely to harm the BP Stock Fund than to help it.

316.    To divest some or all of the Plans of holdings of BP ADS without depressing the market price of BP ADSs or causing the Plans more harm than good, Defendants could have, with the aid of State Street or another outside investment consultant, readily developed a divestment strategy to sell the BP ADSs in the Plans over a period of time, taking into consideration the overall trading volume and any limitations under the securities laws.  Such divestment strategies are routinely used by investment fiduciaries of retirement plans and trusts. Such a strategy should have been in place early in the Relevant Period in response to incidents that occurred prior to *Deepwater Horizon*, and had this strategy been in place, further losses would have been significantly limited.

317.    The implementation of some or all of the options available to the Defendants would have helped to greatly diminish the substantial losses suffered by the Plans and their Participants as a result of the drastic decline in the value of BP ADSs after the *Deepwater Horizon* explosion.

318.    The Insider Defendants breached their fiduciary duties of loyalty and prudence by, among their other failures, knowingly participating in the concealment of, or knowingly undertaking to conceal, crucial information regarding the Company's operations and the artificial inflation of the price of BP ADSs, and investing or allowing the the Plans to invest in the BP Stock Fund at a time when the shares were artificially inflated.

319.    Defendants further breached their duties of procedural prudence by failing to give appropriate consideration of the facts and circumstances that were relevant to the unrestricted investment in the BP Stock Fund and by failing to develop an investment policy or strategy that

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

was reasonably designed to further the purposes of the Plans, taking into consideration the excessive risk of substantial losses and the threat to the retirement security of the Participants. During the Relevant Period, Defendants, especially the Insider Defendants, knew or should have known, based upon a proper investigation of the BP Stock Fund, that the unrestricted investments in the BP Stock Fund were inappropriate and did not serve the Plans' purpose of helping Participants save for retirement.

320.     The Corporate Defendants are liable under the doctrine of *respondeat superior* for the breaches of fiduciary duty committed by Defendants Anthony Hayward, Lamar McKay, Neil Shaw, and James Dupree because each Corporate Defendant knowingly and actively participated in the breaches of fiduciary duty committed by these employees.

321.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Participants, lost a significant portion of their retirement investment.

322.     Pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(3) 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3),  the Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405)
(Against the BP North America Board Defendants,
the Designated Officer Defendants, the Appointing Officer Defendants,
the SPIOC Defendants and the Corporate Defendants)**

323.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

324.   At all relevant times, as alleged above, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, the SPIOC Defendants,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

and the Corporate Defendants ("Monitoring Defendants") were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

325.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Monitoring Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of SPIOC and State Street.

326.   Under the terms of the Plans, the SPIOC Defendants breached their fiduciary duties by failing to adequately monitor other persons responsible for the management and administration of the Plans' assets, including State Street, although such Defendants knew or should have known that such other fiduciaries were allowing the Plans to continue offering the BP Stock Fund as an investment option and investing the Plans' assets in the BP Stock Fund.

327.   The BP North America Defendants appointed the persons who managed and administered the Plans on a day-to-day basis.  BP North America is legally responsible for the actions of its Board of Directors and appointed persons alleged herein.  Accordingly, the BP North America Defendants had a duty to monitor those individuals that it appointed to manage and administer the Plans.

328.   The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, the Monitoring Defendants had the duty to:

(a)    Ensure that the monitored fiduciaries possessed the needed credentials and experience, or used qualified advisors and service providers to fulfill their duties, and were knowledgeable about the operations of the Plans, the goals of the Plans and the behavior of the Participants;

(b)    Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)    Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plans' investments;

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(d)     Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(f)     Ensure that the monitored fiduciaries reported regularly to the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, the SPIOC Defendants, and the BP North America Board Defendants, who must then review, understand, and approve the conduct of the hands-on fiduciaries.

329.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have to prudently manage a plan and a plan's assets.

330.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to ensure that the monitored fiduciaries conducted a proper investigation as to whether to offer the BP Stock Fund; (b) failing to ensure that the monitoring fiduciaries had access to knowledge about the Company's problems alleged above, which made the BP Stock Fund an imprudent retirement investment; and (c) failing to ensure that the monitored fiduciaries completely appreciated the substantial risk of investment of the retirement savings of rank and file employees in the BP Stock Fund, an investment that was imprudent for retirement savings accounts.  The Monitoring Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the BP Stock Fund as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plans in the BP Stock Fund when it no longer was prudent to do so.  Despite this knowledge,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

the Monitoring Defendants failed to take action to protect the Plans, and concomitantly the Participants, from the consequences of these fiduciaries' failures.

331.  Significantly, during the same time period when the SPIOC's monitoring was heightened due to the turmoil in the equity and credit markets and the Defendants were evaluating and considering whether to close the Northern Trust investment options, Monitoring Defendants failed to even consider the prudence of the BP Stock Fund at a time when Defendants knew or should have known that the BP was violating securities, criminal, and environmental laws and risking the retirement accounts of Participants by continuing to invest in inflated shares of BP ADSs.  Rather than fulfilling their fiduciary duties of loyalty and prudence by acting with an "eye single to the interests of the participants and beneficiaries" (*Donovan v. Bierworth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982)), Defendants were conflicted and turned a blind eye to BP's conduct and the extraordinary and unacceptable risks associated with continuing to invest in the BP Stock Fund, thereby breaching their duties of loyalty and prudence and causing the Plans to lose hundreds of millions of dollars.

332.  In addition, the Insider Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the improper conduct and non-disclosures concerning the deficient safety process and spill rate that they knew that the monitored fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to fail to disclose such information to the other fiduciaries, the Insider Defendants breached their monitoring duties under the Plans and ERISA.

333.  The Monitoring Defendants are liable as co-fiduciaries because they were the Plans' fiduciaries and they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

failed to make any effort to remedy these breaches, despite having knowledge of them.

334.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Participants lost a significant portion of their retirement benefits.

335.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of the Plans and Participants, pray for relief as follows:

A.   That judgment be entered for Plaintiffs and Participants on behalf of the Plans, determining that Defendants, and each of them jointly and severally, breached their fiduciary duties owed to the Plans and Participants;

B.   That Defendants, and each of them jointly and severally, restore to the Plans and Participants the losses sustained by the Plans and Participants due to the breaches of fiduciary duties under Count I and Count II, in an amount to be proven at trial;

C.   Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.   An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.   Actual damages in the amount of any losses the Plans suffered, to be allocated among Participants' individual accounts in proportion to the accounts' losses;

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

F.      An Order that Defendants allocate the Plans' recoveries to the accounts of all Participants who had their accounts invested in the BP Stock Fund in proportion to the accounts' losses attributable to the precipitous decline in the share price of BP ADSs;

G.      In the alternative, that an appropriate Class of Participants be certified and designated by the Court to receive the amounts restored to the Plans by Defendants;

H.      That the Court award reasonable attorneys' fees, costs and expenses to Plaintiffs' counsel under 29 U.S.C. § 1132(g) and/or in accordance with the laws and rules governing class actions and common funds, under Fed. R. Civ. P. 23 as appropriate; and

I.      For such further legal, equitable and remedial relief that this Court deems just and proper to protect the legitimate rights of Plaintiffs, the Plans and Participants.

## X.      <u>JURY TRIAL DEMAND</u>

Plaintiffs, pursuant to Fed. R. Civ. P. 38, demand a trial by jury of all issues which are subject to adjudication by a trier of fact.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Dated:  February 12, 2015


*/s/ Thomas R. Ajamie*
_____

Thomas Robert Ajamie
Texas Bar No. 00952400
Dona Szak
Texas Bar No. 19597500
John W. Clay
Texas Bar No. 00796366
AJAMIE LLP
711 Louisiana, Suite 2150
Houston, TX 77002
Tel: (713) 860-1600
Fax: (713) 860-1699

*Attorneys for Plaintiff David M. Humphries*
*and Interim Co-Liaison Counsel*




Ronald S. Kravitz
Texas Bar No. 00795147
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
One California Street, Suite 900
San Francisco, CA 94111
Tel: (415) 429-5272
Fax: (866) 300-7367

*Attorneys for Plaintiff David M. Humphries and*
*Interim Co-Lead Counsel*


*/s/ W. Mark Lanier*
_____

W. Mark Lanier
Texas Bar No. 11934600
THE LANIER LAW FIRM
6810 FM 1960 West
Houston, Texas 77069
Tel: (713) 659-5200
Fax: (713) 659-2204

Evan M. Janush *(pro hac vice)*
THE LANIER LAW FIRM
126 East 56th Street, 6th Floor
New York, New York, 10022
Tel: (212) 860-1600
Fax: (713) 860-7699

*Attorneys for Plaintiffs Charis Moule, Jerry*
*McGuire and Maureen S. Riely and Interim*
*Co-Liaison Counsel*


Sanford P. Dumain *(pro hac vice)*
Lori G. Feldman *(pro hac vice)*
Arvind B. Khurana *(pro hac vice)*
Kristi Stahnke McGregor *(pro hac vice)*
MILBERG LLP
One Pennsylvania Plaza
New York, New York 10119
Tel: (212) 594-5300
Fax:  (212) 868-1229

*Attorneys for Plaintiffs Charis Moule, Jerry*
*McGuire and Maureen S. Riely and Interim*
*Co-Lead Counsel*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Stephen J. Fearon, Jr. (*pro hac vice*)
SQUITIERI & FEARON LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492

*Attorneys for Plaintiffs Ralph Whitley and*
*Frankie Ramirez and Interim Counsel --*
*Executive Committee*

Thomas J. McKenna (*pro hac vice*)
Gregory M. Egleston (*pro hac vice*)
GAINEY McKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300

*Attorneys for Plaintiffs Ralph Whitley*
*And Thomas P. Soesman*

Edwin J. Mills
Michael J. Klein
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230

*Attorneys for Plaintiff Edward Mineman*

Robert I. Harwood (*pro hac vice*)
Tanya Korkhov (*pro hac vice*)
HARWOOD FEFFER LLP
488 Madison Avenue, Suite 801
New York, NY 10022
Tel: (212) 935-7400

*Attorneys for Plaintiffs Charis Moule, Jerry*
*McGuire and Maureen S. Riely and Interim*
*Counsel -- Executive Committee*

Robert A. Izard (*pro hac vice*)
IZARD NOBEL LLP
29 South Main Street Suite 215
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

*Attorneys for Plaintiff Arshadullah Syed*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Complaint was served upon counsel of record for the parties through the Court's ECF system on February 12, 2015.


_/s/ Thomas R. Ajamie_