# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | MDL No. 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | Civil Action No. 4:10-cv-4214 |
| IN RE: BP p.l.c. | § | |
| ERISA LITIGATION | § | HON. KEITH P. ELLISON |
| | § | |
| | § | |

## AMENDED MEMORANDUM AND ORDER

Plaintiffs in this derivative / putative class action seek leave to amend their complaint, brought pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"). They allege that certain corporate entities and individuals associated with the BP Group violated their fiduciary duties to the participants of four employee benefits plans offered before and after the disastrous Deepwater Horizon explosion on April 20, 2010.

Upon consideration of Plaintiffs' Motion (Doc. Nos. 152, 153), Defendants' opposition (Doc. Nos. 154, 155), Plaintiffs' reply (Doc. Nos. 160, 161), Plaintiffs' notice of recent authority (Doc. No. 162), and Defendants' sur-reply (Doc. No. 166), and having heard oral argument, the Court **GRANTS IN PART** Plaintiffs' Motion for Leave to File Amended Complaint (Doc. Nos. 152, 153). At the conclusion of this order, the Court provides guidelines as to the claims which Plaintiffs may replead.

## I.    BACKGROUND

Plaintiffs are participants in two of four employee benefits plans (the "Plans") offered by Defendant BP Corporation North America Inc. ("BP North America" or "BPNAI") between January 16, 2007 and June 24, 2010. (Doc. Nos. 152-1, 153-1 ("CAC"), at ¶¶ 1-2, 29-37, 41-42.) Each Plan featured the option of investing in the "BP Stock Fund," a fund comprised entirely of

BP American Depository Shares ("ADSs") with a minimal cash component "to facilitate daily transactions."[1] (*Id.* ¶ 3.) During the time period in question, the BP Stock Fund comprised approximately one-third of the Plans' assets. (*Id.* ¶ 106.)

Plaintiffs allege that certain corporate entities and individuals associated with the BP Group violated their fiduciary duties to the Plans during the relevant time period.[2] The Court has recounted the specifics of Plaintiffs' allegations in prior written orders and will not repeat itself here. Broadly, however, Plaintiffs assert three theories of liability under ERISA:

(1)    Defendants violated their duties of prudence and loyalty by permitting Plan participants to invest in the BP Stock Fund;

(2)    Defendants violated their duties of prudence and loyalty, as well as their ERISA-based disclosure obligations, by misrepresenting or omitting information relevant to participants' decisions to invest in the BP Stock Fund; and

(3)    Certain defendants failed to adequately monitor other fiduciaries who engaged in activity which violated their duties of prudence and loyalty.

According to Plaintiffs, Defendants' actions and/or inaction cost Plan participants hundreds of millions of dollars in losses following the Deepwater Horizon explosion. (CAC ¶ 317.)

On March 30, 2012, the Court dismissed Plaintiffs' first consolidated pleading—the Consolidated Complaint—in its entirety. (Doc. No. 116 (the "2012 MTD Order").) The Court ruled that Plaintiffs' first theory of liability failed, under the so-called "*Moench* presumption of

---

[1] Because the Plans authorized investment in employer stock, they are Eligible Individual Account Plans ("EIAPs"), as defined in ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3).

[2] Defendants in the ERISA action are:
- Three corporate entities (BP North America; BP p.l.c.; and BP America Inc.);
- Two deliberative bodies found within Defendant BP North America (the Board of Directors and the Savings Plan Investment Oversight Committee); and
- Seventeen individuals employed by various corporate entities within the BP Group (Lord John Browne; Corey Correnti; Marvin L. Damsma; Richard J. Dorazil; James Dupree; Patrick Gower; Anthony Hayward; Jeanne M. Johns; Robert A. Malone; Lamar McKay; Patricia H. Miller; Stephanie C. Moore; Stephen J. Riney; Brian D. Smith; Neil Shaw; Thomas L. Taylor; and Gregory T. Williamson).

prudence,"[3] because (1) Plaintiffs had not adequately alleged that Defendants possessed knowledge of "inside information" which showed that the market was overvaluing BP stock and (2) Plaintiffs had not adequately alleged that BP was in such dire straits as to call into question its continued viability. (*Id*. at 28-36.) The Court also dismissed Plaintiffs' disclosure claims because SEC filings containing alleged misrepresentations and omissions were too many steps removed from the plan documents to be considered fiduciary communications. (*Id*. at 36-42.) Finally, the Court held that Plaintiffs' monitoring claims necessarily failed because they are a form of secondary liability only, requiring a primary violation to be viable. (*Id*. at 42.) Later that year, the Court denied Plaintiffs' request to amend their complaint, because the proposed amendments would have been futile. (Doc. No. 132-1 (the "2012 MLA Order"). Plaintiffs timely appealed to the Fifth Circuit.

The Supreme Court scuttled the *Moench* presumption in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), which issued June 25, 2014. The Supreme Court ruled that the presumption had no basis in ERISA's statutory language. *See id*. at 2467. Accordingly, the Fifth Circuit vacated this Court's judgment in favor of Defendants and remanded for reconsideration in light of *Dudenhoeffer*. (Doc. No. 147.)

Plaintiffs once again seek leave to amend their complaint. Although Defendants acknowledge that *Dudenhoeffer* changed the landscape for certain claims against EIAP fiduciaries, they oppose the request for leave to amend. They argue that Plaintiffs' proposed amendments are still futile, and that leave to amend should once again be denied.

---

[3] The *Moench* presumption provided that company stock was a presumptively prudent investment for employee benefit plans. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008). To overcome the presumption, a plaintiff had to allege "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id*. at 256.

## II.     LEGAL STANDARD

Plaintiffs move for leave to amend their complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Accordingly, district courts in the Fifth Circuit "must entertain a presumption in favor of granting parties leave to amend." *Mayeaux v. Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Leave to amend may be denied, however, in the case of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [or] futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir.1993).

The Court has already indicated that leave to amend will be denied in this case only if the proposed amendment is futile. Futility is shown by amendments which "advance[e] a claim or defense that is legally insufficient on its face, or . . .fail[] to include allegations to cure defects in the original pleading." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. and Proc. § 1487 (3d ed.). In other words, Plaintiffs will be denied leave to amend only if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000); *see also Landavazo v. Toro Co.*, 301 Fed. Appx. 333, 337 (5th Cir. 2008) (affirming denial of leave to amend after determining that "[a] review of the amended complaint leaves the reader speculating as to what conduct, even if taken as true, occurred that would give rise to a right to relief").

A complaint fails to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility

standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the Court must decide whether Plaintiffs' proposed amended pleading—the Consolidated Amended Complaint ("CAC")—states at least one valid claim when viewed in the light most favorable to Plaintiffs. In making this determination, the Court will accept the complaint's well-pleaded facts as true, but will not imbue legal conclusions with the same assumption of truth. *Iqbal*, 556 U.S. at 678 (citation omitted). Nor will the Court "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations [or] unwarranted deductions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). The Court will confine its analysis to the contents of the CAC; documents provided by the parties will be disregarded, unless they are referenced in the CAC and are central to Plaintiffs' claims. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Importantly, the Court is not concerned, at this juncture, with the merits of Plaintiffs' claims. It need only decide whether those claims are adequately pled and legally cognizable. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). If Plaintiffs meet this standard—if their claims are not obviously, facially futile—leave to amend will be granted.

## III.    ANALYSIS

### A.    The disclosure claims ("Count II")

Plaintiffs acknowledge that *Dudenhoeffer* did not change the pleading standards for Plaintiffs' disclosure claims, denominated "Count II" in the proposed CAC. (Doc. Nos. 152, 153

("Mot."), at 8.) As pled in the CAC, the disclosure claims can be divided into three types:

(1)    An "omission" theory: that Defendants failed to disclose specific insider information that was necessary for Plan participants to understand the true value and risks of the BP Stock Fund. (CAC ¶¶ 371-72, 374, 376; Mot. at 8-9.) The insider information alleged in the CAC includes: (1) the actual status of safety reforms within BP, including the implementation of recommendations made by the Baker Panel and BP's new Operating Management Systems ("OMS"); (2) BP's inability to respond to deepwater oil spills; and (3) the actual magnitude of the oil spill post-explosion. (CAC ¶¶ 5, 376.) The only Defendants alleged in the CAC to have insider information are BP North America, Anthony Hayward, Neil Shaw, James Dupree, and Lamar McKay. (*Id.* ¶ 22.)

(2)    A "Plan documents misrepresentation" theory: that "the Plan Administrator filed financial statements for the Plans containing values for the Stock Fund that did not reflect the impaired value of the BP ADSs resulting from the violations of the securities laws about which Defendants knew or should have known."[4] (CAC ¶ 374; Doc. Nos. 160, 161 ("Reply"), at 10-12.)

(3)    A "SEC filings misrepresentation" theory: that Plan documents incorporated by reference and encouraged participants to consult BP's SEC filings which contained affirmatively misleading statements.[5] (CAC ¶¶ 374-75.)

In their motion for leave to amend, Plaintiffs claim to have abandoned their "SEC filings misrepresentation" theory. (Mot. at 2, 8-9.) This decision is mandated by the Court's 2012 ruling that the SEC filings were not "fiduciary communications" actionable under ERISA. (2012 MTD Order at 36-42; 2012 MLA Order at 16-18.) Plaintiffs intend to pursue, however, their "omission" and "Plan documents misrepresentation" theories, which they lump together in their

---

[4] Although Plaintiffs lump this theory in with their "omission" claims, it is more accurately described as a "misrepresentation" than an omission. There is no dispute that ERISA fiduciaries, in making fiduciary communications, are forbidden from lying to Plan participants. *See Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA.") (internal quotation marks and citation omitted); *see also In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003) ("An ERISA fiduciary may not knowingly present false information regarding a plan investment option to plan participants. There is no exception to the obligation to speak truthfully when the disclosure concerns the employer's stock.").

[5] These alleged misstatements are, by and large, the same alleged misstatements at issue in the MDL 2185 securities fraud cases.

briefing to the Court. (Mot. at 8-9; Reply at 10-12.) Both are framed as violations of Defendants'

fiduciary duties of prudence and loyalty, as well as of ERISA-specific disclosure requirements

set by statute and regulation.[6] (CAC ¶ 371.)

As noted by Defendants, Plaintiffs' "omission" theory of liability is not new. The

Consolidated Complaint also alleged that Defendants failed to disclose relevant information to

Plan participants, in violation of ERISA. (*E.g.*, Doc. Nos. 57, 58, at ¶ 396.) Moreover, Plaintiffs'

legal arguments regarding the actionability of Defendants' "omissions" under ERISA—

predicated largely on Sections 101 *et seq.*, which set forth disclosure and reporting requirements

for plans covered by ERISA—were presented to the Court in 2012, both in the context of

Plaintiffs' opposition to Defendants' motion to dismiss and in the context of Plaintiffs' request

for leave to amend their complaint. (Doc. No. 138, at 50; Doc. No. 118, at 6-7.)

The Court's order dismissing the Consolidated Complaint addressed the "omission"

theory of Count II in the following footnote:

> Plaintiffs do not allege any violation of [ERISA's disclosure and reporting
> scheme.] Instead, they argue Defendants breached ERISA's general duty
> of loyalty through their failure to disclose "investment risks of employer
> stock." (Doc. No. 102, at 24.) As the Fifth Circuit has recognized, "the
> express language of ERISA 'provides little indication as to whether there
> is ever a fiduciary duty to disclose information to participants and
> beneficiaries.'" *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483, 488
> (5th Cir. 2011) (quoting *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407,
> 412 (5th Cir. 2003)). Looking to the law of trusts, the Circuit has noted
> that an ERISA fiduciary has a duty to disclose "material facts affecting the
> interest of the beneficiary which the fiduciary knows the beneficiary does
> not know but needs to know for his protection." *Id*. However, the Fifth
> Circuit has confined application of this principle to cases in which a
> fiduciary withholds material information *related to the plan. See, e.g.,
> Kujanek*, 658 F.3d at 488 (finding violation of fiduciary duty where

---

[6] As an aside, neither claim is credibly pled against Defendants not alleged to be privy to the relevant insider information. Although Plaintiffs broadly assert that the Defendants "should have known" about the insider information (*e.g.*, CAC ¶ 374), this boilerplate, conclusory allegation is not sufficiently substantiated to meet the plausibility standard of *Twombly* and *Iqbal*.

> employer withheld plan documents and rollover form); *see also Citigroup*, 662 F.3d 128, at 143 ("We decline to broaden the application . . . to create a duty to provide participants with nonpublic information pertaining to specific investment options.").

(2012 MTD Order at 37 n.17 (emphasis original).) Plaintiffs assert that the Court has never addressed the "omission" theory of liability. (Mot. at 9.) They are mistaken. For purposes of clarity, however, the Court will address at greater length why Plaintiffs' ERISA-based disclosure claims are futile in light of Fifth Circuit case law.

Section 404(a) of ERISA sets forth the fiduciary duties required of plan fiduciaries:

> (a) Prudent man standard of care
>
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> > (A)    for the exclusive purpose of:
> >
> > > (i)    providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)    defraying reasonable expenses of administering the plan;
> >
> > (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a)(1)(A)-(B).[7] Section 404(a)(1)(A) is known as the "duty of loyalty." Section

---

[7] Section 404(a)(1) contains two more provisions, not relevant here:

- Section 404(a)(1)(C) contains a duty to diversify. Pursuant to Section 404(a)(2), the duty to diversify does not apply in the case of EIAPs.

- Section 404(a)(1)(D) instructs fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter." Case law acknowledges that this requirement is subordinate to the overriding duties of loyalty and prudence. *See, e.g., Dudenhoeffer*, 134 S. Ct. at 2468.

404(a)(1)(B) is known as the "duty of prudence."

Section 404(a) contains no explicit duty of disclosure, and previous ERISA plaintiffs' efforts to imbue the statute with such a duty have generally been unsuccessful at the Fifth Circuit. For example, in *Ehlmann v. Kaiser Foundation Health Plan of Texas*, the Fifth Circuit rejected an argument that Section 404(a) encompassed a duty to disclose information not specifically included in the detailed disclosure and reporting requirements of Sections 101-111. *See* 198 F.3d 552, 554-56 (5th Cir. 2000). The Fifth Circuit relied, in part, on the "general principle of statutory construction that more specific provisions in a statute govern over those generally worded." *Id.* at 555. Similarly, in *Martinez v. Schlumberger, Ltd.*, the Fifth Circuit found that ERISA fiduciaries were under no obligation to disclose prospective plan changes because "ERISA itself, which includes broad disclosure duties on the part of an employer-administrator, omits mention of any duty on the part of an employer-administrator to disclose that it is considering amending the plan." 338 F.3d 407, 429 (5th Cir. 2003).

There appear to be exceptions to this general rule, although the exceptions are more theoretical than defined in the case law. In *Ehlmann*, for example, the Fifth Circuit suggested that a non-enumerated, Section 404-based disclosure requirement may exist if a plan participant made "specific inquiry," or if there were some other kind of "special circumstance." 198 F.3d at 556; *see also Kopp v. Klein*, 722 F.3d 327, 342 (5th Cir. 2013) ("We have explicitly refused . . . to judicially engraft onto ERISA's duty of loyalty a 'broad duty to disclose that would apply *regardless of special circumstance or specific inquiry*.'") (quoting *Ehlmann*, 198 F.3d at 556) (emphasis added). The phrase "special circumstances" is necessarily amorphous, but may be limited to circumstances that threaten an "'extreme impact' on the plan as a whole." *In re Enron Corp. Secs., Deriv., & ERISA Litig.*, 284 F. Supp. 2d 511, 559 (S.D. Tex. 2003); *see also*

*McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (recognizing a Section 404-based obligation to disclose a new rate schedule which "would have resulted in prohibitive premiums for any small employer experiencing a single catastrophic claim").

Despite this near-universal refusal to superimpose a duty of disclosure on top of the fiduciary duties established by Section 404(a), the Fifth Circuit appears to have done just that in *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483 (5th Cir. 2011). In *Kujanek*, the defendant— the plaintiff's former employer—never provided him with plan documents or the forms necessary to complete a "roll-over" distribution of his vested benefits pursuant to a profit-sharing plan, despite explicit requests for the information. *See id.* at 485. The Fifth Circuit noted that "'trust principles impose a duty of disclosure upon an ERISA fiduciary when there are material facts affecting the interest of the beneficiary which the fiduciary knows the beneficiary does not know but needs to know for his protection.'" *Id.* at 488 (quoting *Martinez*, 338 F.3d at 412). It is not clear why the Fifth Circuit relied upon undefined "trust principles" in *Kujanek* as the foundation for defendant's "duty of disclosure," as the non-disclosure in that case would appear to be covered by ERISA's disclosure and reporting scheme. *See id.* at 490 (instructing lower court to consider whether defendant's alleged failure to provide plan documents violated ERISA Section 104(b)(1)). Perhaps the court meant to signal that any violation of ERISA's disclosure and reporting scheme would also constitute a breach of fiduciary duty under Section 404(a). This would be supported by language in *Ehlmann*, which acknowledges that the disclosure obligations found in the common law of trusts—the baseline law onto which ERISA was grafted—were deliberately altered by Congress when it created the detailed disclosure and reporting scheme in Sections 101-111. *See* 198 F.3d at 556 ("In enacting the specific disclosure provisions of ERISA, Congress has made the modifications it deems appropriate. Thus, this court will not add a

specific disclosure requirement to those already enumerated.").

In any event, although *Ehlmann* and *Kopp* contemplate that there could be a fiduciary duty of disclosure in the presence of "specific inquiry" or "special circumstance," and although "trust principles" formed the basis of a fiduciary duty of disclosure in *Kujanek*, it appears that the opening for Section 404-based disclosure claims in the Fifth Circuit is narrow indeed. Specifically, it would seem that the duty of disclosure is confined to disclosure of *Plan-related* information—that is, information outlined in ERISA's detailed disclosure and reporting scheme—as opposed to information specific to a particular investment option. The Second Circuit has expressly drawn this line:

> Plaintiffs . . . argue that defendants violated ERISA's more general duty of loyalty, 29 U.S.C. § 1104(a)(1), by failing to provide participants with information regarding the expected future performance of Citigroup stock. They rely on cases stating, in broad terms, that fiduciaries must disclose to participants information related to the participants' benefits. *See, e.g., Dobson v. Hartford Fin. Servs. Grp., Inc.*, 389 F.3d 386, 401 (2d Cir. 2004) ( "A number of authorities assert a plan fiduciary's obligation to disclose information that is material to beneficiaries' rights under a plan . . .").

> The cases cited by plaintiffs are inapposite for two reasons. First, in many of them, the court imposed a duty to inform at least in part because further information was necessary to correct a previous misstatement or to avoid misleading participants. *See, e.g., Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir. 1997) (relying in part on the "materially misleading information" provided by a "benefits counselor" to conclude "that Kodak breached its fiduciary duty to provide Becker with complete and accurate information about her retirement options"). Second, all of the cases cited by plaintiffs relate to administrative, not investment, matters such as participants' eligibility for defined benefits or the calculation of such benefits; none require plan fiduciaries to disclose nonpublic information regarding the expected performance of a plan investment option. *See, e.g., Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 88-89 (2d Cir. 2001) (holding that an employer may be liable for misstatements or omissions about the availability of lifetime life insurance benefits); *Estate of Becker*, 120 F.3d at 9-10 (imposing liability based on an employer's providing misleading information about participants' eligibility for lump-sum retirement benefits).

> *We decline to broaden the application of these cases to create a duty to provide participants with nonpublic information pertaining to specific investment options.*

*In re Citigroup ERISA Litig.*, 662 F.3d 128, 142-43 (2d Cir. 2011) (emphasis added); *see also Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1284-86 (11th Cir. 2012) (agreeing with Second Circuit's decision in *In re Citigroup* because alternative rule would "convert[] fiduciaries into investment advisors"). While the Fifth Circuit has not been so direct as the Second and Eleventh Circuits, it recently declared, in an ERISA case involving employer stock, that "[n]o general duty to disclose non-public information exists under ERISA or under our precedents." *See Kopp*, 722 F.3d at 343.[8] And *Kujanek*, which recognized a Section 404(a)-based duty of disclosure, involved the withholding of *Plan-related* documents likely covered by ERISA's detailed disclosure and reporting scheme. Thus, in the absence of a specific violation of Sections 101-111, Plaintiffs cannot allege a valid disclosure claim, and amendment would be futile.

Plaintiffs have identified only one alleged violation of ERISA's disclosure requirements—that Defendants did not provide Plan participants with an accurate assessment of the value of the BP Stock Fund, because they relied upon the market's erroneous, misinformed valuation. Plaintiffs argue that this reliance—at a time when Defendants "knew or should have known" that violations of the securities laws had "impaired" the market price of BP ADSs—is actionable as a violation of ERISA's fiduciary duties and its disclosure scheme. (CAC ¶ 374; Reply at 10-12.) This theory is described above as the "Plan documents misrepresentation"

---

[8] Plaintiffs have provided one district court case outside the Fifth Circuit which suggests a different conclusion. *See In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1343 (N.D. Okla. 2003) (denying motion to dismiss plaintiffs' disclosure claims because "the duty to disclose, duty to eliminate inappropriate investment options, and duty to avoid a conflict of interest are in effect different aspects of a single fiduciary duty" and "parsing of the alleged actions by the Committee Defendants [i.e., into breaches of the three alleged duties] is not useful at this stage of the litigation"). In light of *Ehlmann*, *Kujanek*, and *Kopp*, the Court does not find *In re Williams* persuasive.

theory. It was not included in the Consolidated Complaint, and was not addressed in the Court's 2012 orders. Leave to amend to add the theory should be denied, however, because it does not plausibly state a claim against any Defendant.

The disclosure obligation at issue is found in Section 103, which mandates the components of a plan's annual report. Section 103(b)(3)(A) provides that a "statement of the assets and liabilities of the plan aggregated by categories *and valued at their current value*" must be attached to the annual report. 29 U.S.C. § 1023(b)(3)(A) (emphasis added). Defendants note, correctly, that this disclosure obligation inures to the Plan Administrator only. *See* 29 U.S.C. § 1024(b) (requiring the Plan Administrator to provide summary plan descriptions and annual reports to Plan participants according to a specific schedule); *see also generally id.* § 1023(a)(2) (requiring third parties to timely transmit to the administrator "information necessary *to enable the administrator to comply with the requirements of this subchapter*") (emphasis added). Plaintiffs have not alleged that any other Defendant participated in the preparation, publication, or distribution of the allegedly misleading financial statements. And the only Plan Administrators named as Defendants—Richard Dorazil and Patricia Miller—are not alleged to have been privy to the insider information which purportedly cast doubt on the accuracy of the market price of BP ADSs. (CAC ¶¶ 22, 90.) Therefore, even assuming that it would be plausible to state a claim against a fiduciary with insider knowledge because he or she directed, caused, or permitted Plan communications to cite a market value known to be inaccurate because of that insider knowledge, Plaintiffs have not adequately alleged such circumstances here.[9]

---

[9] Defendants dispute that even this set of allegations could be the basis of liability under ERISA. They argue that ERISA required the statement of Plan assets to be valued at "current value"—a term explicitly defined elsewhere in ERISA to mean "fair market value where available." 29 U.S.C. § 1002(26). (Doc. Nos. 154, 155 ("Opp."), at 22-23.)

### B.    The prudence claims ("Count I")

Plaintiffs allege that Defendants breached their fiduciary duties of prudence and loyalty by "offer[ing], hold[ing], and acquir[ing]" BP stock at a time when BP ADSs were an "imprudent" investment for Plan participants. (CAC ¶ 4.) They claim the Defendants knew or should have known of the imprudence of the investment because of "publicly available information" as to the riskiness of the ADSs and because of "material non-disclosed information relating to BP's serious mismanagement, securities and environmental violations, and criminal misconduct that caused the BP ADSs to be artificially inflated in price." (*Id.*) The "material non-disclosed information" at issue will be referred to as insider information, and includes: (1) the actual status of safety reforms within BP, including the implementation of recommendations made by the Baker Panel and BP's new Operating Management Systems ("OMS"); (2) BP's inability to respond to deepwater oil spills; and (3) the actual magnitude of the oil spill post-explosion. (CAC ¶¶ 5, 376.) To the extent that Defendants were unaware of the imprudence of the BP Stock Fund option, Plaintiffs fault them for failing to exercise "procedural prudence"— i.e., for failing to adequately scrutinize the Fund in order to determine if it was prudent to offer it as an investment option. (*Id*. ¶¶ 4, 21.)

Before addressing the plausibility or, conversely, the futility of these articulated theories of liability, it is helpful to view the allegations in factual context. As with the securities fraud cases, the relevant time period here is long: from January 2007 until June 2010. Additionally, as in the securities fraud cases, the April 20, 2010 explosion can be viewed as an inflection point in the timeline. Specifically, Plaintiffs' motion papers hint at how their pre-explosion and post-explosion theories and arguments differ. The graph below depicts the three types of claims across the relevant time period, with citations to Plaintiffs' motion papers.

**1.     "Public information" prudence claims**

To the extent that Plaintiffs allege that Defendants knew or should have known BP ADSs were overvalued based on public information, their claims are not plausible. As explained by the Supreme Court in *Dudenhoeffer*:

> In our view, where a stock is publicly traded, allegations that a fiduciary should have recognized from publicly available information alone that the market was over- or undervaluing the stock are implausible as a general rule . . . ERISA fiduciaries, who . . . could reasonably see 'little hope of outperforming the market . . . based solely on their analysis of publicly available information," may, as a general matter, . . . prudently rely on the market price.

134 S. Ct. at 2471 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, ---- U.S. ----, 134 S. Ct. 2398, 2411 (2014)) (citations omitted). The Supreme Court did not fully close the door on prudence claims based on public information; it allowed that a "special circumstance" could

"affect[] the reliability of the market price" in a way that would "make reliance on the market's valuation imprudent." *Id*. at 2472. But it gave no hint whatsoever of what such a "special circumstance" might be.

In their motion for leave to amend, Plaintiffs invoke *Dudenhoeffer*'s "special circumstance" loophole. (Mot. at 3.) But, like the Supreme Court, they have not put any content behind the talismanic phrase. In other words, they offer no coherent theory as to why the market's valuation of BP based on public information was unreliable—i.e., why the market for BP ADSs was inefficient.

Plaintiffs also urge another theory for imprudence based on public information—not that BP ADSs were incorrectly valued by the market, but that they were "excessively risky" and "inappropriate" as an investment for retirement accounts. Pre-explosion, this was due to the fact that BP was allegedly more prone to "mishaps" than its peers in the oil and gas industry—making it probable that the Plans would suffer "large losses" in the event of "yet another mishap." (Mot. at 2, 4-5.) Post-explosion, "the sheer risk of the unknown quantity of the spill, BP's inability to determine the quantity of oil being spilled, the ineffective efforts to cap the well, and the vast uncertainty of future liability" made the BP Stock Fund "an intriguing play for speculation" but an imprudent retirement investment. (*Id*. at 5; Reply at 10.)

Defendants argue that risk profile alone is not sufficient to make an investment option imprudent. (Doc. Nos. 154, 155 ("Opp."), at 10.) Although there is language to this effect promulgated by the Department of Labor and included in a Federal Register entry dated June 26, 1979,[10] such authority is hardly decisive.

---

[10] "[G]enerally, the relative riskiness of a specific investment or investment course of action does not render such investment or investment course of action either *per se* prudent or *per se* imprudent." Rules and Regulations for Fiduciary Responsibility; Investment of Plan Assets

Defendants' best authority is *Dudenhoeffer* itself. In that case, plaintiffs asserted that the company's stock was "overvalued" and "excessively risky" because "publicly available information . . . provided early warning signs that subprime lending, which formed a large part of [the company's] business, would soon leave creditors high and dry as the housing market collapsed and subprime borrowers became unable to pay off their mortgages." 134 S. Ct. at 2464. The Supreme Court indicated that these allegations were implausible because "ERISA fiduciaries . . . may, as a general matter, . . . prudently rely on the market price" as "'an unbiased assessment of the security's value in light of all public information.'" *Id.* at 2471-72 (quoting *Halliburton*, 134 S. Ct. at 2411). This passage suggests that employer stock, widely traded in a public marketplace, is an imprudent investment option only if the market is inefficient for some reason.[11] And, as stated above, Plaintiffs have no plausible allegations that the market for BP ADSs was inefficient. Consequently, amendment of Plaintiffs' "public information" prudence claims would be futile, and leave to amend such claims is denied.

### 2. "Insider information" prudence claims

Plaintiffs also posit that Defendants knew, or should have known, that the market price of BP ADSs was distorted due to non-public company information. There are two hurdles that must be cleared before such "insider information" prudence claims are plausible. First, Plaintiffs must plausibly allege that Defendants had knowledge of the relevant insider information which would

under the "Prudence" Rule, 44 Fed. Reg. 37,221, 37,222 (June 26, 1979).

[11] *But see Gedek v. Perez*, --- F. Supp. 3d ---, 2014 WL 7174249, at *9-10 (W.D.N.Y. Dec. 17, 2014) (finding that plaintiffs had stated a viable claim that ESOP fiduciaries breached the duty of prudence when they "chose to remain invested in Kodak stock" which was "on a long, steady, virtually unstoppable downhill slide [and] no prescience or inside knowledge was needed to realize that it would continue to do so"). Even if *Gedek* can be reconciled with *Dudenhoeffer*, the Court finds it to be of limited usefulness. The alleged riskiness of BP's stock simply does not conjure the inevitability of "default, bankruptcy, or worse" present in *Gedek*. *Id.* at *10.

indicate that the stock price is distorted. Second, Plaintiffs must plausibly allege that Defendants had a viable, prudent alternative course of action available to them, as outlined by the Supreme Court in *Dudenhoeffer*.

a.       **Defendants' knowledge of insider information**

In 2012, the Court dismissed Plaintiffs' original iteration of Count I due, in part, to insufficient allegations of Defendants' knowledge of the relevant insider information. (2012 MTD Order at 28-31.) Several months later, in response to Plaintiffs' motion for leave to amend, the Court acknowledged that Plaintiffs' proposed amendments include "new factual allegations suggesting that at least some Defendants were privy to non-public information regarding systemic problems with process safety, company-wide and specifically regarding operations in the Gulf of Mexico, prior to the Deepwater Horizon accident." (2012 MLA Order at 13.) The Court, however, did not address whether those amendments were sufficient to survive scrutiny under Rule 12, because another deficiency remained unaddressed: that BP was never at the brink of financial ruin, as required to overcome the *Moench* presumption. (*Id.*) *Dudenhoeffer* explicitly rejected the notion that employer stock is presumptively prudent except in cases of imminent financial disaster:

> [W]e do not believe that the [*Moench* presumption] is an appropriate way to weed out meritless lawsuits or to provide the requisite "balancing." The proposed presumption makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances. Such a rule does not readily divide the plausible sheep from the meritless goats. That important task can be better accomplished through careful, context-sensitive scrutiny of a complaint's allegations. We consequently stand by our conclusion that the law does not create a special presumption of prudence for [employee stock ownership plan] fiduciaries.

134 S. Ct. at 2470-71. *Dudenhoeffer* had no effect, however, on the common sense requirement that ERISA fiduciaries cannot be liable for failing to prevent investment in employer securities which they did not know, and had no reason to know, were overvalued.

The Defendants alleged in the CAC to have insider information are BP North America, Mr. Hayward, Mr. Shaw, Mr. Dupree, and Mr. McKay. (CAC ¶ 22.) The allegations relevant to each are detailed below. As will become clear, with only one exception, the insider information allegations relate primarily to the theory that BP failed to fully implement the recommendations of the Baker Panel—most importantly, the new "Operating Management System," or "OMS"—despite public assurances to the contrary. Plaintiffs here, as in the securities cases, allege that these misrepresentations and omissions led the market to underestimate BP's risk profile and exposure to catastrophic risk. The other theory present in the securities cases—that BP misrepresented its internal estimates of the oil spill following the Deepwater Horizon explosion—seems not as prominent in this case, if it is present at all.

**ANTHONY HAYWARD.** The allegations against Mr. Hayward—one of the few individual defendants still implicated in the MDL 2185 securities cases—are very familiar to this Court. Beginning in May 2007, Mr. Hayward was the Group Chief Executive of BP p.l.c. (CAC ¶ 61.) He served as Chairman of the BP Group Operations Risk Committee ("GORC")—a cross-business-segment committee which held monthly meetings and was regularly briefed on accidents and safety breaches across the Group—and as executive liaison to the Safety and Ethics Environment Assurance Committee ("SEEAC")—a committee of Directors tasked with ensuring that BP's safety protocols were implemented and followed, including the Baker Panel recommendations. (*Id.* ¶ 62.) Due to his position within the Company, Mr. Hayward oversaw development and implementation of BP's new OMS. (*Id.* ¶ 63.) He was aware that OMS was not

in place on contractor-owned sites such as the Deepwater Horizon, and that implementation of OMS was not complete as of the date of the explosion. (*Id.* ¶¶ 209-10.) Based on this knowledge and/or access to information, Mr. Hayward has been accused of misleading the market in violation of the securities laws.

According to the CAC, Mr. Hayward was an "Investment Named Fiduciary" and a "Designated Officer" of the Plans.[12] (CAC ¶ 59.) Given that Mr. Hayward is simultaneously accused of violating the securities laws—which require materiality, scienter, and loss causation—he is adequately alleged to have had the type of insider information which would implicate the ERISA duty of prudence. *See Harris v. Amgen, Inc.*, 770 F.3d 865, 877 (9th Cir. 2014) ("If the alleged misrepresentations and omissions, scienter, and resulting decline in share price in *Connecticut Retirement Plans* [i.e., the securities companion case to *Harris*] were sufficient to state a claim that defendants violated their duties under Section 10(b), the alleged misrepresentations and omissions, scienter, and resulting decline in share price in this case are sufficient to state a claim that defendants violated their more stringent duty of care under ERISA.").

**LAMAR McKAY.** Mr. McKay was the Chairman and President of BP America during the relevant period, as well as President of BP North America from 2009 until the present. As BP's "lead representative in the United States," he was responsible for U.S-based operations; for implementation of the Baker Report recommendations in the U.S.; and for compliance with U.S.

---

[12] Where the Plans authorized BP North America to act, they gave BP North America's Board of Directors and each Designated Officer the authority to act on BP North America's behalf. (CAC ¶ 122.) "Designated Officer" means the President of BP North America; the Vice-President of BP North America; or any other officer to whom BP North America has granted authority to act on its behalf. (*Id.* ¶¶ 126, 131.) Designated Officers are either "Investment Named Fiduciaries" or "Administrative Named Fiduciaries." (*Id.* ¶ 128.) The CAC does not indicate any functional or practical difference between these types of fiduciaries. (*Compare id.* ¶ 129 *with id.* ¶ 130.)

safety, regulatory, and environmental laws. (CAC ¶¶ 6, 47.) Like Mr. Hayward, he has admitted that he was aware that OMS was not in place on contractor-owned sites such as the Deepwater Horizon. (*Id.* ¶ 209.)

According to the CAC, Mr. McKay acted as a fiduciary for the Plans through most of the relevant period, specifically as a result of his service on the "Savings Plan Investment Oversight Committee," or "SPIOC," and because, as President of BP North America, he was an "Appointing Officer" and "Designated Officer." (CAC ¶ 46.) Although Mr. McKay is not alleged to have himself engaged in public misstatements regarding the Baker Panel or OMS, he is adequately alleged to have knowledge that the Baker-Panel- and OMS-related public representations of others—such as Mr. Hayward—were exaggerated.

**NEIL SHAW.** Mr. Shaw was Senior Vice-President and Strategic Performance Unit ("SPU") Leader in charge of the Gulf of Mexico division from 2007-2009. Mr. Shaw was also Chief Operating Officer of Developments in the executive office of Global Exploration and Production ("E&P") Unit through the end of the relevant period. (CAC ¶ 84.) Like Mr. Hayward and Mr. McKay, he was allegedly aware that OMS was not in place on contractor-owned sites such as the Deepwater Horizon. (*Id.* ¶ 209.)

Mr. Shaw was a SPIOC member from May 15, 2008 through February 1, 2010. (CAC ¶ 83.) Although Mr. Shaw is not alleged to have himself engaged in public misstatements regarding the Baker Panel or OMS, he is adequately alleged to have knowledge that the Baker-Panel- and OMS-related public misrepresentations of others—such as Mr. Hayward—were exaggerated.

**JAMES DUPREE.** Mr. Dupree followed Mr. Shaw in November 2009 as the Senior VP and SPU Leader of the Gulf of Mexico division; he remained in that position through the

remainder of the relevant period. He was also a Board Member of BP America. (CAC ¶¶ 74-75.) Mr. Dupree was a SPIOC member from February 1, 2010 until the end of the relevant period. (CAC ¶¶ 6, 73.)

The Court cannot discern, on the face of the CAC, whether Mr. Dupree is alleged to have been privy to insider information in the pre-explosion period, the post-explosion period, or both. For instance, although Mr. Dupree is alleged to have been the highest ranking officer responsible for the implementation of OMS in the Gulf (*id*. ¶¶ 74, 211), he is not alleged to have known that OMS was not in place on contractor-owned rigs (*id*. ¶ 209). Thus, it is unclear whether Plaintiffs believe him to have had insider information relevant in the pre-explosion period. Similarly, as to the post-explosion period, Mr. Dupree is alleged to have been part of BP's post-explosion business support team and to have headed up BP's source control efforts: attempts to locate and control the source of hydrocarbons. (*Id*. ¶¶ 218-19.) But he is not specifically alleged to have had insider knowledge relevant to the purported "spill rate" fraud.

Given these ambiguities, the Court finds the "insider information" allegations against Mr. Dupree much less compelling than those against Mr. Hayward, Mr. McKay, and Mr. Shaw. In response to the Court's questioning at oral argument, Plaintiffs specified that Mr. Dupree *should have known* that OMS was not implemented, based upon his leadership position in the Gulf of Mexico. (Transcript of December 17, 2014 Hearing ("Trans.") at 25.) But this allegation is not clearly stated in the CAC. Likewise, to the extent Plaintiffs contend that Mr. Dupree knew or should have known that the public statements regarding BP's internal spill rate estimates were inaccurate, based upon his role on the post-explosion response team, they must include specific allegations to that effect in their amended pleading.

The other defendants are not alleged to have specific insider information. Nonetheless, Plaintiffs indicate they wish to pursue "insider information" prudence claims against them, based on a theory that they *would have known* about the relevant information if they had adequately investigated the prudence of the BP Stock Fund investment option. (Trans. at 29-30.) The Court will address the merits of this argument in the section devoted to Plaintiffs' "procedural prudence" claims, below.

### b.    Availability of legal, "prudent" alternatives

At the same time the Supreme Court took away the defense-friendly *Moench* presumption in *Dudenhoeffer*, it articulated a "new" defense which could, theoretically, be deployed at the pleading stage. Specifically, the Supreme Court directed lower courts to carefully screen ERISA complaints involving employer stock funds to determine whether they plausibly allege that the defendant "acted imprudently." 134 S. Ct. at 2471. The Supreme Court clarified that, in cases based on insider information, the plaintiff has not stated a claim unless he "plausibly allege[s] an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id*. at 2472. Defendants' opposition to Plaintiffs' motion for leave to amend focuses heavily on this aspect of *Dudenhoeffer*, arguing that "the fundamental deficiency of Plaintiffs' proposed amended complaint is that there are no well pleaded factual allegations that the fiduciaries here 'could not have concluded that' potential alternative actions 'would do more harm than good to the fund.'" (Doc. No. 166 ("Sur-Reply"), at 5 (quoting *Dudenhoeffer*, 134 S. Ct. at 2473).)

Plaintiffs have included a new "Causation" section in the CAC which details the alternative actions allegedly available to Defendants.[13] These include:

- **Freezing, Limiting, or Restricting Company Stock Purchases.** BP North America, acting through the Designated Officers and SPIOC, had authority to add, delete, freeze, or liquidate the BP Stock Fund if it determined that BP ADSs were no longer a prudent investment. (CAC ¶ 341.) Additionally, the BP Stock Fund was permitted under the Investment Strategy Guidelines to include cash equivalents, short term lines of credit, other public and private debt and equities securities, options, and future contracts. (*Id.* ¶ 343.) Plaintiffs contend that Defendants should have directed all contributions to the BP Stock Fund be held in cash rather than used to purchase ADSs, because such a decision would not have implicated the insider trading laws and would not have required any public disclosures that could negatively affect the stock price. (*Id.* ¶¶ 344-46.) Alternatively, Plaintiffs allege that Defendants should have closed the BP Stock Fund to further contributions and directed funds to other investment alternatives. (*Id.* ¶ 347.)

- **Disclosure.** Plaintiffs allege that Defendants should have made a complete and accurate disclosure of negative insider information, so the BP ADS market price could accurately reflect its value. Plaintiffs suggest that the stock price drop that would have accompanied the disclosure would have been less severe than what occurred during the Deepwater Horizon disaster. Plaintiffs also allege that the stock price would not have suffered from market distrust of BP, as allegedly occurred during the Deepwater Horizon disaster. (CAC ¶¶ 348-49.)

- **Hedging.** Plaintiffs allege that Defendants should have engaged in various hedging strategies to protect against the risk of holding a concentrated position in what was, based on publicly known information, a risky investment. (CAC ¶ 350.)

- **Other options.** Plaintiffs allege that Defendants could have:

  o   Sought guidance from governmental agencies (such as the Department of Labor or the Securities and Exchange Commission);

  o   Resigned as fiduciaries of the Plan;

---

[13] The CAC periodically references the possible "divestment" of the BP Stock Fund (CAC ¶¶ 157, 310, 317, 366), but does not include it as an available alternative under the "Causation" section. The omission is necessary under *Dudenhoeffer*. *See* 134 S. Ct. at 2472 ("ERISA's duty of prudence cannot require an [employee stock ownership plan] fiduciary to perform an action— such as divesting the fund's holding of the employer's stock on the basis of insider information—that would violate the securities laws.") (citations omitted).

- o Retained outside experts to serve as investment advisors or independent fiduciaries;

- o Retained outside experts in oil and gas and deepwater exploration to serve as advisors or independent fiduciaries; or

- o Limited participant accounts to a maximum percentage investment in the BP Stock Fund. (CAC ¶ 351.)

The Court will focus its attention on the first two alternatives: freezing, limiting, or restricting company stock purchases, and disclosure.[14] *Dudenhoeffer* states, first, that any alleged alternative must be consistent with the securities laws (and, ostensibly, ERISA). There is no question that it would have been consistent with the securities laws to remove the BP Stock Fund as an investment option, so long as Plan participants (and, by extension, the public) were so informed. (Opp. at 15-17.) Similarly, there is no question that it would have been consistent with

---

[14] The Court does not find plausible the other alleged alternatives. To summarize briefly:

- Defendants argue, and the Court agrees, that it would have violated the insider trading laws to have hedged against an anticipated drop in BP's stock price *based on insider information*. (Opp. at 18-19.)

- Plaintiffs' suggestion that Defendants should have retained outside investment advisors is perplexing, given that State Street Global Advisors ("SSgA") was employed in exactly that capacity throughout the relevant period. To the extent that Plaintiffs fault Defendants for not providing SSgA with insider information, they have simply shifted the question, rather than answered it. SSgA was as constrained by the securities laws as Defendants.

- The Court also agrees with Defendants that imposing a "cap" on participants' investment in the BP Stock Fund would be contrary to ERISA § 404(a)(2), which exempts EIAP fiduciaries from any duty to diversify. (Opp. at 19.) Moreover, although the alleged harm would have been *limited*, it would not have been *eliminated*. The same fundamental question would have remained: should the BP Stock Fund have been available as an investment option?

- Finally, the remaining proposed alternatives are not adequately alleged to have produced any tangible benefits to Plan participants. The Court cannot accept that the difficult question posed by *Dudenhoeffer*—i.e., what would or could a prudent fiduciary in these circumstances have done—is answerable by purely cosmetic efforts.

the securities law—if unorthodox—to disclose insider information to the market and allow it to be priced into the value of the stock. (*Id.* at 13-15.) The only dispute, then, is whether Defendants could have used the previously-disclosed liquidity buffer in the BP Stock Fund to prevent further investment in BP stock without disclosure to Plan participants (and, by extension, the public).

As described in the Investment Options Guide, the BP Stock Fund included "cash and short-term investments"—and could include "other public and private debt and equity derivatives"—in order to "provide liquidity to handle participant transactions on a daily basis." (Doc. Nos. 92-2–92-6 (the "IOG"), at 35.)[15] This liquidity buffer was disclosed as being, generally, less than 5% of the value of the Fund. (*Id.*) Plaintiffs argue that Defendants could have directed participants' contributions to the BP Stock Fund to the liquidity buffer, thereby avoiding the purchase of BP ADSs at inflated prices, without informing participants of that decision. Plaintiffs acknowledge that ERISA required Defendants to inform Plan participants of "any material modification in the terms of the [Plans]," 29 U.S.C. §§ 1022(a), 1024(b)(1), but contend that the Investment Options Guide already informed participants that an undisclosed percentage of the Fund would be invested in non-ADS assets. According to Plaintiffs, a decision to direct further contributions be held in cash would not have been a material alteration of the Plans. (Trans. at 34-35.)

The Court cannot agree. Although the Investment Options Guide disclosed that the investment manager would have discretion to "determine[] the appropriate level of liquidity," it also noted that the discretion would be exercised "while attempting to meet the Fund's investment objective"—to "match the investment return of BP American Depository Shares

---

[15] The Court relies upon the contents of the Investment Options Guide because it is central to Plaintiffs' claim that Defendants could have kept Participants' contributions to the BP Stock Fund in cash without necessitating public disclosure. *See Collins*, 224 F.3d at 498-99.

(ADSs)." (IOG at 35.) Funneling participants' contributions to the liquidity buffer would have fundamentally changed the nature of the investment, and systematically following this course of action—particularly over the roughly three-and-a-half-year period that Plaintiffs contend the price of BP ADSs was inflated—without informing the Plan participants would have been inconsistent with Defendants' disclosure obligations under ERISA. Thus, while Defendants could have directed further contributions to the BP Stock Fund be held in cash or other assets, they would have had to disclose the decision to Plan participants and, by extension, the public marketplace. In effect, this option would have been no different than removing the BP Stock Fund as an investment option.

The Court concludes that Plaintiffs have identified alternatives to inaction which were consistent with the securities laws and ERISA, but that each alternative would have required public disclosure. It is undisputed that public disclosure would have led to *some* negative effect on the price of BP ADSs. (*E.g.,* CAC ¶ 348.) This brings into focus the second, more difficult *Dudenhoeffer* requirement: that any alleged alternatives must be "prudent." Defendants argue that Plaintiffs have not plausibly alleged any alternative that a prudent fiduciary "*could not have concluded* . . . would have done more harm than good to the BP Plans as a whole . . . given the undisputed adverse impact that [it] would have had on the Plans' large, pre-existing holdings of BP stock." (Opp. at 2 (emphasis original).)

Defendants' argument is based on the following excerpt from *Dudenhoeffer*:

> [L]ower courts faced with [these] claims should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position *could not* have concluded that [the alternative action] would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

134 S. Ct. at 2473 (emphasis added). Defendants believe that this wording effectively puts a thumb on the scale in EIAP fiduciaries' favor. In other words, Defendants read *Dudenhoeffer* as creating a new kind of presumption—a presumption that alternatives such as freezing the company stock fund or disclosing insider information "would cause more harm than good," which Plaintiffs must "plausibly allege otherwise to avoid dismissal." (Sur-Reply at 5.) Defendants contend that Plaintiffs' allegations are insufficient to overcome the baseline presumption of "more harm than good."

Not surprisingly, Plaintiffs offer a different interpretation of *Dudenhoeffer*. Plaintiffs suggest that they need only plausibly allege that a prudent fiduciary in the same circumstances *would have* viewed the proposed alternative as more likely to help the Fund than harm it. (Reply at 3.) They emphasize that, in the context of a Rule 12(b)(6) motion to dismiss, all reasonable inferences must be drawn in their favor. (*Id*.)

The Court has struggled with the relevant language in *Dudenhoeffer*. To the extent that the semantics of "would not have" versus "could not have" actually matter—to the extent that they even signal a different level of pleading—*Dudenhoeffer* itself is inconsistent. *Compare* 134 S. Ct. at 2472 ("[A] plaintiff must plausibly allege an alternative action . . . that a prudent fiduciary in the same circumstances *would not have* viewed as more likely to harm the fund than help it." (emphasis added)) *with id*. at 2473 ("[T]he complaint [must] plausibly allege[] that a prudent fiduciary in the defendant's position *could not have* concluded that [the alternative action] would do more harm than good to the fund." (emphasis added)). More importantly, however, the Court is not sure how to meaningfully deploy *either* construction on the face of the pleading. The Supreme Court clearly anticipated that its decision in *Dudenhoeffer* would assist lower courts as they attempt to separate the "plausible sheep from the meritless goats." *Id*. at

2470. The question of how a fiduciary would have or could have weighed relative harm to relative good, however, is difficult—if not impossible—to resolve on the pleadings. As Plaintiffs note, in the context of the proposed alternative of freezing the BP Stock Fund:

> Company stock funds may be frozen for many reasons. When a fund should be frozen and/or disclosures made, the contents of disclosures and the impact on the stock price are subject to expert proof. These matters should not be decided on a pleading motion based entirely on Defendants' speculation of whether freezing the stock fund may cause more harm than good.

(Reply at 6.)

The Court feels caught between two untenable positions. If it adopts Defendants' construction of *Dudenhoeffer*, the standard is virtually insurmountable for all future plaintiffs— "plausible sheep" included. Defendants' counsel conceded as much at oral argument, postulating that one of the only situations in which a EIAP fiduciary "could not have" concluded that public disclosure of insider information would do more harm than good is when the company is so new that the employee benefit plans have not accumulated large amounts of pre-existing stock. (Trans. at 53-55.)

Plaintiffs' position is also problematic. The alternatives they propose—freezing the company stock fund, or disclosing insider information—would be available in almost any case. And in any case, the weighing of harm versus good is inherently fact-specific and subject to expert analysis. In other words, Plaintiffs would turn the filter of *Dudenhoeffer* into a tap, forcing EIAP fiduciaries to wait until summary judgment for relief from meritless lawsuits.

With some consternation, then, the Court resorts to the general pleading guidance of *Twombly* and *Iqbal*. As noted above, the CAC plausibly alleges that—at a minimum—Mr. Hayward, Mr. McKay, and Mr. Shaw were aware that the public relations campaign surrounding the Baker Panel recommendations and OMS was overselling the safety reforms which had been

enacted. For Mr. Hayward, alleged to have had a starring role in the campaign, the proposed alternative of disclosing insider information is not an extraordinary or unorthodox measure; it is, in the words of the Ninth Circuit, a point of harmony between ERISA and the securities laws:

> If defendants had revealed material information in a timely fashion to the general public (including plan participants), thereby allowing informed plan participants to decide whether to invest in the [company stock fund], they would have simultaneously satisfied their duties under both the securities laws and ERISA.

*Harris*, 770 F.3d at 878-79.

Mr. McKay and Mr. Shaw present a more difficult case. The Court is sensitive to its responsibility not to let claims against Mr. McKay and Mr. Shaw continue on the "sheer possibility" that they violated their fiduciary obligations to the Plans. *See Iqbal*, 556 U.S. at 678. But it also cannot determine, on the basis of the pleadings alone, that *no* prudent fiduciary would have concluded that removing the BP Stock Fund as an investment option, or fully disclosing the state and scope of BP's safety reforms, would do more good than harm. Although *Twombly* and *Iqbal* require Plaintiffs to present more than "labels and conclusions" or a "formulaic recitation of the elements," dismissing an action on the basis of the pleadings alone remains a draconian measure, "'viewed with disfavor'" and "'rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The Court will allow amendment of the prudence claims against Mr. Hayward, Mr. McKay, and Mr. Shaw, as well as the corporate and organizational defendants on behalf of which they acted in their fiduciary capacity.[16]

---

[16] If Plaintiffs are able to address the deficiencies in their allegations regarding Mr. Dupree's knowledge of insider information, *see* Section III(B)(2)(a) above, the insider information prudence claims against him may also be amended.

### 3.    Procedural prudence claims

Finally, the CAC alleges that Defendants failed to exercise "procedural prudence"—specifically, Defendants never engaged in a good faith review of the prudence of the BP Stock Fund, which was a violation of their fiduciary duties. (*E.g.*, CAC ¶¶ 4, 21.) Defendants have vigorously attacked the accuracy of this allegation.[17] They note that BP employed an independent investment advisor—State Street Global Advisors ("SSgA")—throughout the relevant time period. (Opp. at 5.) Additionally, Defendants have filed SPIOC meeting minutes; reports from SSgA; and other documents from before and after the explosion which suggest that the prudence of the BP Stock Fund was a regular topic of discussion at the SPIOC and between the SPIOC and SSgA. (*Id*.; Doc. Nos. 154-2, 154-3 ("Opp. Ex. A").)

Oddly, this theory is not directly addressed in Plaintiffs' reply. But case law is clear that the Court must confine its analysis to the CAC and limited outside documents. *See Collins*, 224 F.3d at 498-99 (indicating that a district court, resolving a Rule 12(b)(6) motion to dismiss, may consider documents "referred to in the plaintiff's complaint and . . . central to her claim") (internal quotation marks and citation omitted).

Although there are periodic references to "the minutes of the SPIOC" throughout the CAC, such minutes are never directly cited as the foundation of Plaintiffs' allegations of procedural imprudence. At a minimum, those allegations are found in the following two paragraphs of the CAC:

---

[17] They also dispute its premise—that Defendants bore "'responsibility for managing' the BP Stock Fund"—because "complete" investment authority had been delegated to State Street Global Advisors. (Opp. at 5.) Plaintiffs counter that "[u]nder the Plans' terms, Defendants unequivocally retained the ultimate responsibility for the Fund and the discretion to freeze, restrict, or eliminate the Fund." (Doc. Nos. 160, 161 ("Reply"), at 3.) This is a factual dispute; either Defendants had concurrent discretionary authority with SSgA, or they fully delegated that authority to SSgA. Plaintiffs allege the former. (*E.g.,* CAC ¶¶ 109, 112-21.) Because Defendants have given no credible reason to disregard this factual allegation, it must be accepted as true.

- "[T]he Plan Administrator and the SPIOC knew they should periodically evaluate investment options, they knew they had authority to change investment options, and they exercised that authority. They did not, however, subject the BP Stock Fund to the scrutiny given to other investment options." (CAC ¶ 139.)

- "To the Plaintiffs' detriment, the SPIOC did not monitor or evaluate the BP Stock Fund as an investment option." (*Id*. ¶ 140.)

Because the SPIOC minutes are not "central" to Plaintiffs' allegations that Defendants failed to exercise procedural prudence, the Court will not consider the documents filed as "Exhibit A" to Defendants' opposition brief.

Defendants' only other argument is that Plaintiffs have not met the pleading standards established in *Dudenhoeffer*. (Trans. at 5-6.) *Dudenhoeffer*, however, did not address procedural prudence claims, to the extent such claims were present in the case. Defendants' point may be that Plaintiffs cannot proceed on their procedural theory without first identifying a prudent alternative, consistent with the securities laws, which would have been available to Defendants, had they subjected the BP Stock Fund to scrutiny and realized that it was an improvident investment. Defendants may well be correct. But, as noted above, the Court finds that Plaintiffs have met this requirement of *Dudenhoeffer*. Having been given no other authority for the futility of Plaintiffs' procedural prudence claims, the Court will allow the amendment.

### C.     The monitoring claims ("Count III")

Finally, the CAC alleges that certain Defendants failed to adequately "monitor other persons to whom responsibility for management and administration of Plans' assets was delegated, including [SSgA.]" (CAC ¶¶ 25, 383-93.) Defendants argue that amendment of the monitoring claims is futile because the law regarding these claims has not changed, and because the allegations specific to the monitoring claims are identical to those found deficient by the Court in 2012. (Opp. at 24.) But the Court's prior dismissal of the monitoring claims was based

upon the lack of a "primary" violator who had not been properly monitored. (2012 MTD Order at 42.) This deficiency has been rectified, at least on the face of the amended pleading. Because the Court has allowed Plaintiffs to amend their prudence claims, it cannot accept Defendants' argument for the futility of their monitoring claims. Leave to amend Count III will be granted, and Defendants may challenge the viability of Plaintiffs' monitoring allegations through a successive Rule 12 motion, if they so desire.

## IV.   SECTION 1292(b) CERTIFICATION

For the reasons stated in the Court's order granting Defendants' Motion to Certify Interlocutory Appeal (Doc. No. 171), also issued this day, the Court certifies this amended memorandum and order for immediate appeal under 28 U.S.C. § 1292(b). The Court respectfully identifies the following question as appropriate for interlocutory appellate review pursuant to Section 1292(b):

> What plausible factual allegations are required to meet the "more harm than good to the fund" pleading standard articulated by the Supreme Court in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2472-73 (2014).

## V.   CONCLUSION

For the reasons stated above, the Court **DENIES** Plaintiffs' Motion for Leave to File Amended Complaint (Doc. Nos. 152, 153) insofar as it requests leave to amend Count II, denominated as the "disclosure claims" against all Defendants. In light of Fifth Circuit case law, amendment of Count II would be futile. As to Counts I and III—denominated as the "prudence claims" and "monitoring claims," respectively—Plaintiffs' Motion (Doc. Nos. 152, 153) is **GRANTED IN PART**. Plaintiffs have twenty-eight days to file an amended complaint in accordance with this memorandum and order. Defendants may then move to dismiss the

amended complaint within the time allotted by Federal Rule of Civil Procedure 12, but may not raise any arguments addressed and resolved in the course of this order.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the fourth day of March, 2015.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE